# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| LINDT & SPRÜNGLI (NORTH AMERICA) INC., LINDT & SPRÜNGLI (USA), INC., GHIRARDELLI CHOCOLATE COMPANY, AND RUSSELL STOVER CHOCOLATES, LLC, | ) ) ) ) ) | |
| | ) | Case No. 4:22-cv-384 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| GXO WAREHOUSE COMPANY, INC., F/K/A XPO LOGISTICS SUPPLY CHAIN, | ) ) ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs Lindt & Sprüngli (North America) Inc. ("Lindt NA"), Lindt & Sprüngli (USA), Inc. ("Lindt USA"), Ghirardelli Chocolate Company, and Russell Stover Chocolates, LLC (collectively, "Lindt"), by and through their undersigned counsel, file this Complaint against Defendant GXO Warehouse Company, Inc., formerly known as Jacobson Warehouse Company, Inc. d/b/a XPO Logistics Supply Chain ("GXO" or "XPO"), and allege as follows:

## NATURE OF THE ACTION

1. Plaintiff Lindt, the world's premier purveyor of fine chocolates, brings this action to recover the loss of tens of millions of dollars caused by Defendant GXO's failure to properly operate Lindt's highest-volume U.S. distribution center during late 2018 and early 2019 including, crucially, during Lindt's peak holiday selling season.

2. Lindt USA, Ghirardelli, and Russell Stover are well-known, longtime manufacturers of chocolate and other confectionary products recognized in the U.S. and around the world for providing premium chocolate products to hundreds of millions of devoted fans. In

particular, Ghirardelli's Chocolate Squares, Lindt's LINDOR truffles, and Russell Stover's Chocolate Boxes are widely successful products with almost universal brand recognition, especially around the holidays. With its three prominent brands, Lindt NA is the top selling premium chocolate company and among the top three sellers in the U.S. chocolate market overall.

3.      Lindt NA is the corporate parent of each of the three subsidiary manufacturers. As the corporate parent, it provides, among other things, warehousing, distribution, and management services to its subsidiaries.

4.      GXO is a national logistics company that is, upon information and belief, a subsidiary of an NYSE-traded company that is one of the world's largest third-party logistics companies.

5.      For almost twelve years, between November 2007 and May 2019, XPO and its predecessors provided third-party logistics services for Lindt pursuant to the terms of a Services Agreement. Prior to mid-2018, XPO's primary responsibility under the Services Agreement was operating a distribution center for Ghirardelli in Lathrop, California. Although the parties agreed to amendments to the Services Agreement over the years (such as to substitute the original parties for their successors), most of the terms of the Services Agreement remained materially the same and the parties acted in accordance with those terms throughout the relationship. The Services Agreement thus governed the parties' relationship from 2007 until the parties terminated their relationship in 2019. Some of the most important terms of the Services Agreement XPO contractually promised to provide to Lindt include the Key Performance Indicators ("KPIs") that XPO agreed to achieve, including a 98%+ on-time rate and a 99%+ accuracy rate. These KPIs are consistent with industry standards, such as those measured by the Warehousing Education and Research Council, a prominent trade publication.

6.     In 2017, a few years after Lindt NA completed its acquisition of Russell Stover (having acquired Ghirardelli years earlier), and recognizing the efficiencies that could be achieved by streamlining its U.S. operations, Lindt NA decided to consolidate the major national warehouses for its three subsidiaries in order to, among other things, share costs and generate other benefits related to consolidated delivery and production.  To do so, Lindt put out a request for proposal ("RFP") for a company to operate a new, combined warehouse near its current site in Lathrop, California, to serve the entire West Coast market.  As a result of that process, Lindt selected XPO to run a new warehouse for the Lindt companies in nearby Tracy, California.

7.     Through a Letter of Intent, an amendment thereto, and subsequent course of conduct, all parties agreed and confirmed that the terms of the Services Agreement would continue to govern the parties' arrangement in the new Tracy location.  That is, XPO and Lindt operated at the Tracy warehouse exactly how XPO and Ghirardelli operated at the Lathrop warehouse, despite the Services Agreement technically expiring prior to the launch of the Tracy operation and the addition of the other brands.  Thus, XPO's task would be to package, store, and ship hundreds of truckloads of chocolate and other items daily in accordance with the required KPIs.

8.     Due to self-inflicted errors, however, XPO fell far short of its obligations—immediately before and during the most important time of year for Lindt.  One of XPO's most critical errors was attempting to employ a new Warehouse Management System ("WMS") in Tracy.  The WMS was a key part of XPO's RFP response but when XPO deployed the new system it was readily apparent that the system was improperly designed, poorly executed, and XPO did not adequately train its employees to use it.  As a result, for several months, XPO's performance, including its actual rate of on-time and accurate orders, fell far below its requirements, as well as industry standards.  For example, despite its obligation to send out 98%+ of orders on time, a

3

widely-accepted metric, XPO's on-time performance in the first five months ranged from 66% in one month down to merely 32% and 33% in others. And despite its obligation to ensure 99%+ order accuracy—again, a widely-accepted metric—XPO was still finding 11.9% errors in December 2018, over four months after beginning operations in Tracy. XPO's new computer system for tracking inventory was so inaccurate that, even after multiple physical re-counts, a June 2019 reconciliation showed $5+ million in unaccounted-for inventory discrepancies. XPO's performance was so poor and so below industry standards that Russell Stover and Lindt USA had to resume using their previous distribution centers to work to meet holiday demand. XPO's performance fell not only below the level of service that Lindt expected and contracted for, but also below the standards that any industry participant would expect, and surely its own standards as a purportedly premier logistics company.

9.     What is worse, XPO also misrepresented and hid certain key facts throughout this debacle, further injuring Lindt. This string of incorrect information began during the RFP process, when XPO promised to provide a new WMS that improved upon its system in Lathrop, where XPO regularly met and exceeded its KPIs. The new WMS was instead a significant downgrade. The incorrect representations continued early in the transition to the Tracy warehouse. Leading up to the launch, Lindt expressed concern over XPO's readiness to operate the warehouse—specifically questioning potential issues with the new WMS promised in XPO's RFP response and the fact that Lindt's key holiday season was on the horizon. XPO assured Lindt that it was confident in its ability to perform, even though, upon information and belief, XPO had significant internal doubts. Even after XPO began falling behind its contractually promised performance metrics in August 2018, it reiterated that it would "soon" be back on track. It never got there.

10.     Further, upon information and belief, XPO later told employees to "shut up" about problems with the WMS and conceal them from Lindt.  Upon information and belief, XPO went as far as to falsify inventory records to give the appearance that shipments were complete and accurate, leading to false bills of lading that produced significant customer fines for delivery of incomplete orders.

