# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| LINDT & SPRÜNGLI (NORTH AMERICA) INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 22-00384-W-BP |
| GXO WAREHOUSE COMPANY, INC., | ) ) | |
| Defendant. | ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs Lindt & Sprüngli (North America) Inc. ("Lindt NA"), Lindt & Sprüngli (USA), Inc. ("Lindt USA"), Ghirardelli Chocolate Company, and Russell Stover Chocolates, LLC (collectively, "Lindt" or "Plaintiffs"), by and through their undersigned counsel, file this First Amended Complaint against Defendant GXO Warehouse Company, Inc., formerly known as Jacobson Warehouse Company, Inc. d/b/a XPO Logistics Supply Chain ("GXO" or "XPO"), and allege as follows:

## NATURE OF THE ACTION

1.     Lindt, the world's premier purveyor of fine chocolates, brings this action to recover the loss of tens of millions of dollars caused by Defendant GXO's failure to properly operate Lindt's highest volume U.S. distribution center in 2018 and 2019 including, crucially, during Lindt's peak holiday selling season.

2.     Lindt USA, Ghirardelli, and Russell Stover (collectively, the "Lindt Manufacturers") are well-known, longtime manufacturers of chocolate and other confectionary products recognized in the United States and around the world for providing premium chocolate products to hundreds of millions of devoted fans. In particular, Ghirardelli's Chocolate Squares,

Lindt's LINDOR truffles, and Russell Stover's Chocolate Boxes are widely successful premium confections with almost universal brand recognition, especially around the holidays. With its three prominent brands, Lindt NA is the top selling premium chocolate company and among the top three sellers in the U.S. chocolate market overall.

3. Lindt NA is the corporate parent of the Lindt Manufacturers. As the corporate parent, it provides, among other things, warehousing, distribution, and management services to its subsidiaries.

4. GXO is a national logistics company that is a subsidiary of a New York Stock Exchange-traded company that is one of the world's largest third-party logistics companies.

5. For almost twelve years, between November 2007 and May 2019, GXO and its predecessors provided third-party logistics services, including co-packing services, for Lindt.

6. Originally, and throughout most of this business relationship, GXO provided services to Ghirardelli at a warehouse and production facility in Lathrop, California. GXO and Ghirardelli operated pursuant to the terms of a written Services Agreement dated November 1, 2007, as subsequently amended (the "2007 Services Agreement"). Some of the most important material terms of the 2007 Services Agreement included the Key Performance Indicators ("KPIs") that GXO agreed to achieve, including a 98%+ on-time rate and a 99%+ accuracy rate. These KPIs were and are consistent with industry standards, including as measured and reported by the Warehousing Education and Research Council, a prominent trade publication, and other industry sources.

7. The parties' business relationship expanded beginning in 2017, at which point GXO was known as XPO. After Lindt NA completed its acquisition of Russell Stover (having acquired Ghirardelli years earlier), it decided to streamline its U.S. operations and consolidate the major

national warehouses for the Lindt Manufacturers in order to, among other things, share costs and generate other benefits and efficiencies related to consolidated delivery and production.

8. To do so, Lindt put out a request for proposal ("RFP") for a company to operate a new, combined facility near Ghirardelli's current site in Lathrop, California, to serve as the West Coast hub for Lindt NA and the Lindt Manufacturers.

9. Based on Ghirardelli's long relationship with XPO at the Lathrop facility, XPO received the RFP and responded, submitting a proposal for it to operate the new facility for the Lindt Manufacturers.

10. Based upon XPO's RFP Response, Lindt selected XPO to run the new facility for the Lindt Manufacturers, to be located in Tracy, California.

11. Lindt and XPO documented this expansion of their business relationship through a June 2, 2017 Letter of Intent between Lindt NA and XPO, as amended on May 22, 2018, that (among other things) applied the 2007 Services Agreement to the Tracy facility and extended its term until June 30, 2018.

12. XPO began working and preparing to work for Lindt in the Tracy facility in 2018, now performing work for Russell Stover and Lindt US in addition to Ghirardelli.

13. When the written 2007 Services Agreement expired on June 30, 2018, the parties did not cease conducting business with one another. Instead, from July 1, 2018 to May 2019, XPO, Lindt NA, and the Lindt Manufacturers continued to operate under an implied agreement that incorporated the material terms of the 2007 Services Agreement, including the KPIs (the "Implied Agreement").

14. That is, after June 30, 2018, XPO and Lindt agreed to and indeed did operate at the Tracy facility exactly how they had been operating there prior to that date and exactly how XPO

and Ghirardelli had operated at the Lathrop facility, despite the fact that the 2007 Services Agreement had expired and the fact that XPO would be and was performing services at the Tracy facility for Russell Stover and Lindt USA in addition to Ghirardelli.

15.     Specifically, XPO agreed to and continued to package, store, and ship truckloads of chocolate and other items daily for Lindt NA and the Lindt Manufacturers subject to, at a minimum, the required KPIs.

16.     However, XPO fell far short of its obligations under the 2007 Services Agreement and the Implied Agreement—immediately before and during the most important time of year for Lindt.  One of XPO's most critical errors was attempting to employ a new Warehouse Management System ("WMS") in the Tracy facility.  The WMS was a key part of XPO's RFP response that Lindt relied upon to select XPO to run the Tracy facility, but when XPO deployed the new system it was readily apparent that the system was improperly designed, improperly implemented, poorly executed, and XPO did not adequately train its employees to use it.

17.     As a result of this and other operational failures, for several months, XPO's performance, including its actual rate of on-time and accurate orders, fell far below its requirements, as well as industry standards.  For example, despite its obligation to send out 98%+ of orders on time, a widely-accepted metric, XPO's on-time performance in the first five months ranged from 66% in one month down to merely 32% and 33% in others.  And despite its obligation to ensure 99%+ order accuracy—again, a widely-accepted metric—XPO was still finding double-digit errors in December 2018, over four months after beginning operations  at the Tracy facility.  XPO's new computer system for tracking inventory was so inaccurate that, even after multiple physical re-counts, a June 2019 reconciliation showed $5+ million in unaccounted-for inventory discrepancies.   XPO's performance was so poor and so below industry standards that Russell

Stover and Lindt USA had to resume using their previous distribution centers to work to meet holiday demand. XPO's performance fell not only below the level of service that Lindt expected and contracted for, but also below the standards that any industry participant would expect, and surely its own professional standards as a purportedly premier logistics company.

18.     What is worse, XPO also misrepresented and hid certain key facts throughout this debacle, further injuring Lindt. This string of incorrect information began during the RFP process, when XPO represented the fact that it would provide a new WMS with additional features and capabilities to replace the legacy management system XPO had inherited and used at Lathrop. Using the legacy system, XPO regularly met and exceeded its KPIs. The new WMS was instead a significant downgrade.

19.     The misrepresentations continued early in the transition to the Tracy facility. Leading up to the "Go Live" facility launch—when XPO promised that the entire Tracy facility would be fully operational, on approximately August 17, 2018—Lindt expressed concern over XPO's readiness to Go Live, specifically questioning potential issues with the new WMS represented in XPO's RFP response and the fact that Lindt's key holiday season was on the horizon. XPO assured Lindt that it was prepared to perform, even though XPO had significant internal doubts. Those internal doubts came to fruition, as XPO never entirely went "Live." And even after XPO began falling behind its contractually promised performance metrics in mid-to-late August 2018, it reiterated that it would "soon" be back on track. It was not.

20.     Further, upon information and belief, XPO later told employees to "shut up" about problems with the WMS and conceal them from Lindt. Upon information and belief, XPO went as far as to falsify inventory records to give the appearance that shipments were complete and

5

accurate, leading to false bills of lading that produced significant customer fines for delivery of incomplete orders.

21.     XPO's failures to competently prepare for operations, and operate, the busiest of Lindt's three national distribution centers caused massive harm to Lindt. The worst of XPO's poor performance took place just before and during the Halloween-to-Valentine's Day holiday season, which, as XPO knew from its long history of working with Ghirardelli in the former facility, is the peak season for chocolate and confectionary sales. Because the Lindt companies (and Ghirardelli in particular) were unable to get their products on retail shelves and keep them stocked as necessary during this crucial time, Lindt lost millions of dollars in sales that it would have and should have ordinarily made. Lindt also incurred many millions of dollars in other expenses resulting from XPO's failings and Lindt's attempts to mitigate its damages; for example, costs of deeply discounting holiday motif products that were delivered after the holidays and destroying or donating expired products. Lindt's damages further include downstream retail-related losses in the form of, without limitation, harm to Lindt's reputation in the views of retailers and customers, forfeited preferred shelf space fees, loss of preferred shelf space, fines and penalties (monetary or otherwise) imposed on Lindt by its retailers, reduced orders, and discontinuance of certain items. These losses are not limited to the 2018-2019 holiday season; they were (and continue to be) incurred in subsequent years.

22.     Lindt terminated XPO on March 3, 2019, effective May 17, 2019, when it was able to bring in a new logistics company to run the Tracy facility. Upon information and belief, on XPO's final day at the Tracy facility, some XPO employees were so ashamed of the woeful performance by XPO that they created satirical company T-shirts with the logos "#we survived XPO" and "#not always like this":



23.    At least one former XPO employee has already provided sworn testimony in an unrelated matter that XPO performed below expectations and caused the harm to Lindt based upon its failures at the Tracy facility.

24.    Incredibly, after falling short of its obligations and costing Lindt millions of dollars, XPO attempted to claim that Lindt owed *XPO* money.  As Lindt has since learned, XPO has attempted to deflect from its own failings in similar fashion in numerous other instances around the country, many of which are the subject of other lawsuits by aggrieved customers who refused to pay XPO for substandard services.

25.    Because XPO steadfastly refuses to cover Lindt's losses that it caused, Lindt now brings this suit to obtain compensation for the many millions of dollars of damage caused by XPO.

## PARTIES

26.    Lindt & Sprüngli (North America) Inc. ("Lindt NA") is a Delaware corporation with its principal place of business at 4717 Grand Avenue, Suite 700, Kansas City, Missouri 64112.

7

Lindt NA is owned by the Swiss company Chocoladefabriken Lindt & Sprüngli AG. Lindt NA is

the direct parent company of Lindt USA and indirect parent company of Ghirardelli and Russell

Stover, and was during the events at issue in this First Amended Complaint. In addition to owning

the Lindt Manufacturers, it also provides warehousing, distribution, and management services to

these subsidiaries.

