**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| LINDT & SPRUNGLI (NORTH AMERICA) INC., *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:22-cv-00384-BP |
| | ) | |
| GXO WAREHOUSE COMPANY, INC., F/K/A XPO LOGISTICS SUPPLY CHAIN, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT GXO WAREHOUSE COMPANY, INC.'S**
**REPLY SUGGESTIONS IN SUPPORT OF**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

LEGAL ARGUMENT ................................................................................................ 2

I.  Plaintiffs' Implied Contract Claims are Precluded by the Express Language of the Parties' Agreements Requiring Any Extensions of Those Agreements Be in Writing. ........................................................................................................... 2

II.  Plaintiffs Cannot Rely on "Industry Standards" to Create an Implied-in-Fact Contract Where None Exists. ...................................................................... 6

III.  The Affiliates' Express and Implied Contract Claims Fail as a Matter of Law. ............... 7

IV.  Plaintiffs' Breach of Express Contract Claims Are Based on Alleged Breaches and Alleged Damages That Occurred After the Express Contracts Had Expired. ............ 9

V.  Plaintiffs' Claim for Breach of Implied Covenant of Good Faith and Fair Dealing Fails Because (1) there is no Valid Contract Between the Parties and (2) if there were a Valid Contract, the Claim Would Fail Because Express Contractual Provisions Would Govern the Subject Matter of Plaintiffs' Claims. ............................... 12

VI.  The FAC's Allegations Do Not Establish a "Special Relationship" or Independent Duty That Would Negate the Economic Loss Rule. ....................................... 15

VII.  Plaintiffs' Fraud, Negligent Misrepresentation, and Statutory Fraud Claims Fail Because They Have Not Alleged Any Actionable Statements with Particularity. ........... 17

VIII.  Plaintiffs' Fraud, Misrepresentation, and Statutory Fraud Claims Also Fail Because They Have Not Sufficiently Alleged Reliance. .................................. 23

IX.  The Economic Loss Rule Bars the Fraud Claim if the Contract Claims Survive. ............ 24

X.  Plaintiffs Do Not Contest that Ghirardelli Cannot Recover for Lost Market Share or Lost Profits Under the California UCL. ...................................................... 25

**CONCLUSION** ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affordable Cmtys. of Mo. v. EF&A Capital Corp.*, No. 4:11-CV-555 CAS, 2012
WL 43520 (E.D. Mo. Jan. 9, 2012) ..................................................................24

*Autohaus Brugger, Inc. v. Saab Motors, Inc.,* 567 F.2d 901 (9th Cir. 1978) ...........................3, 5

*Balsam v. Tucows Inc.*, 627 F.3d 1158 (9th Cir. 2010) ....................................................7

*Body Jewelz, Inc. v. Valley Forge Ins. Co.*, 241 F. Supp. 3d 1084 (C.D. Cal. 2017)...................16

*Budach v. NIBCO, Inc.*, 2015 WL 3853298 (W.D. Mo. June 22, 2015).........................................23

*Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 826 P.2d 710
(Cal. 1992) ...................................................................................................13

*Cisco Systems, Inc. v. ST Microelectronics*, 77 F. Supp. 3d 887 (N.D. Cal. 2014).....................16

*Citizens for Amending Proposition L v. City of Pomona,* 239 Cal. Rptr. 3d 750
(Cal. Ct. App. 2018)........................................................................................4

*Compass Bank v. Eager Road Associates, LLC*, 922 F. Supp. 2d 818 (E.D. Mo.
2013) .........................................................................................................25

*County of Kern v. Tyler Technologies, Inc.*, 2021 WL 369588 (E.D. Cal. Feb. 3,
2021) ...................................................................................................15, 16, 17

*Dollar Tree Stores Inc. v. Toyama Partners LLC*, No. C 10-0325 SI, 2011 WL
872724 (N.D. Cal., Mar. 11, 2011)...........................................................................7

*Erlich v. Menezes*, 981 P.2d 978 (Cal. 1999)....................................................15, 16, 17

*F.D.I.C. v. CoreLogic Valuation Services, LLC*, 2011 WL 5554324 (C.D. Cal.
Nov. 14, 2011) .........................................................................................16, 17

*First Magnus Fin. Corp. v. Summit Mortg., L.L.C.*, No. 06-0079-CV-W-ODS,
2006 WL 2418918 (W.D. Mo. Aug. 21, 2006)...............................................................22

*Goonewardene v. ADP, LLC*, 434 P.3d 124 (Cal. 2019) .........................................................9

*Great Minds v. Office Depot, Inc.*, 945 F.3d 1106 (9th Cir. 2019)...........................................5

*Green Desert Oil Group v. BP West Coast Products*, No. C 11-02087 CRB, 2011
WL 5521005 (N.D. Cal. Nov. 14, 2011) .......................................................................8

ii

*Healthcare Services Group, LLC v. Hidden Lake Mgmt., LLC*, No. 18-00007-CV-W-GAF, 2019 WL 13235563 (W.D. Mo. Mar. 11, 2019)................................16, 17

*In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617, 2016 WL 3029783 (N.D. Cal., May 27, 2016) ...........................................................................8

*In re Crystal Props., Ltd.*, 268 F.3d 743 (9th Cir. 2001) ................................3

*In re Hard Drive Suspension Assemblies Antitrust Litig.*, Case No. 19-md-02918-MMC, 2020 WL 5074041 (N.D. Cal. Aug. 26, 2020)...........................11

*In re Impac Mortgage Holdings, Inc. Securities Litigation*, 554 F. Supp. 2d 1083 (C.D. Cal. 2008)............................................................................23, 24

*In re Yahoo! Inc. Customer Data Breach Security Litigation*, 313 F. Supp. 3d 1113 (N.D. Cal. 2018)..............................................................................16

*InterPetrol Bermuda Ltd. v. Kaiser Aluminum Int'l Corp.*, 719 F.2d 992 (9th Cir. 1983) .........................................................................................20

*Jacobson Warehouse Co. Inc. v. Schnuck Markets, Inc.*, 13 F.4th 659 (8th Cir. 2021) ...........................................................................................5

*Jay v. Serv. Emps. Int'l Union-United Health Care Workers W.*, 203 F. Supp. 3d 1024 (N.D. Cal. 2016)..............................................................................12

*Level One Techs., Inc. v. Penske Truck Leasing Co., L.P.*, Case No. 4:14 CV 1305 RWS, 2018 WL 558428 (E.D. Mo. Jan. 25, 2018)...........................13, 14

*Love v. Career Educ. Corp.*, 2012 WL 1684572 (E.D. Mo. May 15, 2012) ....................20, 21, 23

*Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.*, 252 Cal. Rptr. 573 (Cal. Ct. App. 1988).............................................................................6

*Multifamily Captive Group, LLC v. Assurance Risk Managers, Inc.*, 629 F. Supp. 2d 1135 (E.D. Cal. May 27, 2009).........................................................25

*Nestle Purina Petcare Co.*, 181 F. Supp. 3d 618 (E.D. Mo. 2016) .......................................24, 25

*Nissan North America, Inc. v. Jim M'Lady Oldsmobile*, 486 F.3d 989 (7th Cir. 2007) ....................................................................................... *passim*

*Pegasus Satellite TV., Inc. v. DirecTV, Inc.*, 318 F. Supp. 2d 968 (C.D. Cal. 2004) ....................7

*Prouty v. Gores Technology Group*, 18 Cal. Rptr. 3d 178 (Cal. Ct. App. 2004) ...................7, 8, 9