11.     XPO's failure to competently operate the busiest of Lindt's three national distribution centers caused massive harm to Lindt.  The worst of XPO's poor performance took place just before and during the end-of-year holiday season, which, as XPO knew from its long history of working with Ghirardelli in the former warehouse, is the peak season for chocolate and confectionary sales.  Because the Lindt companies (and Ghirardelli in particular) were unable to get their products on retail shelves and keep them stocked as necessary during this crucial time, Lindt lost millions of dollars in sales that it would have and should have ordinarily made.  Lindt also incurred many millions of dollars in other expenses resulting from XPO's failings; for example, costs of deeply discounting holiday motif products that were delivered after the holidays; destroying or donating expired products; and paying customer fines for late deliveries.

12.     Lindt terminated XPO in 2019 when it was able to bring in a new logistics company to run the Tracy warehouse.  Upon information and belief, on XPO's final day at Tracy, some XPO employees were so ashamed of the woeful performance by XPO that they created satirical company t-shirts with the logos "#we survived XPO" and "#not always like this":



13.     At least two former XPO employees have already provided sworn testimony in an unrelated matter that XPO performed below expectations and caused the harm to Lindt based upon the failures at the Tracy warehouse.

14.     Incredibly, after falling short of its obligations and costing Lindt millions of dollars, XPO attempted to claim that Lindt owed *XPO* money.  Not only did XPO fail to earn that money, but any amount it claims to be owed is dwarfed by the harm to Lindt.  Lindt thus brings this suit to obtain compensation for the many millions of dollars of damage caused by XPO.

## PARTIES

15.     Lindt & Sprüngli (North America) Inc. ("Lindt NA") is a Delaware corporation with its principal place of business at 4717 Grand Avenue, Suite 700, Kansas City, Missouri 64112. Lindt NA is owned by the Swiss company Chocoladefabriken Lindt & Sprungli AG.  Lindt NA is the direct parent company of Lindt USA and indirect parent company of Ghirardelli and Russell Stover, and was during the events at issue in this Complaint.  In addition to owning the three manufacturers, it also provides warehousing, distribution, and management services to these subsidiaries.

16. Lindt & Sprüngli (USA), Inc. ("Lindt USA") is a New York corporation with its principal place of business at One Fine Chocolate Place, Stratham, New Hampshire 03885-2592. Lindt USA is a famous Swiss-originated manufacturer of chocolate that was founded in New York in 1925 and has manufactured chocolate products out of New Hampshire since 1986. Lindt USA is wholly owned by Lindt NA, and was during the events at issue in this Complaint.

17. Ghirardelli Chocolate Company is a California corporation with its principal place of business at 1111 139th Avenue, San Leandro, California 94578-2631. Ghirardelli is one of the oldest and most famous chocolate companies in the United States, founded 170 years ago in San Francisco. Ghirardelli became part of the Lindt family of companies in 1998. Ghirardelli, through Lindt USA, is wholly owned by Lindt NA, and was during the events at issue in this Complaint.

18. Russell Stover Chocolates, LLC is a Missouri limited liability company with its principal place of business at 4900 Oak Street, Kansas City, Missouri 64112. Like Ghirardelli, Russell Stover is one of the United States' most longstanding and well-known chocolate companies, founded nearly a century ago. Russell Stover became part of the Lindt family of companies in 2014. Russell Stover, through Lindt USA, is wholly owned by Lindt NA, and was during the events at issue in this Complaint.

19. GXO Warehouse Company, Inc., formerly known as Jacobson Warehouse Company, Inc. d/b/a XPO Logistics Supply Chain ("GXO" or "XPO"), is an Iowa corporation with its principal place of business, upon information and belief, at 4035 Piedmont Parkway, High Point, North Carolina 27265. Upon information and belief, GXO is a subsidiary of GXO Logistics, Inc., a public company whose stock trades on the New York Stock Exchange. Upon information and belief, GXO Logistics, Inc. reported revenues of $7.9 billion and net income of $161 million in 2021. XPO (which was GXO's trade name during the time period at issue) managed logistics

for Lindt NA, Lindt USA, Ghirardelli, and Russell Stover at two warehouses in Lathrop and Tracy, California, from 2007 to mid-2019.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the two sides and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

21.     This Court may exercise personal jurisdiction over GXO because, upon information and belief, GXO consented to personal jurisdiction by registering to do business in the state of Missouri and appointing an agent for service of process here.  Upon information and belief, GXO does business in the state of Missouri, including in Kansas City and Palmyra.  Additionally, this Court may exercise personal jurisdiction over GXO because GXO's acts and omissions, including its intentional misrepresentations and concealments, were directed at Lindt NA and Russell Stover in this state, knowing that both are headquartered in this state and that they would be damaged in this state, thus producing actionable consequences in the state of Missouri.

22.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because GXO resides in this District.  GXO resides in this District pursuant to 28 U.S.C. § 1391(c) because GXO consented to personal jurisdiction by registering to do business in the state of Missouri and appointing an agent for service of process here.  Additionally, venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the actionable consequences that occurred in the state of Missouri give rise to the claims herein.

## FACTUAL BACKGROUND

A.     **The Parties Enter into and Operate Under the Services Agreement**

23.     In 2007, Ghirardelli and Arnold Logistics LLC, XPO's predecessor, entered into a Services Agreement dated November 1, 2007. A true and correct copy of the Services Agreement is attached as **Exhibit 1.**

24.     The parties amended and reaffirmed the Services Agreement multiple times over their twelve-year business relationship. In the First Amendment to Services Agreement, effective January 1, 2013, the parties (among other things) extended the term of the Agreement until April 30, 2018. In the Second Amendment to Services Agreement, effective March 15, 2015, the parties amended the Agreement to (among other things) substitute Arnold Logistics for its successor, Jacobson Warehouse Company, Inc. (later doing business as XPO). In the Third Amendment to Services Agreement, effective May 11, 2015, the parties amended the Agreement to (among other things) extend the terms of the Services Agreement to another distribution center in Lathrop. True and correct copies of these amendments are attached as **Exhibits 2, 3, and 4**, respectively.

25.     One of the core provisions of the Services Agreement was that XPO was required to attain certain "Key Performance Indicators," or KPIs, which set metrics for loading trucks on time and filling orders accurately, among other things. XPO "represent[ed] and warrant[ed] that the Services will comply with the Key Performance Indicators ('KPIs') set forth in Attachment 'D,' which will be measured monthly." Services Agreement at § 7; *see also id.* § 11(b) ("strictly adhere to the Service Standards"); § 1(r) (defining Service Standards to include "the Key Performance Indicators"). Attachment D to the Services Agreement reiterated that XPO "represents and warrants that the Services will comply with the following Key Performance Indicators ('KPI's'), which shall be measured monthly," then listed them, including:

"(a) On time presentation of freight to Ghirardelli authorized carriers for delivery against Ghirardelli customer's requested or amended delivery date, within the carriers' posted

9

service schedule, at the rate **of ninety-eight per cent or greater (98%+)**; *provided*, [XPO] is given at least 24 hours' notice of the details of the delivery, carrier is on-time for pick-up appointment, and pick-up appointment is scheduled for regular or agreed to business hours or days."

and

"(b) Order accuracy at the **rate of ninety-nine per cent or greater (99%+)**, as measured in cases of Products, which shall include tracking and challenges (via cycle counts and audit data) of Ghirardelli customer claims of over, shorts and damage from the original shipments. . . ."