27.     Lindt & Sprüngli (USA), Inc. ("Lindt USA") is a New York corporation with its

principal place of business at One Fine Chocolate Place, Stratham, New Hampshire 03885-2592.

Lindt USA is a famous Swiss-originated manufacturer of chocolate that was founded in New York

in 1925 and has manufactured chocolate products out of New Hampshire since 1986. Lindt USA

is wholly owned by Lindt NA, and was during the events at issue in this First Amended Complaint.

28.     Ghirardelli Chocolate Company is a California corporation with its principal place

of business at 1111 139th Avenue, San Leandro, California 94578-2631. Ghirardelli is one of the

oldest and most famous chocolate companies in the United States, founded 170 years ago in San

Francisco. Ghirardelli became part of the Lindt family of companies in 1998. Ghirardelli, through

Lindt USA, is wholly owned by Lindt NA, and was during the events at issue in this First Amended

Complaint.

29.     Russell Stover Chocolates, LLC is a Missouri limited liability company with its

principal place of business at 4900 Oak Street, Kansas City, Missouri 64112. Like Ghirardelli,

Russell Stover is one of the United States' most longstanding and well-known chocolate

companies, founded nearly a century ago. Russell Stover became part of the Lindt family of

companies in 2014. Russell Stover, through Lindt USA, is wholly owned by Lindt NA (its only

member), and was during the events at issue in this First Amended Complaint.

30.    GXO Warehouse Company, Inc., formerly known as Jacobson Warehouse Company, Inc. d/b/a XPO Logistics Supply Chain ("GXO" or "XPO"), is an Iowa corporation with its principal place of business at 4035 Piedmont Parkway, High Point, North Carolina 27265. GXO is a subsidiary of GXO Logistics, Inc., a public company whose stock trades on the New York Stock Exchange.  GXO Logistics, Inc. reported revenues of $7.9 billion and net income of $161 million in 2021.  XPO (which was GXO's trade name during the time period at issue) managed logistics for Lindt NA and the Lindt Manufacturers at two facilities in Lathrop and Tracy, California, from 2007 to mid-2019.

## JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the two sides and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

32.    This Court may exercise personal jurisdiction over GXO because GXO agreed in a written agreement with Lindt to litigate Lindt's claims described herein in this Court and agreed not to object to this Court's personal jurisdiction over GXO.  Further, GXO consented to personal jurisdiction by registering to do business in the state of Missouri and appointing an agent for service of process there.  GXO does business in the state of Missouri, including in Kansas City and Palmyra.  Additionally, this Court may exercise personal jurisdiction over GXO because GXO's acts and omissions, including its intentional misrepresentations and concealments, were directed at Lindt NA and Russell Stover in this state, knowing that both are headquartered in this state and that they would be damaged in this state, thus producing actionable consequences in the state of Missouri.

33.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because GXO resides in this District and GXO agreed in a written agreement with Lindt that venue was proper in this

Court. GXO resides in this District pursuant to 28 U.S.C. § 1391(c) because GXO consented to personal jurisdiction by registering to do business in the state of Missouri and appointing an agent for service of process here. Additionally, venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the actionable consequences that occurred in the state of Missouri give rise to the claims herein.

34.     Lindt's claims are timely under all applicable statutes of limitations, statutes of repose, and equitable theories such as laches.

**FACTUAL BACKGROUND**

**I.     THE PARTIES' CONTRACTUAL RELATIONSHIPS**

35.     As explained below, there can be no dispute that the Lindt Manufacturers and Lindt NA, on the one hand, and XPO, on the other, operated under and pursuant to contractual relationships for the entire time period that XPO provided services in connection with the Tracy facility for all Plaintiffs to this action.

**A.     The 2007 Services Agreement and Key Performance Indicators**

36.     In 2007, Ghirardelli and Arnold Logistics LLC ("Arnold"), a predecessor to XPO, entered into the written 2007 Services Agreement discussed above, dated November 1, 2007. A true and correct copy of the 2007 Services Agreement is attached as **Exhibit 1.**

37.     Ghirardelli and Arnold amended and reaffirmed the 2007 Services Agreement multiple times. In the First Amendment to the 2007 Services Agreement, effective January 1, 2013, Ghirardelli and Arnold amended the Agreement to (among other things) extend the term of the Agreement until April 30, 2018. In the Second Amendment to the 2007 Services Agreement, effective March 15, 2015, Ghirardelli and Arnold amended the Agreement to (among other things) substitute Arnold Logistics for its successor, Jacobson Warehouse Company, Inc. ("Jacobson," later doing business as XPO). In the Third Amendment to the 2007 Services Agreement, effective

May 11, 2015, Ghirardelli and Jacobson amended the Agreement to (among other things) extend its terms to apply at another distribution center in Lathrop. True and correct copies of these amendments are attached as **Exhibits 2, 3, and 4**, respectively. Jacobson subsequently began doing business as XPO.

38.     One of the material provisions of the 2007 Services Agreement required XPO to attain certain "Key Performance Indicators," or KPIs, which set metrics for loading trucks on time and filling orders accurately, among other things. XPO "represent[ed] and warrant[ed] that the Services will comply with the Key Performance Indicators ('KPIs') set forth in Attachment 'D,' which will be measured monthly." 2007 Services Agreement at § 7; *see also id.* § 11(b) ("strictly adhere to the Service Standards"); § 1(r) (defining Service Standards to include "the Key Performance Indicators"). Attachment D to the 2007 Services Agreement reiterated that XPO "represents and warrants that the Services will comply with the following Key Performance Indicators ('KPI's'), which shall be measured monthly," then listed them, including:

"(a) On time presentation of freight to Ghirardelli authorized carriers for delivery against Ghirardelli customer's requested or amended delivery date, within the carriers' posted service schedule, at the rate **of ninety-eight per cent or greater (98%+)**; *provided*, [XPO] is given at least 24 hours' notice of the details of the delivery, carrier is on-time for pick-up appointment, and pick-up appointment is scheduled for regular or agreed to business hours or days."

and

"(b) Order accuracy at the **rate of ninety-nine per cent or greater (99%+)**, as measured in cases of Products, which shall include tracking and challenges (via cycle counts and

audit data) of Ghirardelli customer claims of over, shorts and damage from the original shipments . . . ."

39.     The required KPIs contained in the 2007 Services Agreement conform to warehousing industry standards and best practices.  Indeed, industry standards, such as those published by the Warehousing and Education Research Council, are at least as demanding.  For example, best practice is considered as greater than or equal to 99% on time delivery.  Similarly, best practice for order picking accuracy is greater than or equal to 99.9%.

40.     Most third-party logistics providers, like XPO, use a base set of KPIs that includes on-time shipments and order picking accuracy.  In 2018, the industry-wide acceptable target for on-time shipments ranged between 95 and 100 percent; for order accuracy, 99 to 100 percent.

41.     Through 2017, XPO regularly met the required KPIs at the Lathrop facilities.  For instance, in 2017, XPO's on-time rate exceeded 99% in most months, even hitting 100% in two months.  XPO exceeded the service standard even during the busy holiday months of August through December 2017.  While competent, this was not extraordinary given industry standards.

42.     The 2007 Services Agreement also made XPO "responsible for employing and training responsible, qualified employees to operate and manage the [Packaging and Distribution Center], and the Packaging Operations, storage and shipping functions therein[.]"

**B.     XPO Begins Working for the Lindt Manufacturers at the New Tracy Facility**

43.     In 2017, Lindt NA decided to consolidate the logistics operations for the Lindt Manufacturers.  One goal of this consolidation was to streamline Lindt's operations and achieve efficiencies and cost-savings through cost-sharing.  As part of the consolidation, Lindt needed a new West Coast hub that would service logistics for the Lindt Manufacturers.

44.     Lindt issued a request for proposal in March 2017 (the "RFP"), asking for leading logistics providers around the country to bid on work for three new, consolidated facilities,

including the above-mentioned West Coast hub near Lathrop, California, for a five-year term. A true and correct copy of the RFP is attached as **Exhibit 7**.[1]

45.     The RFP's express language made clear that the RFP was issued on behalf of Lindt NA *and* its three subsidiaries, the Lindt Manufacturers: "Lindt & Sprüngli North America ***together with Ghirardelli Chocolate, Lindt & Sprüngli USA and Russell Stover Chocolate*** are soliciting proposals to select Logistics Providers for multiple sites in our North American distribution network." Thus, while Lindt NA would act as a liaison with the selected logistics provider, the services provided would be for and for the benefit of all of the Lindt entities.

46.     XPO responded to this RFP and was thus expressly aware that, if it was selected through the RFP process to operate the new facility, it would require that XPO perform services for the Lindt Manufacturers and Lindt NA.

47.     The RFP sought a company with an "outstanding reputation in handling significant volumes" that would be required to contribute to the new facility's build-out and launch, and to provide inbound receiving, labeling and re-labeling, co-packing, and outbound shipping services.

48.     Because the new consolidated facility at Tracy was a vital part of Lindt's U.S. business, as the RFP specified, the logistics partner chosen to operate it was critical to Lindt's success.

49.     The RFP detailed the massive scale of the facility and related requirements for the logistics partner. The new facility's operations would be significantly more extensive than at the Lathrop facility. The RFP estimated the Tracy facility would process over 9 million cases of Lindt products per year, equating to over 5,000 truckloads. The RFP further included projected daily

---

[1] Exhibit 7 has been redacted pursuant to the Court's September 6, 2022 Order.

average operational volumes for the facility, such as trucks received (21), pallets received (630), cases picked (39,129), and trucks loaded (70).

50.     The RFP required that inventory, warehouse, and commissioning orders "shall" be processed through the use of a WMS and explicitly required "seamless integration of systems" via electronic transmission of orders from Lindt's in-house SAP system to the WMS. This would allow the WMS to receive the orders from Lindt's customers, translate those orders into orders that needed to be picked from the facility, and create bills of lading for outbound shipment. The RFP further provided that the logistics partner chosen would have their performance measured by a set of mutually agreed upon KPIs.