*R.J. Kuhl Corp. v. Sullivan*, 17 Cal. Rptr. 2d 425 (Cal. Ct. App. 1993).........................................14

*Rockport Pharmacy, Inc. v. Dig. Simplistics, Inc.*, 53 F.3d 195 (8th Cir. 1995) ..........................15

*Sheen v. Wells Fargo Bank, N.A.*, 505 P.3d 625 (Cal. 2022) ..........................................................15

*Spring Lake Pork, LLC v. Great Plains Mgmt., L.L.C.*, 2020 WL 3542292 (E.D. Mo. June 30, 2020) ...............................................................................................22

*State v. Nationwide Life Ins. Co.,* 340 S.W.3d 161 (Mo. Ct. App. 2011)..............................4, 5, 15

*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 122 Cal. Rptr. 2d 267 (Cal. Ct. App. 2002) .........................................................................................................13, 14

*Superior Edge, Inc. v. Monsanto Co.*, 44 F. Supp. 3d 890 (D. Minn. 2014) ...............................21

*TCN Invs., LLC v. Superior Detail*, 588 S.W.3d 245 (Mo. App. W.D. 2019)................................3

*TCP Printing Co., LLC v. Enter. Bank & Trust*, No. 4:15-CV-178, 2017 WL 4357378 (E.D. Mo. Sept. 29, 2017)...............................................................................12

*Trotter's Corp. v. Ringleader Rests., Inc.*, 929 S.W.2d 935 (Mo. App. E.D. 1996).....................20

*U.S. ex rel. Oliver v. Parsons Co.,* 195 F.3d 457 (9th Cir. 1999).....................................................5

*Web Innovations & Technology Services, Inc. v. Bridges to Digital Excellence, Inc.*, 69 F. Supp. 3d 928 (E.D. Mo. 2014) ...............................................................................21

**Rules**

Fed. R. Civ. P. 12...........................................................................................................21, 23

Plaintiffs complain that GXO's Motion to Dismiss the FAC repeats arguments GXO made when it moved to dismiss Plaintiffs' original Complaint. Some repetition arises because, despite having the benefit of GXO's prior motion, the FAC is subject to the same fatal defects as the original Complaint. Both pleadings are replete with legal conclusions, most notably alleged breaches of the terms of an implied-in-fact contract that was substantively identical to the expired Services Agreement. Even the most artful pleading cannot cure Plaintiffs' meritless legal theory that the parties could impliedly agree to be bound by the provisions of the expired Services Agreement when its express terms required any further extensions to be in writing and given the parties' explicit intent to only be bound by the unconsummated Definitive Agreement.

In tacit recognition of the legal principles that are fatal to their position, Plaintiffs resort to a non sequitur: that the very <u>inability</u> of the parties to enter into a Definitive Agreement somehow is evidence that the parties <u>wanted</u> to extend the Services Agreement it was designed to replace. As a matter of law (as well as common sense), the failure to enter into a Definitive Agreement in these circumstances supports only one conclusion: there was no meeting of the minds, express or implied, as to what contract terms would govern the Tracy Facility after the Services Agreement expired (after several written extensions). Plaintiffs' attempts to plead around this problem by asserting causes of action for fraud or negligence are equally unavailing.

Plaintiffs' inability to plead viable causes of action after two attempts demonstrates the lack of any legal basis for their proposition that the parties could "impliedly" be bound by the very contractual terms that had expressly expired and that they did not agree to extend.  It is therefore appropriate to dismiss Plaintiffs' claims with prejudice.

That result does not, as Plaintiffs argue, deprive them of recourse. GXO continued to provide warehouse management services at Tracy for nearly 11 months after the Services

Agreement expired while the parties engaged in the ultimately unsuccessful negotiations over a new Definitive Agreement. FAC ¶¶ 13, 22, 63, 68-69. After negotiations reached an impasse, Lindt NA refused to pay GXO's outstanding invoices representing the value of the products and services GXO provided. FAC ¶ 135. When GXO pleads those claims, Plaintiffs may argue GXO's products and services were worth less than the invoiced charges (or even worthless), and that question will be decided by the trier of fact.

Plaintiffs clearly are dissatisfied with the way events unfolded after the Tracy Facility opened and the parties never agreed on a Definitive Agreement. But that does not entitle Plaintiffs to sue for breach of a non-existent contract. Plaintiffs' FAC should be dismissed with prejudice so that the case can proceed on its proper basis—an adjudication of whether GXO is entitled to recover for the value of the benefit it conferred, and if so, in what amount.

## LEGAL ARGUMENT[1]

I. **Plaintiffs' Implied Contract Claims are Precluded by the Express Language of the Parties' Agreements Requiring Any Extensions of Those Agreements Be in Writing.**

The law is clear that there can be no "implied" agreement to be bound by the terms of the expired Services Agreement because it expressly forbids modification or extensions unless the parties agree in writing, which they never did despite engaging in months of negotiations. In an attempt to avoid this obvious and fatal defect, Plaintiffs resort to the semantic argument that the parties did not "extend" the Services Agreement, but rather entered into a "new" implied contract that just happened to have precisely the same terms as those in the expired express agreement. *See* Opp. at 11; FAC ¶¶ 152, 160, 163. This strains credulity and defies logic. An alleged "new"

---

[1] As GXO explained in its Suggestions, with the exception of the California UCL claim, the substantive law applicable to Plaintiffs' claims is essentially identical whether California, Delaware, or Missouri law applies. ECF 51 at 10 n.7. For that reason, a choice of law analysis for those claims is not necessary, contrary to Plaintiffs' implication. *See* Opp. at 8-9 n.2.

implied contract with the same terms as the old Services Agreement *ipso facto* amounts to an extension of that Agreement because the same terms are continuing in effect, notwithstanding that the parties expressly stated that those terms would not remain in effect unless the parties agreed in writing. Plaintiffs' logic would render the Service Agreement's provision requiring written extensions a nullity, in violation of a fundamental principles of contract interpretation that every provision of the agreement be given effect. *See In re Crystal Props., Ltd.*, 268 F.3d 743, 748 (9th Cir. 2001); *TCN Invs., LLC v. Superior Detail*, 588 S.W.3d 245, 250 (Mo. App. W.D. 2019). Plaintiffs offer no reason why the parties' bargained-for language should be disregarded.

This was the common sense conclusion in *Nissan North America, Inc. v. Jim M'Lady Oldsmobile*, where the Seventh Circuit applied California law to hold that an expired agreement with a provision requiring modifications be in writing could not be extended by implication. The *Nissan* court determined that holding otherwise "would render meaningless the provision of the [agreement] that required all changes to the agreement to be made in a writing signed by both parties." 486 F.3d 989, 996 (7th Cir. 2007). *See also Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 915 (9th Cir. 1978) (finding no implied-in-fact agreement to extend expired contract).

Plaintiffs' attempt to distinguish *Nissan* is inapposite. Plaintiffs point out that *Nissan* dealt with an arbitration provision that the parties objected to including in a proposed amendment that was never executed. Opp. at 14-15. That point, however, relates to a different portion of *Nissan* and is immaterial to *Nissan's* holding that a written modification provision precludes an implied-in-fact agreement to extend contract terms past their expiration. *Nissan* held that the arbitration provision in that case was inapplicable on two different grounds: (1) the written

contract had expired and contained a specific provision requiring modification in writing, <u>which prevented any implied-in-fact agreement to extend the contract's length;</u> and (2) even if there could be an implied-in-fact contract, the parties' conduct did not establish an implied-in-fact agreement to extend the term of the written contract. *Nissan*, 486 F.3d at 996-97. The facts from *Nissan* that Plaintiffs claim are distinguishable relate only to the <u>second</u> ground for the *Nissan* holding—*i.e.,* that the parties' conduct belied any implied-in-fact agreement. Those facts do not negate the <u>first</u> ground for the holding in *Nissan*—that a specific contract provision barring modification in writing precludes an implied-in-fact agreement to extend the contract's terms. That principle bars Plaintiffs' claims for breach of implied-in-fact contract.