26.     These KPIs were attainable and XPO regularly met them at the Lathrop facilities. For instance, in 2017, XPO's on-time rate exceeded 99% in most months, even hitting 100% in two months.  XPO exceeded the service standard even during the busy holiday months of August through December 2017.  While competent, this was not extraordinary, as industry standards such as those published by the Warehousing and Education Research Council, a prominent trade group, are at least as demanding.

**B.     The Parties Continue Their Relationship at the Tracy Warehouse**

27.     In 2017, Lindt NA decided to consolidate the logistics operations for the Lindt brands and, as part of the consolidation, move into a new, combined facility in Tracy, California. One goal was to streamline Lindt's operations and achieve efficiencies and cost-savings through cost-sharing.

28.     Lindt NA issued a request for proposal in 2017, asking for leading logistics providers around the country to bid on work for three new, consolidated facilities, including a West Coast hub near Lathrop, California, for a five-year term.  The requirements in Lindt's RFP showed the massive scale of the facility, which it estimated would process over 9 million cases of Lindt

10

products per year, equating to over 5,000 truckloads.  The new warehouse operations would be significantly more extensive than at Lathrop.  The RFP was issued on behalf of Lindt NA as well as its three subsidiaries, stating, "Lindt & Sprungli North America together with Ghirardelli Chocolate, Lindt & Sprungli USA and Russell Stover Candies are soliciting proposals to select Logistics Providers for multiple sites in our North American distribution network."  The new consolidated facility at Tracy was a vital part of Lindt NA's U.S. business and the partner chosen to operate it was critical to its success.

29.    In its RFP response, XPO asserted that it should be selected in part because it knew Ghirardelli's business well after ten years of service at Lathrop.  XPO also touted its advantages as one of the dominant companies in U.S. logistics with superior technology.  Additionally, XPO explained that it would design and implement a new inventory system (WMS) to enable better tracking of website orders.

30.    XPO's response to the RFP made clear that XPO would be doing business with Lindt under the same terms for the new, combined facility as had applied to the parties' current relationship, stating, "Except for items mentioned in the above pricing section *all other terms and conditions in the current contract* [the existing Services Agreement] *will apply*."

31.    Based on these representations, including the representations about XPO's new WMS, XPO's ability to handle the significant amount of volume that would flow through Tracy, and the commitment to extend the terms of the Services Agreement with Ghirardelli to the broader Lindt family of companies, Lindt entrusted XPO to manage Lindt's West Coast operations at Tracy.

32.     On or about June 2, 2017, Lindt and XPO entered into a Letter of Intent documenting the parties' intent to enter into a "Definitive Agreement" concerning the Tracy warehouse.  A true and correct copy of the Letter of Intent is attached as **Exhibit 5**.

33.     In the Letter of Intent, the parties agreed that the Services Agreement would "form the basis for the drafting and negotiation of the Definitive Agreement."  The parties also agreed that XPO would begin providing preparatory and preliminary services prior to the parties entering into the "Definitive Agreement."  The Letter of Intent stated that it would terminate no later than September 30, 2017.

34.     Thereafter, the parties negotiated the terms of the "Definitive Agreement."  The original term of the Letter of Intent passed without the parties having signed a "Definitive Agreement."  XPO continued providing start-up services with respect to the transitioning of warehouse services from Lathrop to Tracy.

35.     On or about May 22, 2018, Lindt and XPO entered into "First Amendment to Letter of Intent Between XPO and Lindt" ("First LOI Amendment").  A true and correct copy of the First LOI Amendment is attached as **Exhibit 6**.

36.     The First LOI Amendment provided that it would "apply retroactively with effect as of October 1, 2017, as if the LOI has been continuously in force and effect without interruption, and, unless otherwise agreed in writing, shall terminate on June 30, 2018."

37.     The parties agreed in the First LOI Amendment that the Services Agreement would be deemed extended through June 30, 2018, would apply to the Tracy warehouse, and that the "Definitive Agreement" would be an amendment to the Services Agreement.

38.     Further, XPO agreed in the First LOI Amendment to continue providing start-up services necessary to bring the project to a position to begin operations, including the "[h]iring, onboarding, and training of approximately thirty (30) associates" and "[i]mplementation of the XPO WMS [Warehouse Management System]."

39.     The term of the First LOI Amendment expired on June 30, 2018, but the next day and thereafter, the parties continued operating together in the same manner at the Tracy location as they had up to that date and consistent with the terms of the Services Agreement.

40.     Operations fully commenced at the Tracy warehouse in August 2018. By this time, the Services Agreement, the Letter of Intent applying its terms to Tracy, and the First Amended Letter of Intent had all expired. Nevertheless, the parties continued to operate exactly as they had in the prior two Lathrop facilities.

41.     In particular, both before and after June 30, 2018—the expiration of the agreements—XPO performed the same services for Lindt (including Lindt USA, Ghirardelli, and Russell Stover) that it previously performed for Ghirardelli, including, among other services, receiving finished goods and storing them on warehouse shelves, and then after receiving orders, planning the truckloads, picking the cases and pallets, and loading them onto the outbound trucks.

42.     XPO also continued to bill Lindt as it had before June 30, 2018. In August or September 2017, pursuant to the Services Agreement's provision calling for an annual pricing/budget discussion, the parties agreed to a budget and pricing for 2018. This included, among other items, a fixed monthly distribution fee XPO would charge Lindt for operating the distribution center. XPO charged Lindt NA this same fixed fee both before and after June 30, 2018.

43.     At no point prior to the parties' dispute did XPO claim that the material terms of the Services Agreement did not apply between the parties at the Tracy warehouse or that XPO did not want to continue to be bound by them.

44.     Thus, rather than executing a new written contract, XPO and Lindt (including Lindt USA, Ghirardelli, and Russell Stover) expressly and impliedly extended the material terms of the Services Agreement, including XPO's KPIs, to XPO's operations at the Tracy warehouse.[1]

## C.     XPO Fails to Competently Operate the Tracy Warehouse

45.     XPO's performance at Tracy immediately fell below its previous performance at Lathrop, the KPIs in the Services Agreement, and industry standards.

46.     One main cause of XPO's unexpected failures in timeliness and accuracy was the new Warehouse Management System ("WMS") touted in its RFP response.  XPO's previous WMS (called Bluegrass) was a single, highly automated system that worked well at Lathrop.  But as part of its efforts to continue working for Lindt in Tracy, XPO had promised to create a new system that would track website orders and incorporate new inventory software, among other things.  The new WMS design proved to have many critical deficiencies.