51.     On or about April 13, 2017, XPO submitted a formal response to Lindt's RFP (the "RFP Response"). A true and accurate copy of XPO's RFP Response is attached as **Exhibit 8**.

52.     XPO asserted it should be selected in part because it knew Ghirardelli's business well after ten years of service at the Lathrop facility. XPO also described itself as one of the dominant companies in U.S. logistics with superior technology.

53.     XPO's RFP Response represented the fact that XPO had the capabilities to meet all of Lindt's requirements. XPO proposed providing a startup transition team to support process documentation, quality compliance, and training.

54.     In its RFP Response, XPO touted a corporate philosophy of "identify[ing] and focus[ing] on KPIs" for order accuracy, on-time shipping, damage rates, and delivery complaints "that will ensure contract compliance and operational success."

55.     The RFP Response also made numerous factual representations concerning the capabilities of XPO's WMS, including that the WMS "will automatically generate the parcel shipping label," and would deliver "[i]mproved warehouse speed, efficiency, and accuracy through

integration with automated systems." Likewise, XPO touted "a transition team, timeline/milestones, facility up-fit and equipment, and IT integration, as well as process development, staffing, and training to ensure each area of the operation is prepared for go-live prior to the transition.". Additionally, XPO committed to providing "24x365 technical support for all XPO systems and hardware." Finally, XPO explained that it would design and implement a new inventory system to enable better tracking of website orders.

56. All of these representations were made by XPO to all the Plaintiffs.

57. Unbeknownst to the Plaintiffs, many of XPO's representations in its RFP Response were false. Most crucially, Lindt would later discover that the WMS XPO proposed was not integrated as represented. For example, it turned out that the WMS did not generate labels for pallets that referenced the customer order number, required the entry of a large number of manual calculations that invited and compounded human error, and did not have an integrated truck loading and scheduling feature.

58. Moreover, XPO's response to the RFP acknowledged and stated that XPO would be doing business with Lindt (i.e., *all* Plaintiffs) under the same material terms for the new, combined facility as had applied to the current relationship between Ghirardelli and XPO at the Lathrop facility pursuant to the 2007 Services Agreement.

59. Based on these representations, including the representations about XPO's familiarity with Lindt's co-packing operations, XPO's new WMS, XPO's ability to handle the significant amount of volume that would flow through the Tracy facility, and the commitment to extend the terms of the Services Agreement with Ghirardelli to the broader Lindt family of companies, Lindt entrusted XPO to manage Lindt's West Coast operations at Tracy.

### C.    The Parties' Express Contract for Start-Up Services

60.     In response and in relation to the Tracy facility work being awarded to XPO, on or about June 2, 2017, Lindt NA and XPO entered into a Letter of Intent (the "LOI") documenting the parties' intent to enter into a future "Definitive Agreement" concerning the Tracy facility.  A true and correct copy of the Letter of Intent is attached as **Exhibit 5**.

61.     In the Letter of Intent, the parties agreed that the material terms of the 2007 Services Agreement would "form the basis for the drafting and negotiation of the Definitive Agreement." The parties also agreed that XPO would begin providing preparatory and preliminary services prior to the parties entering into the "Definitive Agreement."  The Letter of Intent stated that it would terminate no later than September 30, 2017.

62.     Thereafter, XPO began providing start-up services with respect to the transitioning of warehouse and co-packing services from Lathrop to Tracy.

63.     The parties began negotiating the terms of the "Definitive Agreement."  The original term of the LOI passed without the parties having executed a "Definitive Agreement." XPO nonetheless continued providing start-up services during the end of 2017 and well into 2018 with respect to the transitioning of services from the Lathrop facility to the Tracy facility.

64.     On or about May 22, 2018, Lindt NA and XPO entered into the "First Amendment to Letter of Intent Between XPO and Lindt" ("First LOI Amendment").  A true and correct copy of the First LOI Amendment is attached as **Exhibit 6**.

65.     The First LOI Amendment applied the LOI retroactively with effect as of October 1, 2017, as if the LOI has been continuously in force and effect without interruption.  The First LOI Amendment also stated that the LOI would terminate on June 30, 2018.  The First LOI Amendment further explicitly stated that the 2007 Services Agreement "shall be deemed extended" to June 30, 2018, "shall apply to any services performed by XPO at the Tracy

16

Warehouse" prior to that date, and that the "Definitive Agreement" would be an amendment to the 2007 Services Agreement.

66.     Further, XPO agreed in the First LOI Amendment to continue providing start-up services necessary to bring the project to a position to begin operations, including the "[h]iring, onboarding, and training of approximately thirty (30) associates" and "[i]mplementation of the XPO WMS [Warehouse Management System]."

67.     Therefore, the parties had an express contract through June 30, 2018 governing, at least, XPO's provision of start-up services and any other services at the Tracy facility, which included work by XPO for the Lindt Manufacturers.

**D.     The Parties' Continued Performance Manifests An Implied Agreement**

68.     XPO did not all of a sudden stop providing services to Lidnt at the Tracy facility on June 30, 2018.

69.     Rather, XPO continued providing services from July 1, 2018 until May 2019, and did so under the Implied Agreement.

70.     Operations officially commenced at the Tracy facility in August 2018, with XPO providing services at the facility.  Indeed, XPO continued to operate in the same manner at the Tracy facility as it had up to that date, both at the Lathrop facility and at the Tracy facility, consistent with the material terms of the 2007 Services Agreement and the parties' prior working relationship.

71.     In particular, both before and after June 30, 2018, XPO performed the same services for Lindt NA and the Lindt Manufacturers at the Tracy facility that it previously performed for Ghirardelli at the Lathrop warehouse, including, among other services, filling bags with Ghirardelli chocolates, receiving finished goods and storing them on warehouse shelves, and then after

receiving orders, planning the truckloads, picking the cases and pallets, and loading them onto the outbound trucks.

72.     XPO also continued to bill Lindt as it had before June 30, 2018. In August or September 2017, pursuant to the 2007 Services Agreement's provision calling for an annual pricing/budget discussion, the parties agreed to a budget and pricing for 2018. This included, among other items, a fixed monthly distribution fee XPO would charge Lindt for operating the distribution center. XPO charged Lindt this same fixed fee both before and after June 30, 2018.

73.     In other words, XPO continued to perform services for Lindt before and after June 30, 2018 for compensation under the same material terms of the 2007 Services Agreement and did so for consideration from Lindt.

74.     As further evidence of the parties' meeting of the minds on the Implied Agreement after June 30, 2018, through at least October 2018 (if not later), the parties continued to actively negotiate a Definitive Agreement that would be based on the material terms of the 2007 Services Agreement. The parties never considered entering into a stand-alone agreement that was not based on the material terms of the 2007 Services Agreement. Thus, although the parties never signed a written Definitive Agreement, all parties understood that the material terms of the 2007 Services Agreement would continue to bind them while the parties operated at the Tracy facility and until a final written agreement was reached.

75.     At no point prior to the parties' dispute did XPO claim that the material terms of the 2007 Services Agreement did not apply between the parties at the Tracy facility or that XPO did not want to continue to be bound by them. As stated above, XPO did not stop all work at the Tracy facility on July 1, 2018. To the contrary, XPO continued working at the Tracy facility, performing what it has since claimed to be millions of dollars of work, until May 2019.

76.     Thus, rather than executing a new written contract, XPO and Lindt (including the Lindt Manufacturers) agreed through the Implied Agreement to be bound by the material terms of the 2007 Services Agreement, including at least XPO's KPIs, at the Tracy facility.

## II.     XPO FAILS TO PERFORM BOTH BEFORE AND AFTER JUNE 30, 2018

77.     XPO promised to "Go Live" at the Tracy facility by August 17, 2018, giving XPO more than a *year* to prepare from the time Lindt awarded the Tracy facility work to XPO.  But XPO failed to meet its promises and instead breached its contractual obligations and failed to deliver under the express and implied agreements, both before and after June 30, 2018, respectively.  Contractual obligations aside, XPO failed to operate the facility in a workmanlike manner, which led to missed KPIs, mis-picked orders, and missed deliveries.  As a result, XPO's "Go Live" was a massive failure that damaged Lindt in the tens of millions of dollars.

78.     As an experienced, professional warehouse logistics provider, XPO owed Lindt a duty of care, skill, and proficiency commonly exercised by ordinarily skillful, careful and prudent warehouse professionals.

79.     When operations at the Tracy facility sputtered to a start in August 2018, and with Lindt's peak holiday season fast approaching, XPO immediately failed to meet the contractual KPIs, as well as industry standards and its own representations in the RFP Response.  Specifically, XPO's timeliness and order accuracy fell far below acceptable industry standards and the terms of the express and implied agreements.

80.     These issues were unique to the Tracy facility.  The other two brand-new Lindt facilities, managed by another third-party logistics provider, did not experience these problems.

81.     The timing of Lindt's move to the Tracy facility and the fact that it presented a new setting for the parties had no bearing on XPO's performance failures.  In 2018, XPO was the second-largest third-party logistics provider in the United States, servicing a total of 392

warehouses totaling 81.6 million square feet. Based on this experience and its years of working with Ghirardelli, and its robust RFP Response, XPO knew or should have known that it would need to adequately prepare for and execute its duties to meet Lindt's heightened holiday seasonal demands. Indeed, seasonality is a factor in 54 percent of contract warehouses, and for 57 percent of these warehouses, the fall/winter holiday season is the busiest. Upon information and belief, in the luxury chocolate business, the fall/winter holiday season represents an even greater percentage of annual revenue.

### A.    XPO's Co-Packing Failures

82.    Contract packaging, also known as "co-packing," is the process of assembling a product or good into its final finished packaging.

83.    Under the terms of the parties' agreements, XPO was responsible for co-packing various Lindt goods, such as bags of Ghirardelli chocolate squares, at both the Lathrop and Tracy facilities, for their ultimate sale at Ghirardelli retail stores and other vendors.

84.    XPO began co-packing production in the Tracy facility on approximately May 14, 2018, while the terms of the express 2007 Services Agreement were still in effect. As of July 10, 2018, XPO had completed only 2.4% of its production goal for July. That same day, Lindt's Director of Warehouse Operations, Chris Wood, informed Gordon Steele at XPO by e-mail that Lindt was increasingly concerned about the production backlog, which was caused by XPO's labor shortage:

> I have been waiting for 3 weeks for Mark [Johnson]'s plan to bring in additional
> labor to keep the automated lines running 24/6. Also, we are quickly falling behind
> in seasonal co-pack production, and I need to understand how he is going to ramp
> up additional lines now that he is in the larger space.