*Nissan*'s second holding about the parties' course of conduct also would bar Plaintiffs' implied contract claims here. The FAC allegations regarding the parties' conduct make it clear that the parties never reached an agreement to extend the terms of the Services Agreement past June 30, 2018. As the FAC states, the parties entered into a letter of intent to negotiate a "Definitive Agreement" that would have incorporated the material terms of the Services Agreement and extend them after the Services Agreement expired, but the parties "never signed a written Definitive Agreement." FAC ¶¶ 60-61, 74. The fact that the parties never reached a written agreement to apply the Services Agreement's terms after June 30, 2018, despite extensive negotiations, belies any claim by Plaintiffs that the parties somehow nevertheless impliedly agreed to the same terms. The parties' conduct reveals their shared intent: they did <u>not</u> want to continue with the Services Agreement as is, but could not agree on new terms.[2]

---

[2] Plaintiffs also attempt to distinguish *Citizens for Amending Proposition L v. City of Pomona,* 239 Cal. Rptr. 3d 750 (Cal. Ct. App. 2018), and *State v. Nationwide Life Ins. Co.,* 340 S.W.3d 161 (Mo. Ct. App. 2011). *See* Opp. at 15 n.5. *Citizens* relied on a statutory requirement that "any amendment or extension of the 1993 agreement would need to be . . . reduced to writing" to hold that no implied-in-fact contract could have been formed. *See Citizens,* 28 Cal. App. 5th at 1189. This is analogous to the express written provision in the Services Agreement requiring that amendments be in writing. *Nationwide Life* has facts

4

Case 4:22-cv-00384-BP   Document 67   Filed 12/05/22   Page 9 of 31

Plaintiffs rely on *Autohaus* and *U.S. ex rel. Oliver v. Parsons Co.,* 195 F.3d 457, 462 (9th Cir. 1999), *see* Opp. at 12, but neither of those cases supports disregarding an explicit provision in a parties' written agreement that the terms of the agreement can be modified only in writing. In *Autohaus,* the court found <u>no</u> implied-in-fact agreement to extend an expired agreement, in large part because, like here, the agreement explicitly prohibited its extension by implication. 567 F.2d at 915 ("Secondly, and most importantly, the original franchise agreement itself, which Brugger signed, states that acceptance of orders or continuance of sales or any other act by Saab after termination of the agreement 'shall not be construed as a renewal of this Agreement for any further term.'"). While *Oliver* did find an implied-in-fact agreement after the original agreement expired, it is inapposite as the contract at issue did not contain a provision requiring amendments to be in writing. 195 F.3d at 462 (9th Cir. 1999).

Plaintiffs' final argument, that this issue cannot be decided on a motion to dismiss, also is without merit. *Autohaus* and *Nissan* were decided based on pure questions of law at, respectively, the JNOV and summary judgment stage. As those decisions reflect, the interpretation of a contractual provision is a matter of law for the Court. *See Jacobson Warehouse Co. Inc. v. Schnuck Markets, Inc.*, 13 F.4th 659, 668 (8th Cir. 2021); *Great Minds v. Office Depot, Inc.*, 945 F.3d 1106, 1110 (9th Cir. 2019) (same under California law). Here, both the Services Agreement and the First LOI Amendment expressly forbade modifications except in writing. Even accepting that the alleged conduct that pre-dated the alleged implied contract

strikingly similar to the situation here. In *Nationwide Life*, the parties' express agreement had expired, and they attempted to negotiate a new written agreement but failed to do so. 340 S.W.3d at 192-93. The Missouri Court of Appeals held that, as a matter of law, there could be no implied contract to extend the terms of the expired written agreement where the parties' attempts to negotiate a new written agreement had failed. *Id.*

occurred, the Court should hold as a matter of law that no such implied contract could be created for the reasons applied in *Nissan* and the other cases that have considered the question.

## II.    Plaintiffs Cannot Rely on "Industry Standards" to Create an Implied-in-Fact Contract Where None Exists.

Plaintiffs attempt to avoid the written modification provision by asserting that the supposed implied contract also contains "the KPIs and industry standards" set forth in the FAC. Opp. at 15. The KPIs were contained in the Services Agreement. *See* Opp. at 15, FAC at ¶¶ 38, 163. Thus, this is simply a repetition of the failed argument that the terms of the Services Agreement could be extended by implication.

Plaintiffs also argue that "industry standards" may be used to supply missing or ambiguous contract terms. Opp. at 15-16. They rely, however, on a case involving <u>written</u> contracts. *See Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.,* 252 Cal. Rptr. 573, 576-77 (Cal. Ct. App. 1988) (discussing written television contracts and confirmations that formed the basis of the claims at issue). Nothing in *Midwest Television* discusses the use of industry standards to create an <u>implied</u> contract. Here, of course, the parties' written contracts applied contractually negotiated KPIs rather than amorphous "industry standards," and those contracts had expired. Plaintiffs cite no cases holding that industry standards can be used to create an implied contract where none otherwise exists.

Plaintiffs also assert that a statement by GXO that it was "challenging" to achieve full staffing, and allegations that GXO attempted to improve its performance somehow created an implied agreement to continue the precise terms of the Services Agreement and the KPIs. Opp. at 16. Plaintiffs do not, however, explain how anything in those statements could have resurrected the Services Agreement and KPIs by implication where the express terms of that contract provided that it could be modified and extended only by written agreement, which never

happened. Plaintiffs' allegations regarding an implied in fact contract fail to state a claim upon which any relief could be granted and should be dismissed.

## III. The Affiliates' Express and Implied Contract Claims Fail as a Matter of Law.

Plaintiffs' assertion that the Affiliates can enforce the Services Agreement either as third party beneficiaries or based on an agency theory fails for several reasons. Opp. at 18-21. First, as discussed in GXO's opening brief, the Services Agreement included a specific provision that the agreement did not create any third party beneficiary rights. *See* FAC, Ex. 1, Services Agreement, at Section 18(f) ("Nothing in this Agreement is intended to create any rights with respect to any party other than Ghirardelli or [GXO] nor shall this Agreement be construed as a third-party beneficiary contract."). Thus, under the Services Agreement's unambiguous terms, the Affiliates cannot enforce it. *See Balsam v. Tucows Inc.*, 627 F.3d 1158, 1161-63 (9th Cir. 2010) (applying California law and enforcing express provision which stated, "*No Third–Party Beneficiaries*: This Agreement shall not be construed to create any obligation by either [of the parties] to any non-party to this Agreement. . . ."); *Dollar Tree Stores Inc. v. Toyama Partners LLC*, No. C 10-0325 SI, 2011 WL 872724, *3 (N.D. Cal., Mar. 11, 2011) ("a clause disclaiming any third-party beneficiaries is strong evidence to support a denial of third-party beneficiary rights"); *Pegasus Satellite TV., Inc. v. DirecTV, Inc.*, 318 F. Supp. 2d 968, 977 (C.D. Cal. 2004) (finding no "authority that would allow [the court] to abrogate an express no third-party beneficiary provision" in a contract).