47.     First, XPO did not allocate sufficient resources to implement the new WMS. Because of a slight delay in the opening date for the new facility, XPO chose to divert its IT team to another project in another state, without informing Lindt.  But when the warehouse opened, the team remained occupied and XPO did not timely reallocate them to Tracy.  XPO thus delayed in starting up the new WMS even knowing that Lindt's crucial holiday season was impending.

---

[1] The Services Agreement, and thus the implied agreement governing XPO's performance at the Tracy warehouse, contains an arbitration provision.  However Lindt expressly waives that provision in favor of litigating in this Court. XPO has also waived the arbitration provision through prior litigation between the parties.

48. Second, the new WMS was not integrated. This created myriad problems. The Bluegrass system had integrated all functions: receiving, inventory tracking, order picking (i.e., the warehouse worker filling an order by taking goods off the warehouse shelves and delivering them to the loading dock), truck loading (modeling how the goods will fit in the cargo space) and scheduling (how many trucks should arrive, and when), and bills of lading and other paperwork to communicate clearly to the shipping company. The new WMS, however, was actually a patchwork of four computer systems plus a Google Doc, and the data did not automatically transfer between the systems. This required lengthy cross-checking between systems to perform basic functions. Before, only five employees were needed to work in the Lathrop office coordinating the logistics of new orders and outbound traffic; after start-up with the new WMS at Tracy, even ten were not enough to adequately accomplish the same tasks, because of the high number of manual tasks, calculations, and cross-checks required by the un-integrated system.

49. Third, at start-up, the new WMS was missing important features altogether. For instance, the system did not generate labels for pallets that referenced the customer order number, so when the trucks reached their destination, carriers sometimes needed to contact XPO to ask which goods should be unloaded. Ultimately, XPO employees began manually creating placards to attach to and identify the orders. Similarly, the system did not have a truck loading and scheduling feature, so the XPO employees had to spend hours each day to try to figure out how to fit the cases into the trucks, and then create a "Google Doc" online to try to coordinate truck arrivals and departures.

50. Fourth, the new WMS also required a large number of manual calculations, creating high potential for human error. As one crucial example, the basic units of measure that are standard in warehousing operations are the pallet and the case; the number of contents inside a sealed case

are rarely relevant to workers on the warehouse floor. Thus, in the older XPO WMS system in Lathrop (Bluegrass) for instance, a worker putting away an incoming delivery would type "1" to indicate that he or she was putting away one pallet. But XPO's new WMS system would ask the worker to input the total number of *units* to put away. So if there were 230 cases on a pallet, each with 5 bags of Ghirardelli chocolate squares, the worker was supposed to indicate that he or she had put 1,150 bags on the shelf. This counterintuitive programming led to workers entering incorrect numbers when entering inventory in the system (e.g., typing "1" instead of "1,150") and required workers to do multiplication and division on their smartphone to perform the simple task of retrieving pallets and cases. With individual orders filling up to forty trucks per day, the opportunities for error created by XPO's WMS were significant.

51.     Fifth, XPO's WMS was not user-friendly and XPO failed to provide adequate training, particularly on new versions that XPO would release to try to patch the problems.

52.     Lindt recognized concerns about this new system as XPO was working on it before and shortly after XPO deployed it in Tracy prior to the actual launch and quickly expressed them to XPO. XPO had represented to Lindt that it was prepared to open (i.e., "Go Live") the Tracy facility in August 2018, but Lindt began expressing concern about the feasibility of that scenario.

53.     In late July 2018, Lindt employees expressly asked XPO whether the problems they had seen in the weeks leading up to Go Live would be resolved by the Go Live date. Lindt employees were particularly concerned about whether these issues threatened to disrupt Lindt's crucially important holiday seasonal sales and specifically expressed these concerns to XPO. XPO assured Lindt that XPO had not lost confidence in the system. But, upon information and belief, at the same time, XPO was internally discussing its own concerns about whether it would be ready

for Go Live, and by extension, whether it could meet its contractual and other obligations to Lindt, in particular whether the upcoming holiday season would be in jeopardy.

54.     As Lindt feared, XPO's disastrous new WMS and other errors it committed were not addressed or fixed and XPO's conduct led to massive failures, most notably in terms of on-time shipping and order accuracy.

### 1.     Failures to Ship Orders On Time

55.     Upon information and belief, the rate of on-time shipments is the most important metric that warehouses and distribution centers use to measure performance.  For example, as measured by a survey performed by the Warehousing Education and Research Council, the industry expects that a best-in-class operator will achieve an on-time rating of 99.875% or above; even a typical operator is expected to achieve approximately 99%.  This is consistent with the Services Agreement's KPIs, which required XPO to ensure on-time shipments at a rate of 98% or greater.

56.     In the months after the Tracy warehouse opened, XPO was unable to make shipments on time, leading to a backlog that took months to recover from.

57.     As XPO knew full well based on its decade-long relationship with Ghirardelli, August through December is a pivotal time of year for chocolate shipments, especially to Lindt, and is a time when meeting contractual and industry-standard KPIs is of utmost importance.  It was during this critical time period that XPO failed to meet these KPIs with respect to on-time departures.

58.     In fact, XPO's on-time departures plummeted to 32% in August and 33% in September.  They rose slightly over the next few months, but in December 2018 were still merely 66%, far below the KPIs XPO contractually pledged to meet and those industry wide.  Given that the on-time metric is normally evaluated in terms of fractions of a percentage point (particularly

for companies like XPO that hold themselves out as premier operators, as shown by the Warehousing Education and Research Council's survey results), XPO's shortfalls of between 30 to 60 percentage points were staggering. XPO had continued reporting KPI metrics after the opening of the Tracy warehouse (as the Services Agreement required) but its performance was so far below standard and contractual promises that it stopped regularly reporting on KPIs at times at the end of 2018 and the beginning of 2019.

59.     In February 2019, XPO resumed reporting on KPIs per the Services Agreement, but the results remained lacking. XPO reported that it shipped only 86.8% of shipments on-time during the week of January 23, 2019. While this was a slight improvement over the performance throughout Q4 2018, it still fell substantially below the level of performance required by the Services Agreement and industry standards. It also was too little, too late for the shipments for the peak holiday season, which would have shipped by late January.

## 2.     Failures to Make Accurate Shipments

60.     Upon information and belief, order picking accuracy is another key metric in the warehouse industry and one specifically recognized as important by XPO in its RFP response. Specifically, according to a survey by the Warehousing Education and Research Council, the industry expects that a best-in-class operator will achieve a "perfect" order rating of 99.13% or above; even a typical operator is expected to achieve over 95%. This is consistent with the Services Agreement's KPIs, which required XPO to ensure order accuracy at a rate of 99% or greater.