85.    By July 16, 2018, well after co-packing operations had moved to the Tracy facility, XPO was struggling to ramp up the co-pack operation at the new site and production was approximately 2-4 weeks behind schedule.  To minimize the risk to their operations, Ghirardelli moved some co-packing work to one of XPO's competitors.

86.    By July 2018, sales in Ghirardelli retail stores were down by 6%, almost entirely driven by XPO's failure to meet its co-packing obligations and the resulting failure to stock store shelves with product.

87.    XPO's co-packing failure continued to harm sales at Ghirardelli retail stores throughout the fall of 2018 and beyond.

**B.    XPO's Failure to Provide Adequate Labor and Training**

88.    Under the parties' agreements, XPO was responsible for the hiring, onboarding, and training of employees adequate to operate the Tracy facility.

89.    For example, XPO was "responsible for employing and training responsible, qualified employees to operate and manage the [Packaging and Distribution Center],  and the Packaging Operations, storage and shipping functions therein[.]"  Similarly, XPO agreed in the First LOI Amendment to continue providing start-up services necessary to bring the project to a position to begin operations, including the "[h]iring, onboarding, and training of approximately thirty (30) associates" and "[i]mplementation of the XPO WMS [Warehouse Management System]."

90.    XPO failed to meet its staffing obligations, resulting in significant production shortfalls, in particular with respect to its co-packing obligations.  For example, on August 20, 2018, XPO itself admitted that its "Tracy team has been challenged to achieve full staffing since opening the Tracy facility."

91.     Similarly, XPO failed to adequately train its employees on the new WMS, which significantly compounded issues relating to the inherent deficiencies with the system (as explained in greater detail *infra*) and contributed to XPO's failure to meet the contractually-obligated KPIs and other performance metrics.

**C.     XPO's Failure to Ship Orders On Time**

92.     Upon information and belief, the rate of on-time shipments is the most important metric that warehouses and distribution centers use to measure performance.  For example, per industry standards, a best-in-class operator will achieve an on-time rating of 99.875% or above; even a typical operator is expected to achieve approximately 99%.  This is consistent with the Services Agreement's KPIs, which required XPO to ensure on-time shipments at a rate of 98% or greater.

93.     In the months after the Tracy facility opened, XPO was unable to make shipments on time, leading to a backlog that took months to recover from.

94.     As XPO knew full well based on its decade-long relationship with Ghirardelli, August through December is a pivotal time of year for chocolate shipments, especially to Lindt, and is a time when meeting contractual and industry-standard KPIs is of utmost importance.  It was during this critical time period that XPO failed to meet these KPIs with respect to on-time departures.

95.     In fact, XPO's on-time departures plummeted to 32% in August and 33% in September.  They rose slightly over the next few months, but in December 2018 were still merely 66%, far below the KPIs XPO contractually pledged to meet and those industry wide.  With respect to industry standards, "poor practice"—the lowest standard—is considered as anything less than 94%.  Anything less than 98% is unacceptable.  Given that the on-time metric is normally evaluated

in terms of fractions of a percentage point (particularly for companies like XPO that hold themselves out as premier operators), XPO's shortfalls of between 30 to 60 percentage points were staggeringly below warehousing industry standards, signaling a complete collapse of XPO's leadership, systems, implementation, and preparation.

96.     As the parties' agreement required, and as had occurred at the Lathrop Facility, XPO reported KPI metrics after the opening of the Tracy facility but its performance was so far below standard and contractual promises that it stopped regularly reporting on KPIs at times at the end of 2018 and the beginning of 2019.  Industry standards provide that regular reporting of KPIs is necessary for continuous improvement and identifying systemic warehousing problems.

97.     In February 2019, XPO resumed reporting on KPIs per the parties' agreement, but the results remained lacking.  XPO reported that it shipped only 86.8% of shipments on-time during the week of January 23, 2019.  While this was a slight improvement over the performance throughout Q4 2018, it still fell substantially below the level of performance required by the parties' agreement and industry standards.  It also was too little, too late for the shipments for the peak holiday season, which would have shipped by late January.

**D.     XPO's Failure to Fill Orders Accurately**

98.     Order picking accuracy is another key metric in the warehouse industry and one specifically recognized as important by XPO in its RFP response.  Specifically, per industry standards, a best-in-class operator will achieve a "perfect" order rating of 99.13% or above; even a typical operator is expected to achieve over 95%.  This is consistent with the Services Agreement's KPIs, which required XPO to ensure order accuracy at a rate of 99% or greater.

99.     XPO failed to meet the required level of order accuracy at the Tracy facility, leading to numerous operational problems for Lindt.

100. One problem caused by inaccurate orders is referred to as "short pay for short ship," meaning that when customers do not receive a full shipment, but are billed for a full shipment, the customers (retailers) reduce the amount of their payment. There are other significant consequences of short-shipping. For example, short-shipping leads to loss of retailer shelf space. It also threatens future revenue as consumers look for other goods when shelves are not stocked with the short-shipped items, often leading loyal consumers to switch to cheaper substitutes.

101. For the September-December period in 2018, Ghirardelli's "short pay for short ship" losses ballooned by 1,377% over the same period in 2017 (before the move to the Tracy facility) and equated to an error rate of over 2.5% of the value of goods handled by the facility.

102. But XPO also erred in the opposite directions with other shipments, as a spot audit on December 6, 2018 found significant *over*-picking. An error in this direction is also costly because retailers have little incentive to pay more than they were billed when too many goods are delivered.

103. In late November and early December 2018, concerned with order accuracy, Lindt asked for XPO to "audit" its own outgoing shipments to determine whether the shipments being picked and placed on the loading dock to be loaded onto outgoing trucks were accurate. XPO conducted multiple audits over several days and repeatedly found that it had a high rate of inaccuracy, as high as nearly 18 percent (if not higher). These spot audits meant that, upon information and belief, shipments in August through November also likely had similar (if not worse) issues with accuracy, a symptom of the overall dysfunction in XPO's operations.

104. In addition, in the early February 2019 report on KPIs pursuant the parties' agreement, XPO reported that it had accurately shipped only 64.5% of orders in December 2018 and only 86.6% of orders in January 2019. It had "cut" other orders—i.e., sent out incomplete

shipments—in the rest of the shipments, complaining that it could not find the inventory to pick, even though its own records showed that the inventory was in the building.

### E.     XPO's Dysfunctional Warehouse Management System

105.    One illustrative cause of XPO's failures in timeliness and accuracy was the new WMS touted in its RFP Response.  XPO's previous WMS (called Bluegrass) was a single, highly automated system that worked well at the Lathrop facility.  But as part of its efforts to continue working for Lindt at the Tracy facility, XPO represented the fact that it would create a new system that would track website orders and incorporate new inventory software, among other things.  The new WMS, which XPO referred to as WM10, proved to have many critical deficiencies, and upon information and belief, unbeknownst to Lindt when it selected XPO for the Tracy work, XPO's same WMS had a track record of catastrophic failure at other facilities.

106.    First, XPO did not allocate sufficient resources to implement WM10 at the Tracy facility.  In advance of "Go Live" at the new facility, XPO chose to divert its IT team to another project in another state, without informing Lindt.  But when the Tracy facility opened, XPO's IT team remained engaged in that other matter and XPO did not timely rededicate them to the Tracy facility.   XPO's actions thus delayed implementation of WM10, and XPO acted so despite knowing that Lindt's crucial holiday season was impending and continually informing Lindt that it was ready to "Go Live."

107.    XPO's failure to provide adequate IT resources directly contradicted XPO's representations in its RFP response that it would "provide 24x365 technical support for all XPO systems and hardware."

108.    Second, contrary to XPO's claims in its RFP Response that Lindt relied upon, the WM10 was not integrated.  For example, XPO claimed that its "WMS delivers: . . . Improved

warehouse speed, efficiency, and accuracy through integration with automated systems." XPO similarly claimed that it would "implement systems interfaces (inbound and outbound) between XPO systems and [LSNA's] system instance." XPO also touted its proprietary messaging technology, which allegedly "provide[d] a proven integration framework and software used to ensure information is exchanged between external systems and XPO systems." Likewise, XPO claimed that its "WMS environment is also enhanced by integrated industry-leading commercial technologies including," manifesting software and label and document generation software, among others. However, as it turned out, XPO materially misrepresented the functional integration of WM10.

109. WM10's lack of integration created myriad problems. The Bluegrass system had integrated all functions: receiving, inventory tracking, order picking (i.e., the warehouse worker filling an order by taking goods off the warehouse shelves and delivering them to the loading dock), truck loading (modeling how the goods will fit in the cargo space) and scheduling (how many trucks should arrive, and when), and bills of lading and other paperwork to communicate clearly to the shipping company. The new WMS, however, was actually a patchwork of four computer systems plus a "Google Document," and the data did not automatically transfer between the systems. This required lengthy cross-checking between systems to perform basic functions. Before, at the Lathrop facility, only five employees were needed to coordinate the logistics of new orders and outbound traffic using the Bluegrass software; after start-up with the new WMS at the Tracy facility, even ten were not enough to adequately accomplish the same tasks, because of the high number of manual tasks, calculations, and cross-checks required by the un-integrated system.

110. XPO's unintegrated WMS system violated industry-accepted best practices. For example, per industry standards, a WMS should be fully and seamlessly integrated with other

business systems used by your company, with updates in real time. Here, XPO's unintegrated, bolted together patchwork of systems violated industry-accepted best practices.

111. Third, at "Go Live," the new WMS was missing important features altogether. For instance, despite XPO's representations in its RFP response that the WMS "will automatically generate the parcel shipping label," the system did not generate labels for pallets that referenced the customer order number, so when the trucks reached their destination, carriers sometimes needed to contact XPO to ask which goods should be unloaded. Ultimately, XPO employees began manually creating placards to attach to and identify the orders. Similarly, the system did not have a truck loading and scheduling feature, so the XPO employees had to spend hours each day to try to figure out how to fit the cases into the trucks, and then create a "Google Doc" online to try to coordinate truck arrivals and departures.