*Prouty v. Gores Technology Group*, 18 Cal. Rptr. 3d 178 (Cal. Ct. App. 2004), cited by Plaintiffs (Opp. at 18-19), is readily distinguishable. In *Prouty*, there was an express written provision in the contract disclaiming any intent to benefit third parties, but there was also an express written provision in a written amendment to the contract that explicitly benefitted third

parties. *See Prouty*, 121 Cal.App.4th at 179-181, 183-186. *Prouty* enforced the later of two conflicting provisions in the parties' express written agreements. Here, by contrast, there is no express written provision in the Services Agreement, the LOI, or the First Amendment that the Services Agreement was intended to benefit the Affiliates.

Plaintiffs point to the RFP and GXO's RFP Response about the potential role of the Affiliates at Tracy, Opp. at 20, but that was merely a <u>proposal</u> for a new contract (the "Definitive Agreement") that was never consummated. The RFP cannot overrule the express language of the Services Agreement, which was actually executed by the parties, and which expressly disclaims any third party beneficiaries. Further, the RFP specifically provided that Lindt NA (and not the subsidiaries) would be managing the relationship with the services provider, and also stated that after Lindt NA chose the new manager, the parties would have to enter into a contract before there was a binding agreement. *See* FAC, Ex. 7 (RFP) § 2.3.

California courts have distinguished *Prouty* on these precise grounds. The court in *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617, 2016 WL 3029783, (N.D. Cal., May 27, 2016), enforced a "no third party beneficiary clause." *Id*. at *17-18. In so doing, it distinguished *Prouty* based on the express provision benefitting third parties in the *Prouty* contractual amendment. *Id.* The court pointed out that "[a]lthough Plaintiffs contend that under California law, a general 'no third party beneficiary' clause may be trumped by more specific contract provisions that create benefits for a specific group, Plaintiffs have identified no such specific provisions here." *Id.* at *17-18 (internal quotation marks and citation omitted). *See also Green Desert Oil Group v. BP West Coast Products*, No. C 11-02087 CRB, 2011 WL 5521005, *3 (N.D. Cal. Nov. 14, 2011) ("Here, in contrast to *Prouty* . . ., there is no express provision in the [agreement] intended to benefit Plaintiffs."). Here, there is no basis to disregard the parties'

expressed intent in the Services Agreement barring the creation of any rights in third parties. Additionally, for the same reasons discussed above, the written modification requirements of the Services Agreement and First LOI Amendment bar as a matter of law any attempt to extend the Services Agreement's provisions to the Affiliates by implication.

Even if there were no provision in the Services Agreement disclaiming an intent to benefit third parties, the Affiliates still would not qualify as third party beneficiaries. As Plaintiffs' own *Prouty* case explained: "'[a] third party who is only incidentally benefited by performance of a contract is not entitled to enforce it.'" *Prouty*, 18 Cal. Rptr. 3d at 184 (quoting *E. Aviation Grp., Inc. v. Airborne Express, Inc.*, 8 Cal. Rptr. 2d 355, 357 (Cal. Ct. App. 1992)). Further, "[t]he fact that [a third party] is incidentally named in the contract, <u>or that the contract, if carried out according to its terms, would inure to [the third party's] benefit</u>, is not sufficient to entitle [that third party] to demand its fulfillment." *Prouty*, 18 Cal. Rptr. 3d at 184 (emphasis added) (internal quotation marks and citations omitted). Thus, the fact that some of the items that GXO might have packaged under the LOI were products that originated with the Affiliates and, therefore, GXO's performance of its agreement with Lindt NA under the LOI may have incidentally benefited the Affiliates, is not sufficient to grant the Affiliates the status of third party beneficiaries. *See also Goonewardene v. ADP, LLC*, 434 P.3d 124, 126-127 (Cal. 2019) (employees were not third party beneficiaries of contract between employer and payroll company even though employees were being paid wages under the contract).

## IV. Plaintiffs' Breach of Express Contract Claims Are Based on Alleged Breaches and Alleged Damages That Occurred After the Express Contracts Had Expired.

Plaintiffs readily admit that the Services Agreement between GXO and Lindt NA expired on June 30, 2018, *see* Opp. at 9, FAC ¶¶ 13, 65. Plaintiffs cannot allege breach of an express contract for actions occurring after that date. Plaintiffs attempt to salvage the express contract

claims by arguing they alleged breaches occurring prior to the expiration date during the "Start-Up Services" for the Tracy Facility.[3] Opp. at 10.

Plaintiffs' argument is belied by their own factual averments.[4] Plaintiffs plead that the "Go Live" date at Tracy was August 17, 2018, six weeks <u>after</u> the Services Agreement and First LOI Amendment express agreements expired. *See* FAC ¶¶ 19, 70, 77. Plaintiffs assert that GXO should have trained its labor force sooner or staffed the Tracy Facility more robustly prior to that "Go Live" date, *see* Opp. at 10-11 (citing FAC ¶¶ 84, 90, 93, 158). The FAC, however, including the paragraphs Plaintiffs cite in the Opposition, alleges that these alleged breaches did not occur until <u>after</u> the express agreements had expired.

The FAC paragraphs expressly stating that the breaches occurred after the express contract expired include ¶ 19 (alleging that "XPO <u>began falling behind</u> its contractually promised performance metrics <u>in mid-to-late August 2018</u>") (emphasis added); ¶ 77 (alleging that "XPO's 'Go Live' [on August 17, 2018] was a massive failure that damaged Lindt"); ¶ 79 (alleging that "[w]hen operations at the Tracy facility sputtered to a start in <u>August 2018</u>, . . . XPO immediately failed to meet the contractual KPIs") (emphasis added); ¶ 84 (alleging a failure to meet <u>July 2018</u> production goals); ¶ 87 (alleging that "XPO's co-packing failure continued to

---

[3] "Start -Up Services" is a defined term in the First LOI Amendment, although Plaintiffs do not capitalize the term in the FAC.

[4] Plaintiffs argue in a footnote (Opp. 14 at n.4) that GXO continued to perform Start-Up Services after June 30, 2018. There is no allegation in the FAC that the services that GXO continued to provide after contract termination were "Start-Up Services" as defined in the contract. But more importantly, there is no dispute that GXO continued to provide services at Tracy after June 30, 2018. The operative legal issue is whether Plaintiffs can allege facts that would, if true, establish that the parties understood that those services were subject to the terms of the expired agreement. Plaintiffs cannot do so as a matter of law for the reasons discussed above. *Nissan* was a similar situation where performance continued after contract termination but the contract specified it could only be extended in writing. Applying California law, the Seventh Circuit specifically rejected the argument that the continued performance could be used to argue that the parties had impliedly agreed to be bound by the terms of the expired agreement. 486 F.3d at 996.

harm sales at Ghirardelli retail stores throughout the <u>fall of 2018</u> and beyond") (emphasis added); ¶ 90 (referencing an alleged failure that occurred after Tracy opened, *i.e.,* after August 17, 2018; ¶ 93 (alleging failures that occurred "in the months after the Tracy facility opened"); ¶ 95 (alleging that "XPO's on-time departures plummeted to 32% in <u>August</u> and 33% in <u>September</u>" of 2018) (emphasis added).