61.     XPO failed to meet the required level of order accuracy in Tracy, leading to numerous operational problems for Lindt.

62.     One problem caused by inaccurate orders is referred to as "short pay for short ship," meaning that when customers do not receive a full shipment, but are billed for a full shipment, the customers (retailers) reduce the amount of their payment. For the September-December period in

2018, Ghirardelli's "short pay for short ship" losses ballooned by 1,377% over the same period in 2017 (before the move to the Tracy warehouse) and equated to an error rate of over 2.5% of the value of goods handled by the facility. But the errors also cut both ways: a spot audit on December 6, 2018 found significant *over*-picking. An error in this direction is also costly because retailers have little incentive to pay more than they were billed when too many goods are delivered.

63.     In December 2018, concerned with order accuracy, Lindt asked for XPO to "audit" its own outgoing shipments to determine whether the shipments being picked and placed on the loading dock to be loaded onto outgoing trucks were accurate. XPO investigated and confirmed that it had a high rate of inaccuracy. These spot audits meant that, upon information and belief, shipments in August through November also likely had similar issues with accuracy, a symptom of the overall dysfunction in XPO's operations.

64.     In addition, in the early February 2019 report on KPIs pursuant to the Services Agreement, XPO reported that it had accurately shipped only 64.5% of orders in December 2018 and only 86.6% of orders in January 2019. It had "cut" other orders—i.e., sent out incomplete shipments—in the rest of the shipments, complaining that it could not find the inventory to pick, even though its own records showed that the inventory was in the building.

## D.     Lindt Terminates XPO

65.     XPO's lack of preparedness and inability to meet the KPIs of the Services Agreement or industry standards manifested immediately after Go Live. Nevertheless, XPO continued to provide false hope to Lindt that the problems would be quickly resolved. For example, soon after Go Live, an XPO Vice President informed Lindt that although he doubted whether XPO could recover to its performance targets by September 2018, he was "completely confident that we will get there soon." Upon information and belief, XPO had no basis to make this assurance, and XPO ultimately was not able to meet its obligations "soon" or in any timeframe.

66.     By September 2018, a few weeks into the burgeoning crisis in Tracy, Russell Stover and Lindt USA, left with no choice, pulled out of the facility and re-opened the warehouses that they had closed in Watsonville, California and Texas.  Ghirardelli remained in the Tracy facility because it had no back-up option:  XPO had closed the Lathrop facility and transferred the entire inventory to Tracy.  Further impacting Lindt, Ghirardelli's manufacturing operations are located in California, and thus the Tracy warehouse became the bottleneck preventing Ghirardelli from shipping product to Lindt's other regional distribution centers.

67.     As the problems caused by XPO grew, both Ghirardelli and local management asked XPO to go back to the Bluegrass system until they could recover from the backlog.  Senior XPO management insisted that the new WMS could and would work well.  It never did.  Upon information and belief, XPO told former local managers to "shut up" about the issues in order to conceal them from Lindt.

68.     XPO's rampant failures led to numerous disputes between the parties.  In response, XPO compounded its errors by pulling out staffing and abandoning its attempts to make the WMS work.  XPO then had the audacity to bill Lindt nearly $10 million for its deficient services, including millions for a mark-up not included in the Services Agreement pricing nor supported by industry standards.  Lindt meanwhile demanded recompense for its substantial extra expenses and losses.

69.     After a failed attempt to resolve the parties' differences in February 2019, XPO threatened to simply stop work until Lindt NA paid XPO for its poor performance.

70.     In March, Lindt NA was left with no choice but to look elsewhere and hire a new logistics company, Metro, to take over the facility which occurred as of June 2019.

71.     Lindt terminated XPO effective May 17, 2019.

**E.      Former XPO Workers Admit to XPO's Failings**

72.    Former XPO employees have provided sworn testimony in a different, unrelated matter vividly portraying XPO's failures and confirming that fault lies with XPO, not Lindt.

73.    According to a former XPO Customer Service Manager at Tracy, XPO introduced a dysfunctional WMS, underestimated the difficulty of the transition to Tracy, and did not adequately prepare.  She explained that XPO Customer Services Representatives were not properly trained on the new software systems, that it took XPO months to catch up on late outbound shipments, and that, as a result, XPO did not ship enough product to meet orders during the crucial holiday season.  She testified that 2018 was the worst year for execution of operations by her team, compared to all of her previous years in Lathrop.

74.    Even more troubling, a former XPO line manager reported that the XPO management team instructed XPO employees to falsify records by entering inventory movements into the system as if outbound goods had been loaded (when in fact they had not been) in order to give the appearance that shipments were complete and accurate (when they were not).  Upon information and belief, these falsified records resulted in fake bills of lading and a very high rate of customer fines for delivery of incomplete orders, millions of dollars over what was budgeted.

75.    Upon information and belief, the local XPO staff was so ashamed of XPO's performance that on the final day of the transition to Metro, a number of them wore t-shirts that they made, satirizing an earlier XPO team t-shirt, featuring the hashtags "#we survived XPO" (on the front) and "#not always like this" (on the back):



**F.     Lindt's Business Suffers Severe Harm**

76.     XPO's failures at the Tracy warehouse in late 2018 and early 2019 caused significant damages to Lindt in numerous forms.

77.     First, Lindt lost significant revenues due to XPO's inability to proficiently distribute Lindt products as required.  Ghirardelli suffered particularly significant lost profits as it, unlike Lindt USA and Russell Stover, was unable to cease using the Tracy warehouse once XPO's failings became evident, and the problems at Tracy bottlenecked its entire national operations. However, Lindt USA and Russell Stover also experienced substantial lost sales and profits.  As noted, XPO damaged Lindt's distribution operations at the worst possible time, before and during the peak holiday season, thus exacerbating the losses to Lindt.  Lindt estimates that, conservatively, it lost several million dollars in profits due to XPO.

78.     Lindt also incurred a variety of other costs and losses due to XPO.  For instance and without limitation, Lindt incurred:

a. Millions of dollars in additional costs as a result of Lindt USA and Russell Stover needing to keep open or re-open the back-up warehouses that were supposed to be consolidated into the Tracy facility;

b. Millions of dollars in additional transportation expenses for sending trucks through less-efficient, "out of network" routes in order to try to mitigate XPO's distributional delays;

c. Millions of dollars of losses from having to sell products at deep discounts because they were sold after the applicable holiday;

d. Millions of dollars in inventory that Ghirardelli had to destroy or donate due to delays and expiration dates; and

e. Millions of dollars in customer fines that Ghirardelli had to pay customers for delivery of late (or no) product.

79. Upon information and belief, Lindt also incurred reputational harm as a result of being unable to fully deliver for its business partners during a crucial time of year and as described above. Upon information and belief, Lindt may have also lost market share as a result of XPO's failures.