112. According to industry standards, most WMS products support basic shipping functions including the output of shipping documents/labels and shipment manifesting, which should be a seamless and integrated process that automatically produces all required labels and documents. This is considered the most basic function of a WMS. A WMS that only prints requisite labels as a manual process—as was the case with XPO's WMS—is considered "inadequate practice." Such manual processes are characteristic of outdated systems implemented 20 years ago. XPO's failure to automatically generate necessary shipping label information thus failed to meet common industry practice.

113. Similarly, within the industry, most major WMS software packages offer a dock scheduling module that can be used as the core tool for dock management. Such a WMS system should have the capability to develop a truck loading sequence that supports delivery routing. When measured against industry standards, XPO's loading of trailers on an "ad hoc" basis falls

within inadequate practice.  Accordingly, XPO's failure to have at truck loading and scheduling feature integrated into its WMS violated best practices.

114.    Fourth, the new WMS also required a large number of manual calculations, creating high potential for human error.  As one crucial example, the basic units of measure that are standard in warehousing operations are the pallet and the case; the number of contents inside a sealed case are rarely relevant to workers on the warehouse floor.  Thus, in the older XPO WMS system in Lathrop (Bluegrass) for instance, a worker putting away an incoming delivery would type "1" to indicate that he or she was putting away one pallet.  But XPO's new WMS system would ask the worker to input the total number of *units* to put away.  So if there were 230 cases on a pallet, each with 5 bags of Ghirardelli chocolate squares, the worker was supposed to indicate that he or she had put 1,150 bags on the shelf.  This counterintuitive programming led to workers entering incorrect numbers when entering inventory in the system (e.g., typing "1" instead of "1,150") and required workers to do multiplication and division on their smartphone to perform the simple task of retrieving pallets and cases.  With individual orders filling up to forty trucks per day, the opportunities for error created by XPO's WMS were significant.

115.    Per industry standards, accurate and timely inventory balances are required to meet financial controls and customer satisfaction goals.  In other words, picking accurate orders is a "must."  The use of paper documents that must be later entered into the inventory system significantly increases the opportunity for error and impacts the timely knowledge of inventory status.  XPO's counterintuitive, manual calculations significantly increased the opportunity for errors, thus violating industry standards.

116.    Fifth, XPO failed to provide adequate training, particularly on new versions that XPO would release to try to patch the problems. XPO's failure to train employees on a complex,

counterintuitive WMS disregards the underlying purpose of utilizing a WMS, which is to reduce errors and increase productivity.

117.    By late August 2018, of the nearly 700 orders received into XPO's WMS for the Tracy facility since the beginning of that month, 76 percent (534 orders) were backlogged. Only 21 percent (149 orders) had been shipped.

118.    On or about August 22, 2018, XPO Vice Presidents Jim Arnold (Operations & Sales for N. America) and Mark L. Johnson (Senior Vice President, Operations, Food Vertical for N. America) met with Lindt leadership to report the dismal status of operations, offer explanations for XPO's failures, and promise proposed solutions. At that meeting, Johnson and Arnold admitted the WMS suffered from errors in configuration and data input, and that the WMS—despite XPO's representations that WM10 was "fully operational" at dozens of other sites and ready to perform at the Tracy facility —was not fully built-out or capable of functioning as represented: XPO described WM10 as "a high performance engine that is not yet tuned."

119.    Arnold and Johnson reported no fewer than nine significant problems attributable to XPO's WMS, euphemistically referred to as "barriers to recovery" by XPO:

- WMS used erroneous packing keys and units of measure;

- WMS failed to recognize proper inventory figures due to processing errors regarding purchase orders and inbound stock;

- WMS required error-prone manual calculations, which led to inaccurate bills of lading;

- WMS failed to inform Lindt of orders actually shipped, failed to print shipping paperwork, and failed to send Advance Ship Notices (ASNs) that inform customers of shipping and arrival dates;

- The above WMS issues, in turn, corrupted production orders in a parallel system;

- The above WMS issues caused orders to "hang," creating a physical jam at the loading dock and a backlog of outbound orders;

- The above WMS issues proved to be the "primary root cause" of an inbound backlog of relocated inventory from Lathrop, compounding the physical jam at the loading dock;

- Insufficient number of XPO personnel at the Tracy warehouse to fill the gaps left by WMS's failures; and

- Insufficient training for those XPO personnel who did work at the Tracy warehouse.

120. As Lindt entered the most important time of its seasonal sale cycle, Arnold and Johnson conceded that it could take XPO more than 45 days to fully remedy these major issues.

## III.    XPO'S MISREPRESENTATIONS

121. By July 2018 (nearly a *year* after XPO responded to the RFP and won the Tracy facility work) Lindt employees observed problems with XPO's performance in the weeks leading up to "Go Live," which supposedly occurred in August 2018. Lindt employees grew particularly concerned about whether these issues threatened to disrupt Lindt's crucially important holiday seasonal sales and specifically communicated these concerns to XPO.

122. For example, in late July 2018, Ghirardelli's Director of Demand and Supply Planning, James Turner, asked XPO: "Are we confident this week will be different from the last 4 weeks" regarding XPO's failure to perform its co-packing obligations. Lindt's Director of Warehouse Operations, Chris Wood, also posed the concern to XPO that Ghirardelli was "on the verge of not being able to achieve its seasonal goal due to the lack of [co-packing] production in

Tracy"; further observed, "We also continue to run into issues with the new system XPO is installing," referring to the WMS.

123. XPO responded by representing to Lindt that XPO was prepared to open the Tracy facility in August 2018 as planned. On or about July 31, 2018, GXO Senior Vice President Mark L. Johnson responded to these concerns: XPO has not "lost confidence in having the integration functional for OB go-live."

124. But at the same time, XPO was internally discussing its own concerns about whether it would be ready for "Go Live," and by extension, whether it could meet its contractual and other obligations to Lindt, in particular whether the upcoming holiday season would be in jeopardy. For example, GXO's Kevin Handsome wrote on August 1, 2018: "I have concerns about readiness for go-live picking on Monday. I have sent multiple e-mails asking for directions."

125. On August 19, 2018, shortly after the attempted "Go Live," Mr. Johnson acknowledged XPO's mistakes, yet wrote to Lindt that he remained "personally committed to driving our agreed upon targeted outcomes. While I share your concern for recovering to target by 9/1, I am completely confident we will get there soon." Mr. Johnson continued: "We [XPO] are accountable for our performance, and we will be prepared to answer questions, and more importantly to drive better results."

126. At the August 22, 2018 meeting between Mr. Johnson, Mr. Arnold, and Lindt leadership, the XPO executives further represented "[w]e are tracking to start on-time," despite admitting to the litany of WMS-caused breakdowns, detailed above.

127. XPO's representations about its preparedness and efforts were not true, and lacked reasonable ground for being true as described above. XPO <u>knew</u> its representations to be false and

misleading, as its employees privately conceded XPO could not meet its contractual obligations on-time.

128.    XPO was motivated to make these false representations to Lindt because XPO benefited from continued business with Lindt and did not want to face potential replacement based on its failure to perform.

## IV.    LINDT TERMINATES XPO

129.    As Lindt feared, XPO's co-packing disaster, its failure to provide adequately trained labor and failure to fulfill on-time and accurate orders, and its disastrous new WMS were neither addressed nor fixed, and XPO's conduct resulted in massive disruption of the Tracy facility operations.

130.    XPO's lack of preparedness and inability to meet the KPIs of the Services Agreement or industry standards manifested immediately after Go Live.

131.    By the fall of 2018, as the situation at the Tracy facility was worsening and with the holiday season problems beginning to materialize, Russell Stover and Lindt USA had no choice but to pull nearly all of their product out of the facility, re-open the warehouses that they had closed in Watsonville, California and Lancaster, Texas and transfer the product to those locations. Ghirardelli, however, had no such option because XPO had closed the Lathrop facility, turned off the Bluegrass system, and transferred the entire Ghirardelli inventory to the Tracy facility.

132.    It was also too late for Ghirardelli to seek and secure alternative warehousing and logistics services from another provider or at another location. This is because of the industry standard realities facing premium chocolatiers. For companies like Lindt, securing retail shelf space in the months leading up to the holiday season is not only critical from a business perspective, but required by the retailers themselves. Retailers hold suppliers to strict seasonal

deadlines to accommodate the retailers' own logistics operations. These deadlines require premium chocolatiers like Lindt to produce, deploy, and ship product months in advance of the earliest part of the holiday season. Product that falls behind the retailer-implemented deadlines not only results in direct loss of business from the retailers themselves, but also downstream loss of loyal consumers who encounter an empty shelf and consequently select (and continue to buy) an alternative, competing product. Thus, abruptly switching warehouse service providers (even in the circumstances XPO's failures forced upon it) would have caused even greater damage to Ghirardelli.

133.    Further compounding these problems for Lindt, Ghirardelli's manufacturing operations are located in California, and thus the Tracy facility became the bottleneck preventing Ghirardelli from shipping product to Lindt's other regional distribution centers around the country.

134.    As the problems caused by XPO grew, both Ghirardelli and local management asked XPO to return to using the Bluegrass system until they could recover from the backlog. XPO refused, with senior XPO management insisting that the new WMS could and would work well. It never did. Upon information and belief, XPO told former local managers to "shut up" about the issues in order to conceal them from Lindt.

135.    XPO's rampant failures led to numerous disputes between the parties. In response, XPO pulled out staffing and abandoned its attempts to make the WMS work. This only compounded XPO's errors. XPO then had the audacity to bill Lindt nearly $10 million for its deficient services, including millions for a mark-up not agreed to by Lindt nor supported by industry standards. Lindt meanwhile demanded recompense for its substantial extra expenses and losses that resulted from XPO's failures.

136.     After a failed attempt to resolve the parties' differences in February 2019, XPO threatened to simply stop work until Lindt NA paid XPO for its poor performance.

137.     In March, Lindt NA was left with no choice but to look elsewhere and hire a new logistics company to take over the facility which occurred as of June 2019.

138.     Lindt terminated XPO effective May 17, 2019.

139.     Within one month of the new company taking over duties for XPO, all issues at the Tracy facility (e.g., failure to ship on-time and accurate orders, labor shortages, co-packing failures, WMS and other system failures) resolved.