As evidenced by these averments, the causes of Plaintiffs' harm (if any) were GXO's alleged failure to ship inventory, maintain inventory control, conduct cycle counts, and other tasks related to the <u>operation</u> of the Tracy Facility, which did not occur until after August 17, 2018. Simply put, if GXO had adequately performed the Start-Up Services or performance was otherwise excused, performance of the Start-Up Services obligation would be immaterial. Plaintiffs would still be complaining that GXO's alleged failure to ship inventory, maintain inventory control, or conduct cycle counts (all of which occurred after the written contracts expired) directly led to Plaintiffs' alleged damages.

Dismissal of Plaintiffs' contract claims is warranted where, as here, "the complaint does not include factual allegations that, if true, would establish a *causal connection* between the asserted [breaches of the contract] and the claimed damages." *In re Hard Drive Suspension Assemblies Antitrust Litig.*, Case No. 19-md-02918-MMC, 2020 WL 5074041, *2 (N.D. Cal. Aug. 26, 2020) (emphasis added). The FAC makes no attempt to allege any facts that establish a "causal connection" between Plaintiffs' claimed $40 million in damages (FAC ¶ 150) and any breach of contract that supposedly occurred in May and June of 2018, six weeks before the Tracy Facility actually began shipping operations. Plaintiffs' inability to allege such causation after two attempts demonstrates they cannot plausibly do so. Plaintiffs' attempt to conflate their alleged

post-expiration damages with alleged pre-expiration conduct cannot stand when the FAC explicitly points only to conduct that occurred after contract expiration and Go Live.

Plaintiffs devote most of the FAC and their Opposition to the argument that the parties had an *implied* contract post-expiration that contained all the same terms as the expired express contracts. *See* FAC ¶¶ 13-16, 68-76, 160-166; Opp. at 11-18. If any confirmation were needed that Plaintiffs do not have a cognizable express contract claim, it can be found in those arguments. Plaintiffs would have no need to claim that their damages were caused by breaches of an implied-in-fact contract that was in effect after the written agreements expired if they had valid express contract claims that could support their asserted damages.

**V.    Plaintiffs' Claim for Breach of Implied Covenant of Good Faith and Fair Dealing Fails Because (1) there is no Valid Contract Between the Parties and (2) if there were a Valid Contract, the Claim Would Fail Because Express Contractual Provisions Would Govern the Subject Matter of Plaintiffs' Claims.**

Because their contract claims fail, Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails as well. Plaintiffs do not deny that, under both California and Missouri law, a party may not bring a claim for breach of the implied covenant of good faith and fair dealing where there is no valid contract between the parties. *See* Opp. at 22; *Jay v. Serv. Emps. Int'l Union-United Health Care Workers W.*, 203 F. Supp. 3d 1024, 1034 (N.D. Cal. 2016); *TCP Printing Co., LLC v. Enter. Bank & Trust*, No. 4:15-CV-178, 2017 WL 4357378, at *6 (E.D. Mo. Sept. 29, 2017). Rather, they simply assert that the FAC states valid claims for breach of express and implied contracts. Opp. at 22. It does not, for the reasons set forth above. Thus, Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails to state a claim upon which relief can be granted.

Alternatively, should the Court determine that either the express or implied contract claims are valid, Plaintiffs' claim for breach of the implied covenant of good faith and fair

dealing still fails because the Services Agreement already contains express provisions governing the subject matter of Lindt NA's claims. *See Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 122 Cal. Rptr. 2d 267, 277 (Cal. Ct. App. 2002); *Level One Techs., Inc. v. Penske Truck Leasing Co., L.P.*, Case No. 4:14 CV 1305 RWS, 2018 WL 558428, *5 (E.D. Mo. Jan. 25, 2018). Plaintiffs assert that they have "adequately alleged breaches that are not part of the parties' agreed terms," in the form of vague allegations that "GXO subjectively lacked belief in its acts, unreasonably diverted resources from Tracy, and abused its discretion in performing its duties," Opp. at 22-23, but these are nothing but conclusory allegations that do not set forth facts supporting a claim. Further, it is clear from the FAC that the alleged breaches are all related to the express contract terms that Plaintiffs allege GXO breached. *See* ¶¶ 6, 38, 77, 79, 91, 94-99, 104, 130, 164 (discussing alleged failures to perform according to contractual KPIs).

Plaintiffs attempt to narrow the holding of *Storek* in a manner that is not supported by that opinion. *Storek* did not limit its holding to conduct expressly permitted by a contract. Rather, it based its holding on the fact that Plaintiffs were attempting to hold the defendant liable for alleged breaches beyond the contract terms. 122 Cal. Rptr. 2d at 276. It went on to state broadly that "[t]he [California] Supreme Court has clarified . . . that an implied covenant of good faith and fair dealing cannot contradict the express terms of a contract." *Id. See also Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 826 P.2d 710, 728 (Cal. 1992) (cited by Plaintiffs, Opp. at 21) ("as a general matter, implied terms should never be read to vary express terms").

Further, as the court in *Storek* explained, the covenant of good faith and fair dealing applies "when a party is given absolute discretion by express contract language," and is used to "limit that discretion in order to create a binding contract and avoid a finding that the promise is

illusory. However, when the contract is adequately supported by adequate consideration regardless of the discretionary power, there is no need to impose a covenant of good faith in order to create mutuality." 122 Cal. Rptr. 2d at 278. Finding that "[u]nder the plain language of the loan agreement, Citicorp's obligation to make the loan disbursements was not discretionary," *id.* at 279, and that its obligation was based on Citicorp's contractual duty to make an "objectively reasonable" determination, the *Storek* court held that "[n]o obligation to act in good faith can be implied." *Id.* at 281. Rather, the *Storek* court found that the claim was really a "claim of nonperformance of the express terms of the contract," *id.* at 282, and, thus, reversed judgment on the claim for breach of the implied covenant of good faith and fair dealing. *Id.* at 284.

Here, although Plaintiffs assert in a conclusory fashion the Services Agreement "vested [GXO] with discretion,"[5] FAC ¶ 172, the facts alleged in the FAC are clear that Plaintiffs' contract claims are based on allegations that GXO did <u>not</u> have discretion and was obligated to perform according to the KPIs set forth in the Services Agreement. *See id.* at ¶¶ 6, 38, 77, 79, 91, 94-99, 104, 130, 164. This is not a complaint alleging that one party had "absolute discretion," but, on the contrary, the FAC alleges GXO was required to operate under objective standards.

Similarly, the *Level One* case, which Plaintiffs attempt to distinguish, *see* Opp. at 23, stated that "'the implied covenant will not be imposed where the parties expressly address the matter at issue in their contract.'" *Level One Techs., Inc. v. Penske Truck Leasing Co., L.P.,* 4:14 CV 1305 RWS, 2018 WL 558428, *5 (E.D. Mo. Jan. 25, 2018) (quoting *State v. Nationwide Life*

---

[5] Plaintiffs also cite *R.J. Kuhl Corp. v. Sullivan*, 17 Cal. Rptr. 2d 425 (Cal. Ct. App. 1993), for its discussion of the concept of "bad faith." Opp. at 21. That case does not apply here, as it involved a situation where a party's performance of its contractual duty was subject to a condition precedent and that the party prevented or hindered the occurrence that condition. *See R.J. Kuhl*, 17 Cal. Rptr. 2d at 432. No such allegation has been made here.

*Ins. Co.*, 340 S.W.3d 161, 194 (Mo. Ct. App. 2011)).[6] Plaintiffs clearly allege that the parties expressly addressed GXO's performance obligations in the contract. If Plaintiffs' contract claims stand, their claim for breach of the covenant of good faith and fair duty necessarily fails.