80. XPO damaged Lindt's business in numerous other ways to be established through discovery and proven at trial.

81. XPO's failures at the Tracy warehouse cost Lindt tens of millions of dollars.

**G.      Lindt's Filing of This Suit Is Timely**

82. Lindt's claims are timely under all applicable statutes of limitations, statutes of repose, and equitable theories such as laches.

83. Additionally, GXO has previously agreed that "all applicable statutes of limitations or repose and/or any other time requirements for the giving of any notice or the institution of legal

proceedings by any of the Lindt Companies against GXO . . . shall be tolled" from September 5, 2019 to at least June 8, 2022. As of September 5, 2019, Lindt had many months remaining under each and every potentially applicable statute of limitations or repose and any other time requirements. Thus, as of the filing of this Complaint (filed before the end of such tolling period), Lindt has many months remaining under each and every potentially applicable statute of limitations or repose and any other time requirements.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

84.     Lindt repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

85.     Between November 2007 and May 2019, XPO and its predecessors provided third-party logistics services for Lindt pursuant to the terms of a Services Agreement. Through Lindt's request for proposal relating to the Tracy warehouse; XPO's response to the RFP; a Letter of Intent dated June 2, 2017; a First Amendment to the LOI dated May 22, 2018; and the parties' conduct thereafter, XPO and Lindt (Lindt NA, Lindt USA, Ghirardelli, and Russell Stover) agreed that XPO would operate under the terms of the Services Agreement at the Tracy warehouse for all four Lindt companies.

86.     In the alternative, to the extent XPO's agreement was only with Lindt NA and not with Lindt USA, Ghirardelli, and Russell Stover, the latter are entitled to assert a breach of the agreement between Lindt NA and XPO because, among other reasons, they are third-party beneficiaries to the agreement and/or Lindt NA acted as their principal in entering to the agreement on their behalf.

87.     The Services Agreement contained terms, such as KPIs, that XPO was obligated to comply with at the Tracy warehouse, including a 98%+ on-time rate and a 99%+ accuracy rate.

88.     In the alternative, to the extent the parties' agreement did not specifically incorporate the Services Agreement's terms, including the KPIs, the parties agreed through their words and actions that XPO was obligated to perform at least in accordance with industry standards or other applicable standards of performance (including, for example, its past performance at the Lathrop warehouse), which are consistent with the contractual KPIs and with XPO's representations concerning its own standards and abilities to perform.

89.     XPO fell far short of and breached its obligations under the Services Agreement, industry standards, and any potentially applicable standard, and thereby materially breached the parties' agreement.  For example, for several months, XPO's performance, including its actual rate of on-time and accurate orders, was far below its requirements under the Services Agreement KPIs (and industry standards).  Despite its obligation to send out 98%+ of orders on time, XPO's on-time performance in the first five months ranged from 66% in one month all the way down to 32% and 33% in others.  And despite its obligation to ensure 99%+ order accuracy, XPO was still finding 11.9% errors in December 2018.  A June 2019 reconciliation showed $5+ million in unaccounted-for inventory discrepancies.  XPO's failure to meet its obligations was so extensive that Russell Stover and Lindt USA had to resume using their previous distribution centers in order to try to meet holiday demand.

90.     Lindt performed all of its duties under the parties' agreement or its performance was excused, including by XPO's aforementioned breaches.

91.     XPO's breaches of contract severely damaged Lindt in multiple regards.  For example, XPO's poor performance during peak season caused Lindt to lose millions of dollars in sales that it would have and should have ordinarily made.  Lindt also incurred many millions of dollars in other expenses resulting from XPO's failings; for example, costs of deeply discounting

holiday motif products that were delivered after the holidays; destroying or donating expired products; and paying customer fines for late deliveries.

92. Due to XPO's breaches of contract, Lindt is entitled to damages in an amount to be proven at trial, as well as pre-judgment interest, costs, and its reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**(Breach of Covenant of Good Faith and Fair Dealing)**

93. Lindt repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

94. Between November 2007 and May 2019, XPO and its predecessors provided third-party logistics services for Lindt pursuant to the terms of the Services Agreement. Through Lindt's request for proposal relating to the Tracy warehouse; XPO's response to the RFP; a Letter of Intent dated June 2, 2017; a First Amendment to the LOI dated May 22, 2018; and the parties' conduct thereafter, XPO agreed with Lindt (Lindt NA, Lindt USA, Ghirardelli, and Russell Stover) that it would operate under the terms of the Services Agreement at the Tracy warehouse for all four Lindt companies.

95. In the alternative, to the extent XPO's agreement was only with Lindt NA and not with Lindt USA, Ghirardelli, and Russell Stover, the latter are entitled to assert a breach of the agreement between Lindt NA and XPO and the covenants therein because, among other reasons, they are third-party beneficiaries to the agreement and/or Lindt NA acted as their principal in entering to the agreement on their behalf.

96. In the alternative, to the extent the parties' agreement did not specifically incorporate the Services Agreement's terms, including the KPIs, the parties agreed through their words and actions that XPO was obligated to perform at least in accordance with industry standards or other applicable standards of performance (including, for example, its past performance at the

Lathrop warehouse), which are consistent with the contractual KPIs and with its representations concerning its own standards and abilities to perform.

97. The parties' agreement vested XPO with discretion in how it would proficiently operate the Tracy warehouse in a manner that would meet the parties' performance expectations with respect to on-time loading, accuracy, and other metrics.

98. The parties' agreement, like every agreement, contained an implied covenant of good faith and fair dealing.

99. Lindt performed all of its duties under the parties' agreement or its performance was excused, including by XPO's breaches.

100. XPO breached the implied covenant of good faith and fair dealing in multiple ways.

101. For example, XPO unreasonably diverted IT staffing from the Tracy warehouse without telling Lindt and thus delayed implementing the new WMS.

102. XPO's implementation of and reliance on the flawed WMS system was also unreasonable. This system had many critical deficiencies in terms of design and execution including that it was not integrated, did not generate labels for pallets that referenced the customer order number, did not have a truck loading and scheduling feature, required a large number of manual calculations, and was not user-friendly.

103. As another example, XPO also unreasonably failed to provide adequate training, particularly on new software versions that XPO would release to try to patch the problems.

104. As yet another example, XPO knew about the problems with the WMS system and consciously misrepresented the scope, impact on services, and timeline for resolution to Lindt. Leading up to the launch, Lindt expressed concern over XPO's readiness to operate the warehouse based on issues observed with the new WMS. XPO told Lindt that it was confident in its ability

to perform, although, upon information and belief, XPO had significant internal doubts. Even after XPO began falling behind its performance metrics in August 2018, it reiterated with no reasonable basis that it would "soon" be back on track.

105. Further, upon information and belief, XPO later told employees to "shut up" about problems with the WMS and conceal them from Lindt. Upon information and belief, XPO went as far as to falsify inventory records to give the appearance that shipments were complete and accurate, leading to false bills of lading that produced significant customer fines for delivery of incomplete orders.