## V.      FORMER XPO WORKERS ADMIT TO XPO'S FAILINGS

140.     At least one former XPO employee has provided sworn testimony in a different, unrelated matter vividly portraying XPO's failures and confirming that fault lies with XPO, not Lindt.

141.     In a deposition, the former XPO Tracy Distribution Operations Manager conceded that the "systems that [XPO] used were horrible" and that XPO "did not perform their work very well," which "cost [Lindt] a ton of money in sales."

142.     Even more troubling, a former XPO line manager reported that the XPO management team instructed XPO employees to falsify records by entering inventory movements into the system as if outbound goods had been loaded (when in fact they had not been) in order to give the appearance that shipments were complete and accurate (when they were not).  Upon information and belief, these falsified records resulted in fake bills of lading and a very high rate of customer fines for delivery of incomplete orders, millions of dollars over what was budgeted.

143.     Upon information and belief, the local XPO staff was so ashamed of XPO's performance that on the final day of the transition to Metro, a number of them wore T-shirts that

they made, satirizing an earlier XPO team T-shirt, featuring the hashtags "#we survived XPO" (on the front) and "#not always like this" (on the back):



## VI.    LINDT'S BUSINESS SUFFERS MASSIVE HARM

144.    XPO's failures at the Tracy facility in late 2018 and early 2019 caused significant damages to each of the Lindt entities in numerous forms.

145.    First, Lindt lost significant revenues due to XPO's inability to proficiently distribute Lindt products as required. Ghirardelli suffered particularly significant lost profits as it was unable to cease using the Tracy warehouse once XPO's failings became evident, and the problems at the Tracy facility bottlenecked its entire national operations. Lindt USA and Russell Stover also experienced substantial lost sales and profits. As noted, XPO damaged Lindt's distribution operations at the worst possible time, before and during the peak holiday season, thus exacerbating the losses to Lindt. Lindt estimates that, conservatively, it lost several million dollars in profits in 2018 and 2019 due to XPO's many failures.

146.     XPO's impact on Lindt's revenues did not end when Lindt terminated XPO.  XPO's poor performance damaged Lindt's relationships with some of the nation's largest retailers.  In the retail industry, when a manufacturer fails to deliver as Lindt did in 2018 and 2019 due to XPO's failures, the retailer will often adversely change its purchasing and marketing behaviors for months and years to come.  Lindt estimates that XPO's failures cost Lindt millions more in lost profits in the subsequent years.

147.     Lindt also incurred significant other costs and losses due to XPO.  For instance and without limitation, Lindt incurred:

> a.  Millions of dollars in additional costs as a result of Lindt USA and Russell Stover needing to keep open or re-open the back-up warehouses that were supposed to be consolidated into the Tracy facility in order to mitigate their losses;
>
> b.  Millions of dollars in additional transportation expenses for sending trucks through less-efficient, "out of network" routes in order to try to mitigate XPO's distributional delays;
>
> c.  Millions of dollars of losses from having to sell products at deep discounts because they were sold after the applicable holiday, in order to mitigate Lindt's losses;
>
> d.  Millions of dollars in inventory that Ghirardelli had to destroy or donate due to delays and expiration dates; and
>
> e.  Millions of dollars in customer fines that Ghirardelli had to pay customers for delivery of late (or no) product.

148.    Upon information and belief, Lindt also incurred reputational harm as a result of being unable to fully deliver for its business partners during a crucial time of year and as described above.    Upon information and belief, Lindt (and especially Ghirardelli, whose California operations were highly reliant on XPO) also lost market share as a result of XPO's failures.  This type of harm and losses can take years for premium brands like Lindt to recover from.

149.    XPO damaged Lindt's business in numerous other ways to be established through discovery and proven at trial.

150.    In sum, Lindt conservatively estimate that XPO's failures at the Tracy facility cost it at least $40 million in damages.

### FIRST CLAIM FOR RELIEF
**(Breach of Contract)**

151.    Lindt repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

152.    Through its numerous errors and failures at the Tracy facility, XPO breached two agreements with Lindt having substantially the same material terms: the 2007 Services Agreement and the Implied Agreement.

### The 2007 Services Agreement

153.    First, the 2007 Services Agreement (as amended by the LOI and LOI Amendment) was a valid, binding written agreement that applied to all of XPO's operations at the Tracy facility through June 30, 2018.

154.    The 2007 Services Agreement was between Lindt NA and Ghirardelli, on the one hand, and XPO, on the other.

155.    Lindt USA and Russell Stover are entitled to assert a breach of the 2007 Services Agreement at the Tracy facility because, among other reasons, they are specifically intended third-

party beneficiaries to the agreement and/or they were and are in an agency relationship with Lindt NA. Ghirardelli is entitled to assert a breach of the 2007 Services Agreement because it was a party to the agreement until at least April 30, 2018, during the time of XPO's breaches.

156. In the alternative, to the extent that the 2007 Services Agreement was between XPO and only Lindt NA, and not the Lindt Manufacturers, the Lindt Manufacturers were party to an implied agreement with XPO during the time that XPO performed work for the Lindt Manufacturers at the Tracy facility prior to June 30, 2018, as evidenced by the totality of the circumstances, including, without limitation, the RFP and XPO's response thereto, negotiations and discussions between the parties, and the parties' conduct, which embodied all of these factors. The totality of circumstances and facts to be proven at trial show that there was a meeting of the minds between XPO and the Lindt Manufacturers for XPO to provide services to the Lindt Manufacturers at the Tracy facility for consideration prior to June 30, 2018.

157. Pursuant to the 2007 Services Agreement, XPO had a duty to provide start-up services in anticipation of XPO's "Go Live" date for the Tracy facility.

158. XPO breached the 2007 Services Agreement by, for example, failing to provide sufficient labor and failing to adequately train the labor it did provide. XPO additionally breached its duty by failing to meet its co-packing obligations.

159. The 2007 Services Agreement expired on June 30, 2018.

**The Implied Agreement**

160. The parties continued working together after June 30, 2018 pursuant to a valid and binding Implied Agreement demonstrated by the totality of the circumstances, including, without limitation, the material terms of the 2007 Services Agreement, warehousing industry standards of workmanship, the RFP and XPO's response thereto, negotiations and discussions between the parties, and the parties' conduct, which embodied all of these factors. The totality of circumstances

and facts described herein and to be proven at trial show that there was a meeting of the minds between XPO and Lindt for XPO to provide services to the Lindt Manufacturers at the Tracy facility for adequate consideration.

161.    The Implied Agreement was between XPO, on the one hand, and all Plaintiffs, on the other.

162.    In the alternative, to the extent that the parties' implied agreement was between XPO and only Lindt NA, and not the Lindt Manufacturers, the latter are entitled to assert a breach of the agreement between Lindt NA and XPO because, among other reasons, they are third-party beneficiaries to the agreement Tracy Agreements and/or they were and are in an agency relationship with Lindt NA.

163.    The Implied Agreement incorporated the 2007 Services Agreement's material terms, such as KPIs, that XPO was obligated to comply with at the Tracy facility, including a 98%+ on-time rate and a 99%+ accuracy rate.

164.    As described in detail above, XPO fell far short of and materially breached its obligations under the Implied Agreement to perform under the KPIs, industry standards, and any potentially applicable standard.  For example, for several months, XPO's performance, including its actual rate of on-time and accurate orders, was far below the KPIs originally set out in the 2007 Services Agreement KPIs, as well as industry standards.  Despite its obligation to ship 98%+ of orders on time, XPO's on-time performance in the first five months ranged from 66% in one month all the way down to 32% and 33% in others.  And despite its obligation to ensure 99%+ order accuracy, XPO was still finding double-digit errors in December 2018.  A June 2019 reconciliation showed $5+ million in unaccounted-for inventory discrepancies, and this number is likely far under-representative.  XPO's failure to meet its obligations was so extensive that Russell Stover

and Lindt USA had to resume using their previous distribution centers in order to try to meet holiday demand, which they were unable to do.

165.    Lindt performed all of its duties under the 2007 Services Agreement and Implied Agreement or its performance was excused, including by XPO's aforementioned breaches.

166.    XPO's breaches of the 2007 Services Agreement and Implied Agreement severely damaged Lindt in multiple regards.  For example, XPO's poor performance during peak holiday season caused Lindt to lose millions of dollars in sales that it would have and should have ordinarily made.  Lindt also incurred many millions of dollars in other expenses resulting from XPO's failings; for example, costs of deeply discounting holiday motif products that were delivered after the holidays and destroying or donating expired products.  Lindt's damages further include downstream retail-related losses in the form of, without limitation, harm to Lindt's reputation in the views of retailers and customers, forfeited preferred shelf space fees, loss of preferred shelf space, fines and penalties (monetary or otherwise) imposed on Lindt by its retailers, reduced orders, and discontinuance of certain items.  These losses are not limited to the 2018-2019 holiday season; they were (and continue to be) incurred in subsequent years.

167.    Due to XPO's breaches of contract, Lindt is entitled to damages in an amount to be proven at trial, as well as pre-judgment interest, costs, and its reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF
### (Breach of Covenant of Good Faith and Fair Dealing)

168.    Lindt repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

169.    Between November 2007 and May 2019, XPO and its predecessors provided third-party logistics services for Lindt pursuant to the 2007 Services Agreement and the Implied Agreement (together, the "Tracy Agreements").

170.     In the alternative, to the extent that the 2007 Services Agreement was between XPO and only Lindt NA, and not the Lindt Manufacturers, the Lindt Manufacturers were party to an implied agreement with XPO during the time that XPO performed work for the Lindt Manufacturers at the Tracy facility prior to June 30, 2018, as evidenced by the totality of the circumstances, including, without limitation, the RFP and XPO's response thereto, negotiations and discussions between the parties, and the parties' conduct, which embodied all of these factors. The totality of circumstances and facts to be proven at trial show that there was a meeting of the minds between XPO and the Lindt Manufacturers for XPO to provide services to the Lindt Manufacturers at the Tracy facility for consideration prior to June 30, 2018.

171.     In the alternative, to the extent the Implied Agreement was only with Lindt NA and not with the Lindt Manufacturers, the latter are entitled to assert a breach of the agreements between Lindt NA and XPO and the covenants therein because, among other reasons, they are third-party beneficiaries to the agreements and/or they were and are in an agency relationship with Lindt NA.