## VI. The FAC's Allegations Do Not Establish a "Special Relationship" or Independent Duty That Would Negate the Economic Loss Rule.

Plaintiffs do not deny the basic principle under both California and Missouri law that the economic loss rule bars recovery in negligence for purely economic losses. Opp. at 23-24; *see Sheen v. Wells Fargo Bank, N.A.*, 505 P.3d 625, 632 (Cal. 2022); *Rockport Pharmacy, Inc. v. Dig. Simplistics, Inc.*, 53 F.3d 195, 198 (8th Cir. 1995). Plaintiffs invoke two exceptions to this rule, neither of which applies here.

First, Plaintiffs assert that the "special relationship" exception to the economic loss rule saves their claims. *Id.* California courts, however, have rejected the argument that a service provider like GXO has a "special relationship" with a contracting party. *See Erlich v. Menezes*, 981 P.2d 978 (Cal. 1999). In *Erlich*, a couple sued their general contractor after discovering leaks in their home. *Id.* at 980-81. The couple attempted to sue the general contractor for negligence based on an alleged "special relationship." The California Supreme Court rejected this argument, because the plaintiffs could have hired any of the many "contractors willing to accept work in the area where their home would be constructed." *Id.* Subsequent decisions from California federal courts have followed the *Erlich* decision in declining to find plaintiffs could recover under a special relationship exception to the economic loss rule. *See County of Kern v.*

---

[6] As Plaintiffs point out in a footnote, Opp. at 23 n.10, the *Nationwide* case involved an allegation that a party had breached the covenant of good faith and fair dealing by failing to renew a contract that had expired. *See Nationwide*, 340 S.W.3d at 194. The basis for that holding, however, was the broad legal principle that "[a]n implied covenant will not . . . be imposed where the parties expressly address the matter at issue in their contract." *Id.* That same legal principle applies here.

*Tyler Technologies, Inc.*, 2021 WL 369588, *7-9 (E.D. Cal. Feb. 3, 2021); *F.D.I.C. v. CoreLogic Valuation Services, LLC*, 2011 WL 5554324, *5-6 (C.D. Cal. Nov. 14, 2011).[7]

The reasoning of *Erlich* applies here. While Plaintiffs allege that they relied on GXO's expertise, it is clear from the allegations in the FAC that GXO was not the only warehouse operator who could have provided services at the Tracy Facility. Indeed, as the FAC and attached RFP indicate, Lindt NA had a number of qualified logistics providers to choose from, and did in fact choose other providers to handle other facilities. *See* FAC ¶ 8, 80, Ex 7. Moreover, Lindt NA ultimately replaced GXO with another service provider. *See id.* at ¶¶ 137-38. Thus, there was nothing "special" about GXO's and Lindt NA's relationship.

Plaintiffs' authority is inapposite or supports application of the economic loss rule. *Body Jewelz, Inc. v. Valley Forge Ins. Co.*, 241 F. Supp. 3d 1084 (C.D. Cal. 2017) (cited in Opp. at 24), actually rejected application of the special relationship exception, finding that it did not apply to parties in privity and holding "public policy . . . favors broad imposition of the economic loss rule." *Id.* at 1092-94. In *Cisco Systems, Inc. v. ST Microelectronics*, 77 F. Supp. 3d 887 (N.D. Cal. 2014) (cited in Opp. at 24) and *In re Yahoo! Inc. Customer Data Breach Security Litigation*, 313 F. Supp. 3d 1113 (N.D. Cal. 2018) (cited in Opp. at 25), the courts failed to even address the holding in *Erlich*. Indeed, the court in *County of Kern, supra*, criticized the *Yahoo!* case, pointing out that "[t]he line of reasoning in . . . *Yahoo!*, however, appears to be at odds with the California Supreme Court's holding in *Erlich*." 2021 WL 369588, at *8. Given that

---

[7] Missouri law similarly holds that the existence of a normal business relationship does not establish a "special relationship" for purposes of the economic loss rule. *See Healthcare Services Group, LLC v. Hidden Lake Mgmt., LLC*, No. 18-00007-CV-W-GAF, 2019 WL 13235563, *4 (W.D. Mo. Mar. 11, 2019) (applying Missouri law to dismiss counterclaims, holding that "Defendants present no factual basis that their relationships with HCSG were anything beyond a business relationship to provide housekeeping and dietary services to their facilities. Therefore, the Court finds that no special relationship existed . . . [and] the economic loss doctrine still applies to bar Defendants' negligence and fraud claims.").

the California Supreme Court is the ultimate arbiter of California law, this Court must follow *Erlich* and hold the special relationship exception is inapplicable here.

Second, Plaintiffs assert that the economic loss rule does not apply because GXO owed a "professional" or "independent" duty of care. Opp. at 25. Plaintiffs do not contest that neither Missouri nor California has held that warehouse operators are subject to a professional duty of care. *Id.* at 25 n.12. Rather, they argue that the Court should decline to dismiss the case at this stage, pointing out that the *Schnucks* court waited to decide this issue on summary judgment. *Id.* at 25. Other federal courts, however, have refused to delay the inevitable, granting motions to dismiss based on the economic loss rule without waiting for summary judgment. *See County of Kern*, 2021 WL 369588, at *8-9 (granting motion to dismiss negligence claim with prejudice upon finding that the "special relationship" and "professional negligence" exceptions did not apply to services contract); *CoreLogic*, 2011 WL 5554324, at * 4-6 (same); *Healthcare Services Group*, 2019 WL 13235563, at *4 (dismissing counterclaims for negligence and fraud after finding no special relationship). The question of whether Missouri or California recognizes a "professional warehouse and logistics provider" exception to the economic loss rule is a legal question based on the facts alleged in the FAC that will not change upon further discovery. Thus, there is no reason to delay ruling on this issue and dismissing Plaintiffs' negligence claim.

## VII. Plaintiffs' Fraud, Negligent Misrepresentation, and Statutory Fraud Claims Fail Because They Have Not Alleged Any Actionable Statements with Particularity.

Plaintiffs' fraud, misrepresentation, and statutory fraud claims likewise fail because they are attempts to fit a square peg inside a round hole. The FAC sets forth facts that show a case of disappointed customer expectations, with optimistic statements about the future allegedly having failed to come to fruition. That is not fraud. Rather, this is simply a situation where plans for the

future did not unfold the way the parties had hoped and intended. The mere fact that the WMS system did not work as the parties had hoped is not evidence of fraud.

Plaintiffs engage in yet another round of semantics as they try to recast their allegations as misrepresentations of <u>ability</u> rather than <u>intent, in order to avoid the binding authority that demands dismissal of their misrepresentation claims</u>. But looking at what Plaintiffs actually pleaded in the FAC, it is indisputable that Plaintiffs seek to recover for GXO's representations as to future conduct, not GXO's then-present capability—and Plaintiffs' Opposition confirms this obvious conclusion. In a single sentence on pages 27-28, Plaintiffs state no less than five times what GXO represented it "would" do in the future. The FAC and the Opposition make clear that the alleged misrepresentations were not about quantifiable present capabilities, such as how much data the WMS could process or GXO's headcount, but rather GXO's intent that the WMS "would be 'integrated'" and that GXO "would provide '24x365 technical support.'" Opp. at 27-28. Thus, the critical inquiry is GXO's <u>intent</u> at the time the statements were made (e.g., in the RFP Response). As more fully set forth below, Plaintiffs' linguistic gamesmanship (e.g., Opp. at 27 n.15) cannot save their misrepresentation claims.