106. Further still, XPO acted unreasonably and with an intentional disregard for Lindt's business by threatening and/or actually pulling out staffing and ceasing its attempts to make the WMS work, after the dispute with Lindt came to a head.

107. XPO's conduct in implementing the new WMS system immediately before the peak season for confectioners and continuously misrepresenting the status of the warehousing issues was objectively unreasonable.

108. XPO's conduct in implementing the new WMS system immediately before the peak season for confectioners and continuously misrepresenting the status of the warehousing issues was a conscious and deliberate act.

109. XPO's failure to meet to the Services Agreement KPIs unfairly frustrated the agreed common purposes and disappointed Lindt's reasonable expectations under the contract.

110. XPO's breaches of the implied covenant of good faith and fair dealing severely damaged Lindt in multiple regards. For example, XPO's poor performance during peak season caused Lindt to lose millions of dollars in sales that it would have and should have ordinarily made. Lindt also incurred many millions of dollars in other expenses resulting from XPO's failings; for

example, costs of deeply discounting holiday motif products that were delivered after the holidays; destroying or donating expired products; and paying customer fines for late deliveries.

111.    Due to XPO's breaches of the implied covenant of good faith and fair dealing, Lindt is entitled to damages in an amount to be proven at trial, as well as pre-judgment interest, costs, and its reasonable attorneys' fees.

<u>**THIRD CLAIM FOR RELIEF**</u>
**(Negligence, in the Alternative)**

112.    Lindt repeats and realleges each and every allegation set forth in the preceding paragraphs 1 through 83 as if fully set forth herein.

113.    As a contractor and operator of a warehouse entrusted with Lindt's valuable goods and with bringing those goods to market, XPO owed Lindt a duty of care in receiving, inventory tracking, order picking, truck loading, scheduling, preparing bills of lading and other shipping paperwork, and all other logistical and warehouse operations at the Tracy warehouse.

114.    XPO was thus required to exercise at least the skill and knowledge normally possessed by warehouse operators.  But here, because XPO held itself as a premier logistics company with greater skill and knowledge than a typical operator, it was required to operate the Tracy warehouse at even higher standards.

115.    XPO negligently breached its duty of care owed to all of the Lindt companies because its performance fell not only below the level of service that Lindt was accustomed to XPO providing at the Lathrop warehouse, but also below the standards of the industry, below the standards of a purportedly premier logistics company, and below the standards of a reasonable warehouse operator.

116.    For instance, in the months after the Tracy warehouse opened, XPO was unable to make shipments on time as measured by the applicable standards of care, leading to a backlog that

took months to recover from. XPO was also unable to make shipments with the accuracy required by the applicable standards of care. For example, XPO failed to meet industry-standard KPIs with respect to on-time departures during the most critical time of year for chocolate shipments. On-time departures were between 32% and 66%, significantly below the industry standard of 98-99%.

117. XPO's breaches of its duties of care owed to Lindt, including its failure to maintain an accurate inventory and to timely fulfill and prepare orders for shipment, severely damaged Lindt in multiple regards, including through reputational injury, loss of revenue, and excess costs to Lindt.

118. Due to XPO's negligence, Lindt is entitled to damages in an amount to be proven at trial, as well as pre-judgment interest, costs, and its reasonable attorneys' fees.

## FOURTH CLAIM FOR RELIEF
### (Fraud by Misrepresentation and Concealment)

119. Lindt repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

120. Lindt entrusted XPO to run its Tracy warehouse on behalf of all three Lindt brands, and as a result the parties had a special relationship of confidence and trust. As a result of this special relationship, XPO had a duty to fully and accurately disclose material information to Lindt concerning the operations of the Tracy warehouse. XPO had superior knowledge regarding the operation of the facility.

121. As previously alleged, the new WMS that XPO attempted to implement at the Tracy warehouse had many critical deficiencies in terms of design and execution that it either failed to tell Lindt or concealed from Lindt. These misrepresentations and omissions about the faulty operation and design of its new WMS include, at least:

      a. The WMS was not integrated;

b. The WMS did not generate labels for pallets that referenced the customer order number;

c. The WMS did not have a truck loading and scheduling feature; and

d. The new WMS required a large number of manual calculations, and was not user-friendly, which invited and compounded human error.

122. Upon information and belief, XPO knew of the shortcomings of this new software and concealed the same.

123. Upon information and belief, XPO knew about these problems with the WMS system, but intentionally misrepresented or concealed the scope, impact on services, and timeline for resolution to Lindt. XPO's representations concerning the advantages of the WMS in its RFP were thus not true, or XPO had no reasonable basis to make them. Lindt reasonably relied on these representations and they were material to Lindt's decision to engage XPO.

124. Upon information and belief, XPO also falsely represented and hid certain key facts, further injuring Lindt and leading it to not terminate XPO at an earlier date. Leading up to the launch, Lindt expressed concern over XPO's readiness to operate the warehouse based on issues observed with the new WMS. On or about July 31, 2019, GXO Senior Vice President of Supply Chain Mark L. Johnson told Lindt that XPO was confident in its ability to perform, although, upon information and belief, XPO had significant internal doubts. Even after XPO began falling behind its performance metrics in August 2018, GXO Senior Vice President of Supply Chain Mark L. Johnson reiterated that XPO would "soon" be back on track, when that was not true.

125. Further, upon information and belief, XPO later told employees to "shut up" about problems with the WMS and conceal them from Lindt. Upon information and belief, XPO went

as far as to falsify inventory records to give the appearance that shipments were complete and accurate, when they were not, leading to false bills of lading that produced significant customer fines for delivery of incomplete orders.

126.    XPO made these misrepresentations and concealed these material facts with the knowledge and intent that Lindt would rely on them.

127.    XPO had exclusive knowledge of these material facts.

128.    Lindt reasonably relied on XPO's false representations and omissions to its detriment.  Lindt chose XPO through the RFP process to launch and run its brand new consolidated warehouse facility in Tracy, and Lindt also continued to use the Tracy warehouse and WMS system instead of attempting alternative solutions, such as demanding the re-implementation of the Bluegrass system used at Lathrop.

129.    XPO's fraudulent misrepresentations and concealment severely damaged Lindt in multiple regards.  For example, XPO's poor performance during peak season caused Lindt to lose millions of dollars in sales that it would have and should have ordinarily made.  Lindt also incurred many millions of dollars in other expenses resulting from XPO's failings; for example, costs of deeply discounting holiday motif products that were delivered after the holidays; destroying or donating expired products; and paying customer fines for late deliveries.

130.    Due to XPO's fraudulent misrepresentations and concealment, Lindt is entitled to damages in an amount to be proven at trial, as well as pre-judgment interest, costs, and its reasonable attorneys' fees.

## FIFTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

131.    Lindt repeats and realleges each and every allegation set forth in the paragraphs 1 through 83 as if fully set forth herein.

132.     Lindt entrusted XPO to run its Tracy warehouse on behalf of all three Lindt brands, and as a result of this relationship, XPO had a duty to fully and accurately disclose material information to Lindt concerning the operations of the Tracy warehouse.  XPO had superior knowledge regarding the operation of the facility.

133.     As previously alleged, the new WMS that XPO attempted to implement at the Tracy warehouse had many critical deficiencies in terms of design and execution including that it was not integrated, did not generate labels for pallets that referenced the customer order number, did not have a truck loading and scheduling feature, required a large number of manual calculations, and was not user-friendly.  XPO failed to provide adequate training, particularly on new versions that XPO would release to try to patch the problems.

134.     Upon information and belief, XPO knew about the problems with the WMS system, but negligently misrepresented the scope, impact on services, and timeline for resolution to Lindt.

135.     For example, leading up to the launch, Lindt expressed concern over XPO's readiness to operate the warehouse based on issues observed with the new WMS.  On or about July 31, 2019, GXO Senior Vice President of Supply Chain Mark L. Johnson told Lindt that it was confident in its ability to perform, although, upon information and belief, XPO had significant internal doubts.  Even after XPO began falling behind its performance metrics in August 2018, GXO Senior Vice President of Supply Chain Mark L. Johnson reiterated that it would "soon" be back on track.

136.     XPO had no reasonable ground for believing this to be true.

137.     XPO made these misrepresentations intending for Lindt to rely on them and not take any action against XPO.  Indeed, these nondisclosures and misrepresentations caused Lindt

to continue to use the Tracy warehouse and WMS system instead of attempting alternative solutions, such as demanding the re-implementation of the Bluegrass system used at Lathrop.

138. Lindt had no knowledge that XPO's misrepresentations were not correct and thus reasonably relied on them.

139. XPO's negligent misrepresentations and concealment severely damaged Lindt in multiple regards. For example, XPO's poor performance during peak season caused Lindt to lose millions of dollars in sales that it would have and should have ordinarily made. Lindt also incurred many millions of dollars in other expenses resulting from XPO's failings; for example, costs of deeply discounting holiday motif products that were delivered after the holidays; destroying or donating expired products; and paying customer fines for late deliveries.

140. Due to XPO's negligent misrepresentations and concealment, Lindt is entitled to damages in an amount to be proven at trial, as well as pre-judgment interest, costs, and its reasonable attorneys' fees.

### SIXTH CLAIM FOR RELIEF
**(Violation of Cal. Business and Professions Code § 17200, et seq.)**
**(Ghirardelli v. XPO)**

141. Lindt repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

142. Ghirardelli, a California corporation headquartered in California, was reputationally and economically injured in California as a result of XPO's fraudulent business acts at the Tracy warehouse.

143. As alleged in Lindt's Fourth Claim for Relief, XPO engaged in fraud by misrepresenting the scope, impact on services, and timeline for resolution of issues with the WMS system; by falsely representing its readiness to operate the warehouse; by falsely telling Lindt

(including Ghirardelli) that it was confident in its ability to perform, although it had significant internal doubts; by reiterating that it would "soon" be back on track when poor performance metrics continued after August 2018; and by falsifying inventory records to give the appearance that shipments were complete and accurate (when they were not).

144.    XPO's fraud led to false bills of lading that produced significant customer fines for delivery of incomplete orders.  Further, Ghirardelli relied on these fraudulent misrepresentations, leading Ghirardelli to be unable to get its products on the shelves and keep them stocked as necessary during peak season.

145.    XPO's fraudulent business acts under California Business and Professions Code § 17200 *et seq.* severely damaged Ghirardelli in multiple regards.  For example, Ghirardelli lost millions of dollars in sales that it would have and should have ordinarily made.  Ghirardelli and Lindt also incurred many millions of dollars in other expenses resulting from XPO's failings; for example, costs of deeply discounting holiday motif products that were delivered after the holidays; destroying or donating expired products; and paying customer fines for late deliveries.

146.    Due to XPO's violations of California Business and Professions Code § 17200 *et seq.*, Ghirardelli is entitled to damages in an amount to be proven at trial, as well as pre-judgment interest, costs, and its reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

Lindt hereby demands a jury trial on any and all issues appropriately triable before a jury.

## PRAYER FOR RELIEF

WHEREFORE, Lindt prays for the following judgment and relief against GXO:

   A.  Judgment in favor of Plaintiffs and against Defendant;

B.  An award of all damages adequate to compensate Plaintiffs for Defendant's breaches and other wrongful acts in an amount to be proven at trial, together with pre-judgment and post-judgement interest and costs, as fixed by the Court;

C.  An award of Plaintiffs' costs, expenses, disbursements, and reasonable attorneys' fees related to Defendant's breaches and wrongful acts;

D.  Such other further relief, in law or equity, as this Court deems just and proper.

Dated: June 8, 2022                    Respectfully submitted,


                                       /s/ Jeffrey J. Simon
                                       Jeffrey J. Simon, MO Bar #35558
                                       Taylor Concannon Hausmann, MO Bar #67056
                                       HUSCH BLACKWELL LLP
                                       Kansas City, Missouri 64112
                                       Telephone: 816.983.8000
                                       Facsimile: 816.983.8080
                                       jeff.simon@huschblackwell.com
                                       taylor.hausmann@huschblackwell.com

                                       Evan M. Rothstein (*pro hac vice* to be filed)
                                       Patrick B. Hall (*pro hac vice* to be filed)
                                       ARNOLD & PORTER KAYE SCHOLER LLP
                                       1144 Fifteenth Street, Suite 3100
                                       Denver, Colorado 80202
                                       Telephone: 303.863.1000
                                       Facsimile:  303.832.0428
                                       evan.rothstein@arnoldporter.com
                                       patrick.hall@arnoldporter.com
                                       kristen.kendall@arnoldporter.com

                                       Theresa M. House (*pro hac vice* to be filed)
                                       ARNOLD & PORTER KAYE SCHOLER, LLP
                                       250 West 55th Street
                                       New York, NY 10019-9710
                                       Telephone: (212) 836-8094
                                       Theresa.House@arnoldporter.com

                                       Kathleen M. McCarte (*pro hac vice* to be filed)
                                       ARNOLD & PORTER KAYE SCHOLER, LLP
                                       700 Louisiana Street
                                       Suite 4000
                                       Houston, TX 77002-2755
                                       Telephone: (713) 576-2400
                                       kathleen.mccarte@arnoldporter.com

                                       *Counsel for Plaintiffs Lindt & Sprüngli (North
                                       America) Inc., Lindt & Sprüngli (USA), Inc.,
                                       Ghirardelli Chocolate Company, and Russell Stover
                                       Chocolates, LLC*