172.     The Tracy Agreements vested XPO with discretion in how it would proficiently provide start-up services and operate the Tracy facility in a manner that would meet the parties' performance expectations.

173.     The Tracy Agreements, like every agreement, contained an implied covenant of good faith and fair dealing.

174.     Lindt performed all of its duties under the parties' agreement or its performance was excused, including by XPO's breaches.

175.     XPO breached the implied covenant of good faith and fair dealing in multiple ways.

176.    For example, XPO unreasonably diverted IT staffing from the Tracy facility without telling Lindt and thus delayed implementing the new WMS.

177.    XPO's implementation of and reliance on the flawed WMS system was also unreasonable. This system had many critical deficiencies in terms of design and execution including that it was not integrated, did not generate labels for pallets that referenced the customer order number, did not have a truck loading and scheduling feature, and required a large number of manual calculations.

178.    Further, upon information and belief, XPO later told employees to "shut up" about problems with the WMS and to conceal them from Lindt. Upon information and belief, XPO went as far as to falsify inventory records to give the appearance that shipments were complete and accurate, leading to false bills of lading that produced significant customer fines for delivery of incomplete orders.

179.    Further still, XPO acted unreasonably and with an intentional disregard for Lindt's business by threatening and/or actually pulling out staffing and ceasing its attempts to make the WMS work, after the dispute with Lindt came to a head.

180.    XPO's conduct in implementing the new WMS system immediately before the peak season for confectioners and continuously misrepresenting the status of the warehousing issues was objectively unreasonable.

181.    XPO's conduct in implementing the new WMS system immediately before the peak season for confectioners and continuously misrepresenting the status of the warehousing issues was a conscious and deliberate act.

182.    XPO's breaches of the implied covenant of good faith and fair dealing severely damaged Lindt in multiple regards. For example, XPO's poor performance during peak season

caused Lindt to lose millions of dollars in sales that it would have and should have ordinarily made. Lindt also incurred many millions of dollars in other expenses resulting from XPO's failings; for example, costs of deeply discounting holiday motif products that were delivered after the holidays and destroying or donating expired products. Lindt's damages further include downstream retail-related losses in the form of, without limitation, harm to Lindt's reputation in the views of retailers and customers, forfeited preferred shelf space fees, loss of preferred shelf space, fines and penalties (monetary or otherwise) imposed on Lindt by its retailers, reduced orders, and discontinuance of certain items. These losses are not limited to the 2018-2019 holiday season; they were (and continue to be) incurred in subsequent years.

183. Due to XPO's breaches of the implied covenant of good faith and fair dealing, Lindt is entitled to damages in an amount to be proven at trial, as well as pre-judgment interest, costs, and its reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF
### (Negligence, in the Alternative)

184. Lindt repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein. Lindt pleads this claim in the alternative to its contract claim, to the extent the Court finds a lack of a contractual duty on the same subject and for the same time period between any of the Lindt entities and XPO.

185. XPO is a professional warehouse and logistics services provider that owed Lindt a duty of care, skill, and proficiency commonly exercised by ordinarily skillful, careful and prudent warehouse professionals.

186. As a contractor and operator of a warehouse entrusted with Lindt's valuable goods and with bringing those goods to market, XPO owed Lindt a professional duty of care in receiving,

inventory tracking, order picking, truck loading, scheduling, preparing bills of lading and other shipping paperwork, and all other logistical and warehouse operations at the Tracy facility.

187. XPO was thus required to exercise at least the skill and knowledge normally possessed by professional warehouse operators. But here, because XPO held itself as a premier logistics company with greater skill and knowledge than a typical operator, it was required to operate the Tracy facility at even higher standards.

188. XPO failed to operate the Tracy facility in a workmanlike manner, which led to missed KPIs, mis-picked orders, and missed deliveries. In doing so, XPO negligently breached its duty of care owed to all of the Lindt companies because its performance fell not only below the level of service that Lindt was accustomed to XPO providing at the Lathrop facility, but also below the standards of the industry, below the standards of a purportedly premier logistics company that responded to the Tracy RFP, and below the standards of a reasonable professional warehouse operator.

189. For instance, in the months after the Tracy warehouse opened, XPO was unable to make shipments on time as measured by the applicable standards of care, leading to a backlog that took months to recover from. XPO was also unable to make shipments with the accuracy required by the applicable standards of care. For example, XPO failed to meet industry-standard KPIs with respect to on-time departures during the most critical time of year for chocolate shipments. On-time departures were between 32% and 66%, significantly below the industry standard of 98-99%.

190. XPO's breaches of its duties of care owed to Lindt, including its failure to maintain an accurate inventory and to timely fulfill and prepare orders for shipment, severely damaged Lindt in multiple regards, including through reputational injury, loss of revenue, and excess costs to Lindt.

191.    Due to XPO's negligence, Lindt is entitled to damages in an amount to be proven at trial, as well as pre-judgment interest, costs, and its reasonable attorneys' fees.

## FOURTH CLAIM FOR RELIEF
### (Fraud)

192.    Lindt repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

193.    On or around March 2017, Lindt issued a RFP, seeking a logistics provider to operate Lindt's new facility in Tracy, California. The facility would service orders for the Lindt Manufacturers' products for the entire West Coast.

194.    Lindt sought responses to the RFP, intending to rely on those responses and related communications when selecting a company to operate the Tracy warehouse.

195.    XPO communicated its responses to Lindt's RFP in writing, including through the RFP Response, and via other oral and in-person statements. XPO's responses, however, contained material misrepresentations that XPO knowingly made to induce Lindt to hire and retain XPO for the Tracy warehouse work.

196.    As but one example of XPO's false representations, on or around April 13, 2017, XPO submitted the RFP Response.

197.    Of note, the RFP Response detailed the alleged capabilities of XPO's Warehouse Management Solution software system, including that the WMS would deliver "[i]mproved warehouse speed, efficiency, and accuracy through integration with automated systems." *See* RFP Response, at 3-1 ("Should LSNA want to integrate their Net Suite systems with XPO, our proven integration platform and methodology will ensure successful integration for smooth and rapid implementation."); *id.* at 3-2, 3-3 ("XPO's proprietary messaging technology, Connection Manager (CM), provides a proven integration framework and software used to ensure information

is exchanged between external systems and XPO systems . . . XPO uses Connection Manager to provide a seamless integration to our client's systems with full auditing and event tracking to ensure delivery of information."). The RFP Response stated that "the [WMS] system will automatically generate the parcel shipping label." Finally, XPO committed to providing "24x365 technical support for all XPO systems and hardware."

198. These representations were false. The WMS was not integrated as represented. It required the entry of a large number of manual calculations that invited and compounded human error. It did not generate labels for pallets that referenced the customer order number. And XPO ultimately refused to provide and held back adequate technical support for its systems.

199. Lindt was unaware of the falsity of the representations when XPO made them.

200. XPO's misrepresentations were material to and substantially influenced Lindt's decision to award XPO the Tracy facility work; indeed, without a WMS that promised integration and appropriate printing and scheduling features, for example, Lindt would not have selected XPO.

201. XPO made these false representations in response to the RFP intending to induce Lindt to award the Tracy warehouse business to XPO, and intending and expecting Lindt to rely upon them in making its decision.

202. When XPO made these false representations to Lindt in April 2017 and the following weeks, XPO did so without believing these representations to be true. For example, the XPO personnel who drafted XPO's written response to the RFP could not have so believed their written guarantees about the WMS's capabilities because the WMS plainly was not capable of performing as promised: the WMS was not integrated, it did not contain an integrated truck loading and scheduling feature, and it did not print pallet labels with the requisite information. At the very

least, those XPO personnel made these false representations in a reckless manner without knowing whether their statements were true or false.

203.    Lindt reasonably relied on XPO's false representations made in response to the RFP when Lindt determined to award the Tracy facility work to XPO.  Having worked successfully with XPO at the Lathrop facility since 2007, Lindt's reliance on XPO's representations in response to the RFP was reasonable and justifiable.

204.    As a result of reasonably and justifiably relying on XPO's representations in response to the RFP, Lindt awarded the Tracy warehouse work to XPO over other logistics vendors.

205.    Just as XPO fraudulently induced Lindt to engage XPO at the Tracy facility, it also made fraudulent misrepresentations to keep Lindt from terminating the parties' agreement or taking any other action against XPO earlier than May 2019.

206.    Specifically, in the summer of 2018, when the WMS's deficiencies became increasingly apparent, Lindt employees raised concerns to XPO.

207.    For example, Ghirardelli's James Turner asked, "Are we confident this week will be different from the last 4 weeks," referring to the problems with co-packing production.  Chris Wood expressed concerns that Ghirardelli was "on the verge of not being able to achieve its seasonal goal due to the lack of [co-pack] production in Tracy."  Mr. Wood also observed that Lindt "continue[d] to run into issues with the new system XPO is installing."

208.    On July 31, 2018, in an email to Mr. Wood and another now-former Lindt executive, XPO Senior Vice President Mark L. Johnson kept Lindt in the contractual relationship by reassuring the Lindt Companies that XPO was ready for the launch, stating that he had not "lost confidence in having the integration functional for OB go-live."

209.    But Mark Johnson's representations in his July 31, 2018 email were false because, at that same time, XPO was internally expressing significant concerns about its ability to perform. For example, the very next day, GXO's Kevin Handsome internally wrote: "I have concerns about readiness for go-live picking on Monday. I have sent multiple e-mails asking for directions."

210.    As the summer of 2018 progressed, XPO failed to meet its contractual performance requirements and continued to misrepresent its ability to recover.

211.    For example, on August 17, 2018, Chris Wood and another now-former Lindt executive both wrote to Mark Johnson to express concerns over the coming "disaster." On August 19, 2018, Mark Johnson responded to the former Lindt executive that "[w]hile [Mark Johnson] share[d] [the] concern[s] for recovering to target by 9/1, [he was] completely confident we will get there soon."

212.    Mark Johnson's representations in his August 19, 2018 email were false. Mr. Johnson was representing that XPO was taking the steps needed to improve performance and operations; however, in reality, those steps were insufficient to improve XPO's performance and would not enable XPO to meet its contractual obligations "soon" or in the near future. In other words, XPO strung Lindt along with the intention that Lindt would not learn of XPO's inability to perform and not terminate XPO or take other action against XPO at an earlier point.