No matter how the alleged misrepresentations are characterized, however, the failure to plead fraud with particularity remains. The only fraud allegations Plaintiffs even attempt to claim are sufficiently specific are statements in the RFP response and by Mr. Johnson, Opp. at 27-28 (allegations underlying fraud and negligent misrepresentation claims), 34-35 (allegations underlying UCL fraud claim).[8] Plaintiffs' assertion that they have sufficiently pleaded *specific*

---

[8] Plaintiffs appear to acknowledge that other allegations in the FAC are not sufficiently specific to be a basis for a cognizable fraud claim. *See* Opp. at 33-34 (stating that allegations of falsified inventory records and alleged directions to GXO employees to conceal problems with the WMS "do not form the basis of Lindt's fraud claims.").

*facts* that, if true, would establish a cognizable claim that GXO and/or Mr. Johnson "failed to exercise reasonable care" in making the statements (a prerequisite to a negligence misrepresentation claim), *id.,* are without merit.

Plaintiffs point to FAC ¶¶ 202, 216 (Opp. at 28), but paragraph 216 asserts nothing regarding Mr. Johnson's alleged knowledge of the falsity of any statement. Paragraph 202 alleges nothing more than a failure of performance and asserts that, because promises about how the WMS would perform did not come true, GXO personnel were "reckless" in making the promises (which were really predictions, which is why Plaintiffs have not sued for breach of contract about the promises). There are no allegations of cognizable facts about why it was "reckless" to make the statements, other than the allegation that the prediction did not come true. If that were sufficient to allege misrepresentation, every case of disappointed business expectations would be a fraud claim.

The critical distinction is between making statements about specific *facts*, which may be sufficient to assert a misrepresentation claim if all of the elements are pleaded, and statements of opinion or promises regarding future performance, which are not actionable as intentional or "negligent" misrepresentation. *See* GXO's Suggestions at 25-26. Plaintiffs ignore that distinction because they cannot dispute that statements of opinion are not actionable. Instead, they attempt to conflate the two categories, but it is apparent that Plaintiffs actually pleaded (as opposed to characterizing in the Opposition), are non-cognizable predictions rather than statements of fact.

The statements in the RFP on which Plaintiffs rely repeatedly assert that the WMS system "will" do various things and discuss plans for operations of the warehouse. Opp. at 27-28; FAC ¶¶ 54-55, 108, 111. Similarly, Mr. Johnson expressed his opinion that he had not "lost confidence" in Go Live, that he was "confident we will get there soon," and that GXO was

"tracking to start on-time." *Id.;* FAC ¶¶ 123, 125-126. Plaintiffs ignore the authority cited by GXO that "[m]ere statements of opinion, expectations, and predictions for the future are insufficient to authorize a recovery for fraudulent misrepresentation," *Trotter's Corp. v. Ringleader Rests., Inc.*, 929 S.W.2d 935, 940 (Mo. App. E.D. 1996), and that "[s]tatements of opinion are not generally actionable in fraud." *InterPetrol Bermuda Ltd. v. Kaiser Aluminum Int'l Corp.*, 719 F.2d 992, 996 (9th Cir. 1983) (applying California law). Plaintiffs argue that puffery and opinion can be actionable, Opp. at 29-30, but they ignore the key point that all of the statements they claim were "fraudulent" were not only statements of opinion; but they were statements of opinion regarding <u>future performance</u>.

Statements of opinion regarding future performance are not statements of fact that can support a claim for fraud. *See Love v. Career Educ. Corp.*, 2012 WL 1684572, \*4 (E.D. Mo. May 15, 2012). In *Love*, the plaintiff alleged fraud in the admissions process at a college, pointing to statements like "Sanford Brown's programs would provide students with sufficient training to enter the medical assistant field upon graduation," that "SBC's Hazelwood instructors were adequately experienced and qualified to teach advertised courses," and that "SBC's Hazelwood campus was equipped with adequate equipment and facilities to train the students enrolled at those campuses." *Love*, 2012 WL 1684572, at \*4.

Contrary to Plaintiffs' attempt to downplay the specificity of the allegations in *Love*, *see* Opp. at 30, these were affirmative statements regarding the college's ability to educate students and prepare them for the future. They are similar to the alleged statements regarding GXO's abilities and future performance in GXO's RFP response. *See e.g.,* FAC, Ex. 8 at Section 6.5.6 and 6-16 ("XPO will provide 24x365 technical support for all XPO systems and hardware."); *id.* at Section 4.1 ("[o]ur <u>plan</u> includes a transition team, timeline/milestones, facility up-fit and

equipment, and IT integration . . ."). The court in *Love* held that the statements there "constitute statements of opinion that cannot be proven true or false." *Id.* Further, and importantly, the court pointed out that allegations regarding future performance could not support a fraud claim, stating, "Allegations related to Plaintiff's future earnings or future marketability after graduation cannot form a basis for fraud <u>as a matter of law</u>" and granted the Rule 12(b)(6) motion. *Id.*

The same is true here. Regardless of whether they are called puffery, opinion, or the like, the statements in the RFP Response regarding future performance of the WMS and statements by Mr. Johnson expressing optimism about the ability to "Go Live" are the same type of opinion statements regarding future performance held insufficient to support a fraud claim in *Love*. The WMS had not been installed at Tracy yet when the RFP was issued and "Go Live" occurred years later. All of the assertions cited in the FAC about the WMS were opinion statements and/or promises about the future, as were the statements the FAC alleges were made by Mr. Johnson.

The distinction between predictions of future performance and statements about falsifiable facts is illustrated in two cases cited by Plaintiffs. In *Web Innovations & Technology Services, Inc. v. Bridges to Digital Excellence, Inc.*, 69 F. Supp. 3d 928, 932 (E.D. Mo. 2014), Opp. at 27, the defendant made a specific representation regarding the number of donations of electronics equipment it received from certain business partners each week when the actual number was lower. *See id.* at 932. There is no allegation here that GXO misrepresented made a specific falsifiable statement about, for example, how much MB of data the WMS could store. The defendant in *Superior Edge, Inc. v. Monsanto Co.*, 44 F. Supp. 3d 890, 907 (D. Minn. 2014), Opp. at 27, made statements that it had experience using the specific software processes at issue when in fact the defendant did not have such experience. Notably, in both cases the plaintiff argued it was damaged because it was fraudulently induced into entering into a contract. In

contrast, Plaintiffs were not induced into entering a contract because the parties never agreed on a Definitive Agreement. This is a further reason why, as discussed above, Plaintiffs cannot assert an affirmative claim for damages proximately caused by the alleged misrepresentations.

Plaintiffs do not allege that GXO made a statement of fact that was falsifiable at the time it was made. They merely allege that GXO stated it possessed warehouse management experience. FAC ¶ 52. But the FAC acknowledges that GXO did have warehouse management experience, most obviously at the Lathrop Warehouse. *E.g.,* FAC ¶ 41. GXO's statements therefore were not false, in contract to the situation in *Spring Lake Pork, LLC v. Great Plains Mgmt., L.L.C.*, 2020 WL 3542292 (E.D. Mo. June 30, 2020), cited in Opp. at 27, 29, where the defendants "fraudulently misrepresented themselves as having technical and managerial expertise" regarding pig breeding, *id.* at *2, when in fact they had no such experience.