213.    Chris Wood and the now-former Lindt executive had the authority and right to rely on Mark Johnson's statements on behalf of Lindt.

214.    Lindt was unaware of the falsity of the representations.

215.    Mark Johnson's representations were material to Lindt's decision to continue using XPO's services at the Tracy facility. Without his assurances that XPO's issues would be resolved in time to avoid massive lost profits, Lindt would have sought to replace XPO with another

logistics vendor at an earlier point, or at least attempted alternative solutions. But by this time, switching providers at the Tracy facility or shifting Ghirardelli to another site was not possible. The capabilities of XPO's WMS and their proper function were part and parcel of XPO's representations in response to the RFP and XPO's contract and/or transactional relationship with Lindt.

216.    Mark Johnson made these false representations with the intent to induce Lindt to retain XPO despite XPO's failure to perform, rather than seek and secure a replacement logistics vendor. As Mark Johnson would have been aware around this time, Lindt was in the process of moving Russell Stover and Lindt USA to alternative sites operated by XPO's competitors, motivating him to make these misrepresentations of fact to induce Lindt NA and Ghirardelli to stay the course with XPO.

217.    Lindt relied on Mark Johnson's false representations when Lindt determined to continue using XPO's services at the Tracy facility and to forego seeking a replacement logistics vendor prior to early 2019. Having worked successfully with XPO at the Lathrop facility since 2009, Lindt's reliance on Mark Johnson's statements was reasonable and justifiable.

218.    As a result of reasonably and justifiably relying on XPO's representations—both those made in response to the RFP and those communicated by Mark Johnson in July and August 2018—Lindt awarded the Tracy facility work to XPO over other logistics vendors and then determined not to replace XPO when XPO failed to perform in the spring and summer of 2018.

219.    By selecting and continuing to work with XPO, Lindt suffered damages in the tens of millions of dollars. For example, XPO's failure to perform during peak season caused Lindt to lose millions of dollars in sales that Lindt would have and should have ordinarily realized. Lindt also incurred many millions of dollars in other expenses resulting from XPO's failure to perform,

including, without limitation, costs of deeply discounting holiday motif products delivered after the holidays, destroying or donating expired products, harm to Lindt's reputation in the views of retailers and customers, forfeited preferred shelf space fees, loss of preferred shelf space and resulting loss of sales, fines and penalties (monetary or otherwise) imposed on Lindt by its retailers, reduced orders, and discontinuance of certain items..

220.     Due to XPO's false representations, Lindt is entitled to damages in an amount to be proven at trial, as well as pre-judgment interest, costs, and its reasonable attorneys' fees.

## FIFTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

221.     Lindt repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

222.     Lindt entrusted XPO to run its Tracy facility on behalf of Lindt NA and the Lindt Manufacturers, and as a result of this relationship, XPO had a duty to fully and accurately disclose material information to Lindt concerning the operations of the Tracy facility. XPO had superior knowledge regarding the operation of the facility.

223.     As previously alleged, at a minimum, the new WMS that XPO attempted to implement at the Tracy facility had many critical deficiencies in terms of design and execution including that it was not integrated, did not generate labels for pallets that referenced the customer order number, and required a large number of manual calculations. XPO failed to provide adequate training, particularly on new versions that XPO would release to try to patch the problems.

224.     Upon information and belief, XPO knew about the problems with the WMS system, but negligently misrepresented the scope, impact on services, and timeline for resolution to Lindt.

225.    For example, leading up to "Go Live," Lindt expressed concern over XPO's readiness to operate the facility based on issues observed with the new WMS.  On or about July 31, 2019, GXO Senior Vice President Mark L. Johnson told Lindt that XPO was confident in its ability to perform, although, upon information and belief, XPO had significant internal doubts. Even after XPO began falling behind its performance metrics in August 2018, Mark L. Johnson reiterated that it would "soon" be back on track.

226.    But given XPO's significant internal doubts, XPO had no reasonable ground for believing that it would "soon" be back on track.

227.    XPO made these misrepresentations intending for Lindt to rely on them in the course of their commercial relationship and to refrain from taking action against XPO.  Indeed, these nondisclosures and misrepresentations caused Lindt to continue to use the Tracy facility and WMS system instead of attempting alternative solutions, such as demanding the re-implementation of the Bluegrass system used at Lathrop.

228.    Given its decade-plus relationship with XPO and its predecessors, Lindt had no knowledge that XPO's misrepresentations were not correct and thus reasonably relied on them.

229.    XPO's negligent misrepresentations severely damaged Lindt in multiple regards. For example, XPO's poor performance during peak season caused Lindt to lose millions of dollars in sales that it would have and should have ordinarily made.  Lindt also incurred many millions of dollars in other expenses resulting from XPO's failings, for example, costs of deeply discounting holiday motif products that were delivered after the holidays, destroying or donating expired products, harm to Lindt's reputation in the views of retailers and customers, forfeited preferred shelf space fees, loss of preferred shelf space and resulting loss of sales, fines and penalties

(monetary or otherwise) imposed on Lindt by its retailers, reduced orders, and discontinuance of certain items.

230. Due to XPO's negligent misrepresentations, Lindt is entitled to damages in an amount to be proven at trial, as well as pre-judgment interest, costs, and its reasonable attorneys' fees.

## SIXTH CLAIM FOR RELIEF
### (Violation of Cal. Business and Professions Code § 17200, et seq.)
### (Ghirardelli v. XPO)

231. Lindt repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

232. Ghirardelli, a California corporation headquartered in California, was reputationally and economically injured in California as a result of XPO's fraudulent and unfair business acts at the Tracy warehouse.

233. Ghirardelli was a consumer of XPO's logistical services as alleged above.

234. As alleged above, including in Lindt's Fourth Claim for Relief, XPO engaged in fraud and unfair business practices by misrepresenting the scope, impact on services, and timeline for resolution of issues with the WMS system by: falsely representing its readiness to operate the Tracy facility; falsely telling Lindt (including Ghirardelli) that it was confident in its ability to perform, although it had significant internal doubts; and reiterating that it would "soon" be back on track when poor performance metrics continued after August 2018.

235. Ghirardelli relied on these fraudulent misrepresentations and unfair business practices by not terminating XPO sooner or not seeking alternative options, leading Ghirardelli to be unable to get its products on the shelves and keep them stocked as necessary during peak season.

236.    XPO's fraudulent and unfair business acts under California Business and Professions Code § 17200 *et seq.* severely damaged Ghirardelli in multiple regards.  For example, Ghirardelli and Lindt NA paid monies to XPO for its services at the Tracy facility that it would not have and should not have paid but for XPO's misrepresentations.  Ghirardelli lost millions of dollars in sales that it would have and should have ordinarily made.  Ghirardelli and Lindt also incurred many millions of dollars in other expenses resulting from XPO's failings; for example, costs of deeply discounting holiday motif products that were delivered after the holidays, destroying or donating expired products, harm to Lindt's reputation in the views of retailers and customers, forfeited preferred shelf space fees, loss of preferred shelf space and resulting loss of sales, fines and penalties (monetary or otherwise) imposed on Lindt by its retailers, reduced orders, and discontinuance of certain items..

237.    XPO's fraudulent and unfair business acts also harmed the general public and consumers of Lindt's products as they, among other things, created a difficult work environment for the many workers in the Tracy facility during the XPO-caused crisis, interrupted the purchases of numerous retailers, and deprived Lindt's consumers of their choice of products during the holidays.

238.    Due to XPO's violations of California Business and Professions Code § 17200 *et seq.*, Ghirardelli is entitled to restitution and damages in an amount to be proven at trial, as well as pre-judgment interest, costs, and its reasonable attorneys' fees.

## **DEMAND FOR JURY TRIAL**

Lindt hereby demands a jury trial on any and all issues appropriately triable before a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Lindt prays for the following judgment and relief against GXO:

A.  Judgment in favor of Plaintiffs and against Defendant;

B.  An award of all damages adequate to compensate Plaintiffs for Defendant's breaches and other wrongful acts in an amount to be proven at trial, together with pre-judgment and post-judgment interest and costs, as fixed by the Court;

C.  An award of Plaintiffs' costs, expenses, disbursements, and reasonable attorneys' fees related to Defendant's breaches and wrongful acts;

D.  Restitution under Cal. Business and Professions Code § 17200, *et seq.*

E.  Such other further relief, in law or equity, as this Court deems just and proper.

Dated: September 8, 2022                    Respectfully submitted,


                                  /s/ *Evan M. Rothstein*
                                  Jeffrey J. Simon, MO Bar #35558
                                  Taylor Concannon Hausmann, MO Bar #67056
                                  HUSCH BLACKWELL LLP
                                  Kansas City, Missouri 64112
                                  Telephone: 816.983.8000
                                  Facsimile: 816.983.8080
                                  jeff.simon@huschblackwell.com
                                  taylor.hausmann@huschblackwell.com

                                  Evan M. Rothstein (*pro hac vice*)
                                  Patrick B. Hall (*pro hac vice*)
                                  ARNOLD & PORTER KAYE SCHOLER LLP
                                  1144 Fifteenth Street, Suite 3100
                                  Denver, Colorado 80202
                                  Telephone: 303.863.1000
                                  Facsimile:  303.863-2301
                                  evan.rothstein@arnoldporter.com
                                  patrick.hall@arnoldporter.com
                                  kristen.kendall@arnoldporter.com

                                  Theresa M. House (*pro hac vice*)
                                  ARNOLD & PORTER KAYE SCHOLER, LLP
                                  250 West 55th Street
                                  New York, NY 10019-9710
                                  Telephone: (212) 836-8094
                                  Theresa.House@arnoldporter.com

                                  Peter H. Vogel (*pro hac vice*)
                                  ARNOLD & PORTER KAYE SCHOLER, LLP
                                  70 West Madison Street
                                  Suite 4200
                                  Chicago, IL 60602-4231
                                  Telephone: (312) 583-2300
                                  Peter.Vogel@arnoldporter.com

                                  *Counsel for Plaintiffs Lindt & Sprüngli (North*
                                  *America) Inc., Lindt & Sprüngli (USA), Inc.,*
                                  *Ghirardelli Chocolate Company, and Russell Stover*
                                  *Chocolates, LLC*

US 172107351