Plaintiffs also cite *First Magnus Fin. Corp. v. Summit Mortg., L.L.C.*, No. 06-0079-CV-W-ODS, 2006 WL 2418918 (W.D. Mo. Aug. 21, 2006), along with *Spring Lake Pork*, for the proposition that "[p]uffery can form the basis of a fraud claim where the party alleged to have made fraudulent statements holds itself as having specialized knowledge or expertise." Opp. at 30. *First Magnus* is distinguishable, as it involved a specialized opinion in the form of an appraisal by a certified appraiser and alleged fraud in connection with the appraisal process. *See First Magnus*, 2006 WL 2418918, *5. That is far different from representations regarding future performance in an RFP. Further, *Spring Lake Pork* did not set forth a blanket rule that puffery is actionable where a party is alleged to have specialized expertise. Rather, the court found under the specific circumstances of that case—where the defendants had falsely represented their expertise—the alleged fraudulent statements were actionable. 2020 WL 3542292, *2. By

contrast, as discussed above, Plaintiffs pleaded that GXO <u>did</u> have expertise as a warehouse operator (FAC ¶ 41), so GXO's statements about that it had experience clearly were not false.

Plaintiffs also erroneously argue that a court cannot make a 12(b)(6) ruling on a fraud clam, because interpreting alleged fraudulent statements allegedly depends on "context." Opp. at 29. Courts, however, have repeatedly granted Rule 12(b)(6) motions based on alleged fraudulent statements that cannot support a claim. *See Love*, 2012 WL 1684572, at *4 (granting fraud claim on motion to dismiss based on finding that alleged fraudulent statements were nothing more than opinion statements regarding future performance); *Budach v. NIBCO, Inc.*, 2015 WL 3853298, *7-8 (W.D. Mo. June 22, 2015) (dismissing statutory fraud claim on Rule 12(b)(6) motion upon finding that the alleged false statements were non-actionable puffery). Plaintiffs' sole case from the District of Minnesota does not justify a blanket prohibition against dismissal.

## VIII. Plaintiffs' Fraud, Misrepresentation, and Statutory Fraud Claims Also Fail Because They Have Not Sufficiently Alleged Reliance.

As GXO explained in its Suggestions, Plaintiffs' fraud, negligent misrepresentation, and statutory fraud claims must be dismissed for the additional reason that Plaintiffs have failed to plead sufficient facts with particularity to show that their reliance on the alleged false statements was justified. Suggestions at 29, 33-34. Plaintiffs' attempts to distinguish the case law cited by GXO are unavailing. The cases cited by GXO did not solely involve statements that were "outside of the speaker's control," as Plaintiffs' assert. *See* Opp. at 31. The alleged false statements in *In re Impac Mortgage Holdings, Inc. Securities Litigation*, 554 F. Supp. 2d 1083 (C.D. Cal. 2008) were alleged predictions by the defendant corporation regarding its own future economic performance, *id.* at 1098, an area where the corporation may not have had full control but certainly would have had substantial control. Yet the court still held that a reasonable investor could not rely on those statements and dismissed the claims. *Id.* at 1087.

Further, the FAC does not allege that the opinions in the RFP and by Mr. Johnson regarding future events in this case were solely within GXO's control. Indeed, they cannot, as the RFP specifically stated that "[t]hese facilities will be leased directly by Lindt & Sprungli North America," FAC, Ex. 7, at 2.1, "[t]he facilities at these locations have not been completed," *id.*, and that the company awarded the RFP would "be asked to partner" with Lindt NA in finalizing a layout for the facilities. *Id.* Thus, GXO's predictions regarding future performance of the WMS and integration with Lindt NA's facilities were dependent on actions by Lindt NA regarding those facilities that were not within GXO's control. It would have been unreasonable for Lindt NA to rely on GXO's opinions about the future as being promises of what would definitely come to pass. *See In re Impac Mortg.*, 554 F. Supp. 2d at 1087; *Affordable Cmtys. of Mo. v. EF&A Capital Corp.*, No. 4:11-CV-555 CAS, 2012 WL 43520, *4 (E.D. Mo. Jan. 9, 2012).

IX.     **The Economic Loss Rule Bars the Fraud Claim if the Contract Claims Survive.**

Plaintiffs do not deny that the economic loss rule generally bars fraud claims based on breach of a contract, as discussed in detail in GXO's Suggestions. *See id.* at 30-31; Opp. at 32. Rather, they attempt to argue that the fraud claims "arises from acts that are separate and distinct from the contract." Opp. at 32. Contrary to Plaintiffs' argument, the alleged false misrepresentations in the cases cited by GXO were not all included in the contracts themselves. In *Nestle Purina*, for example, the alleged false statements were allegedly made on the product labeling, not in the contracts. *See Nestle Purina Petcare Co.*, 181 F. Supp. 3d 618, 629, 632-33 (E.D. Mo. 2016) (alleging that the meal was "mislabeled"). The contracts in that case were not even before the court. *Id.* at 639. Rather, the basis for the holding was that the alleged fraudulent statements concerned the quality of the chicken and turkey meal that were the subject of the parties' contract and, thus, the economic loss rule barred the fraud claim because both involved

the same subject matter. *Id.* at 638-39. This is directly analogous to our case, where the alleged false statements concerned GXO's performance of warehouse services at Tracy, which is the very subject matter of the alleged contract claims.

*Compass Bank v. Eager Road Associates, LLC*, 922 F. Supp. 2d 818 (E.D. Mo. 2013), is likewise on point, as those plaintiffs alleged that the defendants had fraudulently induced them to enter into a contract by alleged false representations regarding the defendants' ability to perform according to the contract terms. *Id.* at 827. These are the same allegations Plaintiffs make here, and *Compass Bank* held that "[s]uch a fraudulent inducement claim is precluded by Missouri's economic loss doctrine." *Id.* at 827. Similarly, *Multifamily Captive Group, LLC v. Assurance Risk Managers, Inc.*, 629 F. Supp. 2d 1135 (E.D. Cal. May 27, 2009) found that alleged misrepresentations involving the same relationship and transaction as the contract were barred by the economic loss rule. *Id.* at 1145-1146. If Plaintiffs' contract claims survive, their fraud claim is barred by the economic loss rule and must be dismissed.

**X.    Plaintiffs Do Not Contest that Ghirardelli Cannot Recover for Lost Market Share or Lost Profits Under the California UCL.**

As GXO explained in its Suggestions, lost market share and lost profits are not proper damages measures under the UCL. Suggestions at 34-35. Plaintiffs apparently agree, arguing instead that Ghirardelli only seeks restitution. Opp. at 35. Of course, Ghirardelli's UCL claim fails to state a statutory fraud claim for the reasons set forth in Section VIII, but if it is allowed to stand, any alleged claim for lost market share or lost profits under the UCL should be dismissed.

**CONCLUSION**

For all the reasons set forth above and in GXO's Motion to Dismiss and Suggestions in Support, Plaintiffs' claims should be dismissed in their entirety with prejudice.

Respectfully submitted,

THOMPSON COBURN LLP

By  */s/ Lawrence C. Friedman*
     Lawrence C. Friedman, # 34382
     Mark A. Mattingly, # 56536
     One US Bank Plaza
     St. Louis, MO 63101
     (314) 552-6000
     (314) 552-7000 (facsimile)
     lfriedman@thompsoncoburn.com
     mmattingly@thompsoncoburn.com

*Attorneys for GXO Warehouse Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2022, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system to all counsel of record.

*/s/ Lawrence C. Friedman*

26