**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| LINDT & SPRÜNGLI (NORTH AMERICA), INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 22-00384-CV-W-BP |
| GXO WAREHOUSE COMPANY, INC., f/k/a XPO LOGISTICS SUPLLY CHAIN, | ) ) ) ) | |
| Defendant. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS**

Pending is Defendant's Motion to Dismiss.  (Doc. 50.)  For the following reasons, the

Motion is **GRANTED IN PART AND DENIED IN PART**.

**I.  BACKGROUND**

This case involves a variety of contracts and agreements, which were in place from 2007

to 2018, between various entities.    In 2007, Plaintiff Ghirardelli Chocolate Company

("Ghirardelli") and Defendant GXO Warehouse Company, Inc. entered an agreement regarding

provision of warehousing, packaging, and shipping services at a facility in Lathrop, California (the

"Services Agreement").[1]  (*See* Doc. 33-1.)[2]  The Services Agreement was amended several times,

but the only modification relevant to this suit extended the termination date to April 2018.  (Doc.

33-2, p. 2.)  All amendments were in writing and provided that any terms not amended remained

the same.  (Doc. 33-2, p. 4; Doc. 33-3, p. 3; Doc. 33-4, p. 3.)

---

[1] Some contracts relevant to this action were entered by a predecessor of Defendant.  For ease of discussion, the Court will refer only to Defendant.

[2] All page numbers are those generated by the Court's CM/ECF system and may not correspond to the documents' original pagination.

Meanwhile, Plaintiff Lindt & Sprüngli (North America), Inc. ("Lindt NA") acquired Ghirardelli and Plaintiff Russell Stover Chocolates, LLC ("Russell Stover"). (Doc. 33, ¶ 7.) In March 2017, Lindt NA issued a Request for Proposal (the "RFP"), which, in part, solicited information regarding provision of warehousing, packaging, and shipping services for a new facility to be located in Tracy, California. (Doc. 33, ¶ 7-8; Doc. 33-7.) The new facility consolidated the warehouses of Lindt NA with those of its subsidiaries, Lindt USA, Ghirardelli, and Russell Stover (the "Lindt Manufacturers"), to share costs and increase efficiencies related to delivery and production. Defendant responded (the "RFP Response") and, in June 2017, Lindt NA and Defendant entered into a Letter of Intent (the "LOI"), stating the parties would begin negotiating a definitive agreement for Defendant to operate the Tracy facility. (Doc. 33-5, p. 2.) The LOI further provided that the Services Agreement would "form the basis for the drafting and negotiation" of a definitive agreement. (Doc. 33-5, p. 2.) The Tracy facility was expected to be operational in the first half of 2018, and, through the LOI, Defendant agreed to provide start-up services to ensure the deadline was met. (Doc. 33-5, p. 2.) Over time, Defendant began transitioning processes from Lathrop to Tracy. (Doc. 33, ¶ 62.)

The LOI expired in September 2017. (Doc. 33-5, p. 2.) However, Defendant continued work related to the Tracy facility. In May 2018, Lindt NA and Defendant executed an Amendment to the LOI (the "LOI Amendment"). (*See* Doc. 33-6.) The LOI Amendment applied retroactively to October 2017 and terminated on June 30, 2018, unless the parties agreed otherwise in writing or a definitive agreement replaced it. (Doc. 33-6, p. 2.) The LOI Amendment also impacted the Services Agreement by replacing Ghirardelli with Lindt NA and explicitly stating it "shall apply to any services performed by [Defendant] at the Tracy Warehouse and Lathrop Warehouse." (Doc. 33-6, p. 2.) The parties again contemplated Defendant would provide start-up services before the

2

Tracy facility became fully operational in the first half of 2018. (Doc. 33-6, pp. 2-3.) On June 30, 2018, the LOI Amendment and the Services Agreement expired, but Defendant continued providing services as it had while they were in effect. (Doc. 33, ¶ 68-69.) The Tracy facility fully opened in August 2018. (Doc. 33, ¶ 70.)

The First Amended Complaint alleges Defendant's services, both before and after the LOI Amendment expired, were deficient in various respects. For instance, it asserts Defendant failed to (1) meet co-packing targets, (2) satisfy staffing obligations, (3) ship orders on time, (4) fill orders accurately, and (5) provide systems meeting the descriptions included in the RFP Response. (*See, e.g.*, Doc. 33, ¶¶ 77, 84, 90, 95, 104, & 105.) Because of these failures, worsening problems, and an inability to resolve differences, Lindt NA terminated Defendant's services in May 2019 and then turned to another logistics company. (Doc. 33, ¶¶ 129, 134-38.)

In June 2022, Plaintiffs filed the instant action, which asserts the following claims arising from issues with the Tracy facility:

- Count I alleges Defendant breached (1) the Services Agreement as amended by the LOI and LOI Amendment and (2) an implied contract arising after June 30, 2018, (Doc. 33, ¶¶ 151-67);

- Count II alleges Defendant breached the covenant of good faith and fair dealing implied in the above contracts, (Doc. 33, ¶¶ 168-83);

- Count III, as an alternative to the first two claims, alleges Defendant negligently performed logistical and warehouse operations, (Doc. 33, ¶¶ 184-91);

- Count IV alleges Defendant committed fraud by including false statements in its RFP Response and later providing false assurances that errors would be rectified, (Doc. 192-220);

3

- Count V alleges Defendant made negligent misrepresentations by indicating errors would be rectified, despite significant doubts, (Doc. 33, ¶¶ 221-30); and

- Count VI, which is asserted only by Ghirardelli, alleges Defendant violated California's Unfair Competition Law (the "UCL") by engaging in fraudulent and unfair business acts, (Doc. 33, ¶¶ 231-38.)

Plaintiffs seek damages, interest, costs, and attorneys' fees. (Doc. 33, pp. 53-54.) They further seek restitution under the UCL. (Doc. 33, pp. 53-54.) Defendant has filed a Motion to Dismiss all Counts. (Doc. 50.) Plaintiffs oppose the Motion. (Doc. 59.) The Court resolves the parties' arguments below, and additional facts will be discussed as necessary in Part II of this Order.

## II. DISCUSSION

Defendant premises its arguments on Federal Rule of Civil Procedure 12(b)(6), which entitles a party to dismissal if the opposing party fails to state a claim upon which relief can be granted. When evaluating such challenges, the Court "must accept as true all of the complaint's factual allegations and view them in the light most favorable to the Plaintiffs." *Stodghill v. Wellston School Dist.*, 512 F.3d 472, 476 (8th Cir. 2008) (quotation omitted).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citations omitted). In making this evaluation, the Court is limited to a review of the Complaint, exhibits attached to the Complaint,

4

and materials necessarily embraced by the Complaint. *E.g.*, *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

## A. Choice of Law

As a preliminary matter, the substantive law applicable to these disputes (aside from the UCL claim) is unclear. This suit was filed in Missouri, the Services Agreement indicates it must be interpreted under California Law, (Doc. 33-1, p. 17), and the LOI and LOI Amendment state they are governed by Delaware law, (Doc. 33-5, p. 3; Doc. 33-6, p. 4.) However, the parties do not conduct a choice of law analysis. Instead, Defendant contends Missouri, California, and Delaware law are not materially different for present purposes and cites law from all three states. Plaintiffs follow Defendant's lead by focusing primarily on California law and discussing the cases cited by Defendant.[3] Having been presented no choice of law analysis, the Court declines to conduct such analysis on its own and, when necessary, discusses law from multiple states.[4]

## B. Breach of Contract (Count I)

"The essential elements of a breach of contract claim are: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Hamilton v. Greenwich Invs. XXVI, LLC*, 126 Cal. Rptr. 3d 174, 183 (Cal. Ct. App. 2011) (quotation omitted). Necessarily, a breach of contract claim is premised on the existence of an agreement. The relevant contract can be express, meaning its terms are stated in words, or implied, meaning the existence of an agreement and its terms are manifested by conduct. *Retired*

---

[3] The Court rejects Plaintiffs' argument that *Leisman v. Archway Medical, Inc.*, 53 F.Supp. 3d 1144, 1148 (E.D. Mo. Oct. 8, 2014), requires Defendant to undertake the choice of law analysis or face automatic denial of its Motion.

[4] The Court finds it puzzling that no party conducted a choice of law analysis, particularly because it appears the relevant bodies of law are not completely uniform.

*Emps. Assn. of Orange Cnty., Inc. v. Cnty. of Orange*, 266 P.3d 287, 290 (Cal. 2011).  Plaintiffs advance claims for breach of express contract and breach of implied contract.

### 1. Express Contract

Defendant contends Plaintiffs have failed to allege breach of an express contract because they fail to assert breaches occurred before the June 30, 2018, expiration of the Services Agreement and LOI Amendment.  However, the Court disagrees.  The First Amended Complaint specifically alleges Defendant's services, both before and after the Tracy facility opened, were deficient in various respects, including Defendant's failure to meet co-packing targets and satisfy staffing obligations.  (*See, e.g.*, Doc. 33, ¶¶ 62-63, 77, 84, & 157-58.)  Thus, Plaintiffs allege at least some breaches occurred before the Services Agreement and LOI Amendment expired on June 30, 2018.

Defendant next argues that, to the extent the Plaintiffs have alleged a breach of express contract, they fail to properly plead a causal connection between the alleged pre-expiration breaches and any damages they suffered.  Again, the Court disagrees.  Taking the First Amended Complaint as a whole, the Court concludes Plaintiffs adequately plead that Defendant's failure to properly provide start-up services prior to June 30, 2018, contributed to cause the damages they seek to recover.  For example, Plaintiffs allege Defendant's failure to, before June 30, 2018, create and implement an automated system for tracking orders contributed to damages Plaintiffs experienced during the 2018 holiday season.  (Doc. 33, ¶¶ 105-120, 166.)  Defendant's Motion to Dismiss Count I as to breach of an express contract is denied.

### 2. Implied Contract

Defendant next contends Plaintiffs' implied contract claim is deficient.  It characterizes the implied agreement alleged in the First Amended Complaint as an agreement to extend the LOI Amendment and Services Agreement, which must be invalid because the Services Agreement

6

provided it "shall not be modified, changed, discharged, or terminated, nor shall any provision …

be waived, except by a writing signed by two (2) authorized officers of each party."  (Doc. 33-1,

p. 16; *see also* Doc. 33-6, p. 2 (providing the LOI Amendment terminated on June 30, 2018, unless

otherwise agreed in writing or a definitive agreement was reached).)  Because of these provisions,

Defendant maintains the parties could not have an implied contract.  Again, the Court disagrees.

The First Amended Complaint clearly alleges the parties continued their business

relationship after the Services Agreement and LOI Amendment expired, creating a new implied

agreement.  (*See* Doc. 33, ¶¶ 13, 68-76, 160; *see also* Doc. 59, pp. 20-21.)  Specifically, the parties

continued to act in the same manner (e.g., Defendant provided services required by the Services

Agreement and billed Plaintiffs and the parties agreed to a budget as required under the Services

Agreement).  (Doc. 33, ¶¶ 71-73.)  The First Amended Complaint also contains statements from

Defendant acknowledging it was not meeting expectations set forth in the Services Agreement,

(*e.g.*, Doc. 33, ¶¶ 118-20, 123-26), indicating Defendant understood a contract was in place.

"When an agreement expires by its terms, if, without more, the parties continue to perform

as theretofore, an implication arises that they have mutually assented to a new contract containing

the same provisions as the old."  *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 915

(9th Cir. 1978).  Here, after June 30, 2018, almost all obligations under the LOI Amendment, (*see*

Doc. 33-6, p. 3), and the Services Agreement ceased.  Despite this, the parties continued working

together.  Characterizing the events as termination of a contract and creation of a new agreement

is plausible and permissible under the law, notwithstanding the fact the written agreements could

only be amended in writing.[5]

---

[5] The cases relied on by Defendant are thus distinguishable.  For instance, some address implied modifications to
written agreements, not the creation of an implied contract after the termination of a written agreement.  *See Yates v.
Norsk Titanium US, Inc.*, 2017 WL 8232188, at *3 (C.D. Cal. Sept. 20, 2017); *Cell-Crete Corp. v. Lexington Ins. Co.*,

Of course, Plaintiffs must still plausibly allege (1) the parties conduct manifested an agreement and (2) the terms of said agreement. *See Retired Emps. Assn. of Orange Cnty.*, 266 P.3d at 290. Defendant posits the First Amended Complaint fails to do so, arguing that supporting allegations are conclusory and that, because of differences between the Lathrop and Tracy facilities—such as inventory from additional companies, a larger operation, and a different warehouse management system—application of the Services Agreement to the Tracy facility is nonsensical. The Court disagrees. Plaintiffs allege the parties continued the same business relationship after June 30, 2018, and representatives from Defendant tried to meet expectations existing under prior written contracts. This is sufficient to plead an implied agreement. Further, application of the terms contained in the Services Agreement to the Tracy facility was plausible. After all, the LOI Amendment explicitly did so, (Doc. 33-6, p. 2), and many terms of the Services Agreement would not change when applied to the Lathrop or the Tracy facility, (*see* Doc. 33-1, pp. 7, 40-41; Doc. 33-2, pp. 3-4.) Defendant's Motion to Dismiss the implied contract claim is denied.

### 3. Parties to the Contracts

Defendant argues that, because the express contract contains a provision limiting claims of third parties, only Lindt NA can properly bring a breach of contract claim and the Lindt Manufacturer's claims must be dismissed. Defendant correctly notes the Services Agreement

---

2014 WL 12601011, at *2-*3 (C.D. Cal. July 30, 2014). In another decision, a party contended the agreement was extended. *See Nissan N. Am., Inc. v. Jim M'Lady Oldsmobile, Inc.*, 486 F.3d 989, 996-97 (7th Cir. 2007). Finally, in *Autohaus Brugger*, a franchise agreement was not renewed; one party repeatedly tried to do so but was rejected. 567 F.2d at 904. The Ninth Circuit found that, even though the parties continued to do business, the agreement did not continue because (1) one party clearly did not want it to and (2) the franchise agreement specifically stated "acceptance of orders or continuance of sales or any other act by Saab after termination of the agreement 'shall not be construed as a renewal of this Agreement for any further term.'" *Id.* at 915 (footnote omitted); *see also State v. Nationwide Life Ins. Co.*, 340 S.W.3d 161, 192-93 (Mo. Ct. App. 2011) (finding (1) the parties did not intend to continue their contract because one party rejected an offer to continue and (2) the parties were operating based on continuing obligations contained in the expired contract).

8

states "[n]othing in this Agreement is intended to create any rights with respect to any party other than [Lindt NA] or [Defendant] nor shall this Agreement be construed as a third-party beneficiary contract," (Doc. 33-1, p. 16). However, even the cases cited by Defendant fail to establish such language fully bars third-party beneficiary claims. *See Balsam v. Tucows Inc.*, 627 F.3d 1158, 1161-63 (9th Cir. 2010); *Prouty v. Gores Tech. Grp.*, 18 Cal. Rptr. 3d 178, 184-87 (Cal. Ct. App. 2004). Rather, the Court must determine who the parties intended to be beneficiaries of the contract by reading the agreement as a whole. *See Prouty*, 18 Cal. Rptr. 3d at 184; *Green Desert Oil Grp. v. BP W. Coast Prod.*, 2011 WL 5521005, at *3-*4 (N.D. Cal. Nov. 14, 2011) ("reading the contract as a whole in light of the circumstances under which it was entered" and determining only the party to the contract benefited from relevant provisions (quotation omitted)).

Having concluded the explicit contract consists of the LOI Amendment and the incorporated Services Agreement, the Court looks to a variety of documents to determine who the parties intended to be a beneficiary to the contract. Because the LOI and LOI Amendment resulted from the RFP, (Doc. 33-5, p. 2 (discussing negotiations for a definition agreement and explicitly referencing portions of the RFP); *see also* Doc. 33-6, p. 3.), the Court considers it first. The RFP explicitly stated Lindt NA and the Lindt Manufacturers were "soliciting proposals to select Logistics Service Provider(s) for multiple sites in our North American distribution network." (Doc. 33-7, p. 4.) Because the Tracy facility would serve Lindt NA as well as the Lindt Manufacturers, the Court concludes the parties' agreement envisioned Defendant would provide benefits (e.g., start-up and logistics services) to all those entities. Thus, the parties intended both Lindt NA and the Lindt Manufacturers to be beneficiaries of the contract.

Defendant makes two additional arguments against this conclusion, both of which are unavailing. First, Defendant cites language in the RFP, which states Lindt NA will "manage[]"

9

the relationship. (Doc. 33-7, p. 6.) But the fact Lindt NA managed the relationship has no bearing on the intended beneficiaries to the contract. Second, Defendant argues that, if the Court concludes the Lindt Manufacturers are beneficiaries to the contract, they were only incidentally benefitted and are not entitled to bring claims under the contract. *See Prouty*, 18 Cal. Rptr. 3d at 184 ("The fact that [a third party] is incidentally named in the contract, or that the contract, if carried out according to its terms, would inure to his benefit, is not sufficient to entitle him to demand its fulfillment." (quotation omitted)). The Court disagrees. Plaintiffs allege, and the RFP shows, the Tracy facility was meant to benefit all Plaintiffs, (*see* Doc. 33, ¶¶ 7-8; Doc. 33-7, p. 4.) Further, the First Amended Complaint asserts the Lindt Manufacturers were harmed by Defendant's performance, (Doc. 33, ¶ 145), which indicates Defendant handled their products. These benefits were central, not incidental, to the contract. Because of all this, the First Amended Complaint has stated a viable basis for third-party enforcement by the Lindt Manufacturers.

Defendant raises similar arguments regarding the implied contract, which the Court rejects for the reasons stated above.

## C. Breach of the Covenant of Good Faith and Fair Dealing (Count II)

Plaintiffs, in connection with their contract claims, assert Defendant violated the covenant of good faith and fair dealing. (Doc. 33, ¶¶ 172-81.) "[E]very contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract such that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Storek & Storek, Inc. v. Citicorp Real Est., Inc.*, 122 Cal. Rptr. 2d 267, 276 (Cal. Ct. App. 2002). However, breach of the implied covenant of good faith and fair dealing must involve something more than breach of the contractual terms. *See Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 272 Cal. Rptr. 387, 399 (Cal. Ct. App. 1990). Plaintiffs must allege

10

the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.

*Id.* at 399-400; *see also Storek & Storek*, 122 Cal. Rptr. 2d at 282.

Plaintiffs contend they have plead breaches outside of the contractual terms. For instance, they assert Defendant (1) "unreasonably diverted IT staffing from the Tracy Facility"; (2) implemented and relied on a flawed warehouse management system in an unreasonable manner; and (3) concealed, falsified, and misrepresented information to Plaintiffs. (Doc. 33, ¶¶ 176-181.) Plaintiffs explain their "claim arises from the deficient *manner* in which [Defendant] performed its obligations." (Doc. 59, p. 30 (emphasis in original).) In other words, the claim is based on Defendant's alleged breaches of its obligations under the contract. To the extent Plaintiffs' allegations are not duplicative of their breach of contract claims, the First Amended Complaint mostly asserts Defendant's actions were unreasonable, fails to allege Defendant's conduct meets the threshold referenced above, and does not explain why Plaintiffs were further deprived of the benefits of the agreements. (Doc. 33, ¶¶ 176-81). Plaintiffs also seek the same damages for their breach of contract claims and their breach of the covenant of good faith and fair dealing claim. (*Compare* Doc. 33, ¶ 166 *with* Doc. 33, ¶ 182), further hindering their claim. *See Careau & Co.*, 272 Cal. Rptr. at 400 ("If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated."). These assertions are insufficient to state a claim for breach of the covenant of good faith and fair dealing. For these reasons, this claim is dismissed.

11

## D. Negligence (Count III)

Plaintiffs allege that, after Defendant was entrusted with their goods and with bringing them to market, it acted negligently because its performance fell below the standards of a professional warehouse operator. (Doc. 33, ¶¶ 185-89.) The First Amended Complaint explains this claim is an alternative to Plaintiffs' contract claims. (Doc. 33, ¶ 184.) Plaintiffs reaffirm this in their opposition. (Doc. 59, p. 30.) Put differently, the negligence claim is relevant only if it is later determined no contract existed. Defendant posits Plaintiffs do not state a claim because they seek only economic losses, which, absent other injury, cannot be recovered in tort. Plaintiffs appear to accept this proposition, as they focus on exceptions to the economic loss doctrine. But, at this juncture, the Court is not persuaded the doctrine applies.

As an initial matter, when adjudicating diversity cases, the Court's role "is to interpret state law, not to fashion it." *Kingman v. Dillard's, Inc.*, 643 F.3d 607, 615 (8th Cir. 2011) (quotation omitted). In so doing, it is bound by decisions of the relevant state Supreme Court. *See id.* Absent such authority, the Court "predict[s] how the court would rule" and "follow[s] decisions from the intermediate state courts when they are the best evidence of" state law. *See id.* (quotation omitted). Here, Defendant has not thoroughly analyzed which state's law applies or how, under relevant state law, the economic loss doctrine applies to Plaintiffs' negligence claim, which can proceed only if no contract exists.

Based on the cases cited by Defendant, the Court is not convinced the economic loss doctrine applies in these circumstances. "In general, there is no recovery in tort for negligently inflicted purely economic losses, meaning financial harm unaccompanied by physical or property damage." *Sheen v. Wells Fargo Bank, N.A.*, 505 P.3d 625, 632 (Cal. 2022) (quotation omitted); *see also Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195, 198 (8th Cir. 1995)

(stating "Missouri prohibits a cause of action in tort where the losses are purely economic" and citing Missouri law). Despite this broad language, the cases cited by Defendant address specific and different circumstances. They primarily discuss the economic loss doctrine in terms of preventing tort recovery when a contract was breached. *See, e.g.*, *Sheen*, 505 P.3d at 632-33; *Rockport Pharmacy, Inc.*, 53 F.3d at 198 ("The substance of Rockport's negligence claim is for the recovery of losses arising out of [the defendant]'s alleged breach of contract."); *Long Beach Mem'l Med. Ctr. v. Kaiser Found. Health Plan, Inc.*, 286 Cal. Rptr. 3d 419, 429 (Cal. Ct. App. 2021) (stating the doctrine "rests on the premise that economic relationships are typically governed by contracts or by comprehensive government regulation."). Another application of the doctrine is "when courts are concerned about imposing liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Sheen*, 505 P.3d at 632. These concerns are not implicated by Plaintiffs' alternative negligence claim.

Defendant, relying on *Long Beach Memorial Medical Center*, argues the economic loss rule applies, even if there is no contract. Yet this view of the case is incomplete, as the court applied the doctrine because the amount health plans were required to repay medical providers for emergency services was "governed either by contract (when the parties have a preexisting contract) or by the quasi-contractual remedy of quantum meruit (when they do not) . . . ."). *See Long Beach Mem'l Med. Ctr.*, 286 Cal. Rptr. 3d 419 at 429. Here, however, Plaintiffs' negligence claim is viable only if there is no contract theory available. At this stage of the proceedings, the Court finds Plaintiffs' alternative negligence claim is not barred by the economic loss doctrine.[6]

---

[6] As a result, the Court need not address whether an exception to the general rule applies.

### E. Fraud (Count IV)

Plaintiffs' fraud claim is premised on allegations that Defendant misrepresented the capabilities of its software as well as other systems and its ability to provide adequate services within a certain timeframe. (*See* Doc. 33, ¶¶ 197-98, 211-12.)[7] Fraud has the following elements:

> (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) the speaker's intent that the representation should be acted upon by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of the falsity of the representation, (7) the hearer's reliance on the representation being true, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury.

*Midwest Printing, Inc. v. AM Int'l, Inc.*, 108 F.3d 168, 170 (8th Cir. 1997). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). The pleading must contain "the who, what, when, where, and how: the first paragraph of any newspaper story." *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011) (quotation omitted).

Defendant alleges (1) the statements relied upon by Plaintiffs are not actionable in fraud and (2) the claim, if the contract claims survive, is barred by the economic loss doctrine.

#### 1. Challenges to the Statements

Defendant's challenges to the statements can be broken into two categories: they (1) were not facts and (2) could not be reasonably relied upon. Plaintiffs, in defending this claim, focus on statements from the RFP Response and by Mark Johnson, an executive of Defendant. The Court will do so as well.

---

[7] Defendant posits that, if Plaintiffs assert it falsely promised it would perform without the intent to do so, such a claim must fail. Plaintiffs, however, explain this is not the basis of their claim, reiterating they focus on Defendant's ability to perform. Defendant contends this argument is "semantic[]" and constitutes "linguistic gamesmanship," (Doc. 67, p. 23), but the Court disagrees. Intending to perform but fabricating one's ability to do so is clearly distinct from not intending to perform at all.

### a. Were the Statements Facts?

To determine whether a statement is actionable, the Court must ascertain whether it can be proven true or false. *See Love v. Career Educ. Corp.*, 2012 WL 1684572, at *4 (E.D. Mo. May 15, 2012) (citing a Missouri Appellate Court case); *Murphy v. Rigdon, Inc.*, 2018 WL 1005409, at *4 (W.D. Mo. Feb. 21, 2018). Statements of opinion, sales puffery, expectations, and predications about the future typically cannot form the basis of a fraud claim. *See Midwest Printing, Inc. v. AM Int'l, Inc.*, 108 F.3d 168, 170-71 (8th Cir. 1997); *Trotter's Corp. v. Ringleader Restaurants, Inc.*, 929 S.W.2d 935, 940 (Mo. Ct. App. 1996); *InterPetrol Bermuda Ltd. v. Kaiser Aluminum Int'l Corp.*, 719 F.2d 992, 996 (9th Cir. 1983).

Plaintiffs allege Defendant misrepresented its capability to provide what was promised in the RFP Response. (*See, e.g.*, ¶¶ 55-57, 197-98; *see also* Doc. 59, p. 34.) Specifically, Defendant indicated Plaintiffs' and Defendant's systems could be integrated, (*see, e.g.*, Doc. 49-1, p. 22 ("[O]ur proven integration platform and methodology will ensure successful integration for smooth and rapid implementation."); Doc. 49-1, p. 23 ("[Defendant]'s proprietary messaging technology, Connection Manager (CM), provides a proven integration framework and software used to ensure information is exchanged between external systems and [Defendant's] systems."), and indicated it could provide certain services, (Doc. 49-1, p. 18 ("[T]he system will automatically generate the parcel shipping label and update the order status to 'Staged for Shipment'".); Doc. 49-1, p. 48 (stating "[Defendant] will provide 24x365 technical support for all [Defendant] systems and hardware").) Defendant characterizes these statements as plans or proposals for future performance. While true, they have another component—what types of services Defendant and its equipment could provide. This aspect of the statements is not opinion or puffery and can be verified. Surely a party, during negotiations, cannot simply lie about what it can provide, obtain a

15

contract, and later say that, even though its statements were false, they were non-actionable promises of performance.  Although allegations in the First Amended Complaint sometimes focus on Defendant's failure to perform, it also alleges the statements in the RFP Response were false.  (*See, e.g.*, Doc. 33, ¶¶ 57, 198, 202.)  Moreover, the Court notes that, within the statements about what Defendant would provide, there are aspects that could be verified as true or false.  For example, some statements reference "proven" technology, (Doc. 49-1, p. 22-23), which indicates there is a history of successful performance.

The fraud claim is also based on statements made by Johnson, such as (1) "[Defendant] ha[d] not 'lost confidence in having the integration functional for [the go-live date]"; (2) "'I am completely confident'" issues will soon be resolved; and (3) "'[w]e are tracking to start on-time.'"  (Doc. 33, ¶¶ 123, 125-26.)  Defendant asserts Plaintiffs have failed to allege Johnson knew these statements were false.  The Court disagrees.  Immediately after these allegations, Plaintiffs state "[Defendant] <u>knew</u> its representations to be false and misleading, as its employees privately conceded [Defendant] could not meet its contractual obligations on-time."  (Doc. 33, ¶ 127 (emphasis in original).)  They also reference statements from other high-ranking representatives, which demonstrate internal doubts.  (Doc. 33, ¶ 122.)  Even though Plaintiffs did not explicitly allege Johnson knew these statements were false, this could be inferred from other pleaded facts.

Defendant also attacks these statements as opinions and future predictions.  But, again, they relate to Defendant's capabilities and can be verified.  If Johnson stated errors would be rectified and certain deadlines would be met when he knew such was untrue, this could constitute fraud.  Moreover, as with the RFP Response, some of Johnson's statements contain aspects that could be proven true or false.  (*See* Doc. 33, ¶¶ 26 (alleging Johnson indicated Defendant was "'tracking to start on-time'").)

16

### b. Was Reliance Reasonable?

Defendant next posits Plaintiffs could not reasonably rely on the statements at issue because they were forward-looking statements of optimism or predictions about the future. *See, e.g.*, *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1087 (C.D. Cal. 2008); *Affordable Communities of Missouri v. EF & A Cap. Corp.*, 2012 WL 43520, at \*4 (E.D. Mo. Jan. 9, 2012). Defendant's statements explained its capabilities, equipment, and software, and some elements of those assertions were verifiable. Parties must be able to rely on negotiation statements such as these, at least to some extent. Additionally, reliance on Defendant's representations was sensible, as only Defendants would understand what it could provide. For these reasons, the statements at issue are actionable and the fraud claim is properly pleaded.

### 2. The Economic Loss Doctrine

Defendant asserts that, if the breach of contract claim survives, the fraud claim is barred by the economic loss doctrine. As explained above, the Court, in diversity cases, interprets state law, is bound by decisions of the relevant state Supreme Court, and follows intermediate state court decisions if they are helpful evidence of state law. *Kingman*, 643 F.3d at 615. Here, Defendant mostly cites and discusses federal District Court cases, which are not binding or particularly helpful, given the above principles. More importantly, it has not properly analyzed which state's law governs Plaintiffs' claims or how state law applies the economic loss doctrine to fraud claims. Defendant cites only one state Supreme Court case. *See Sheen*, 505 P.3d 625. There, the California Supreme Court stated the general principle that the economic loss doctrine does not bar tort claims independent of a contract, while citing another case allowing fraud and intentional misrepresentation claims to proceed. *Id.* at 633 (citing *Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268, 274 (Cal. 2004)). *Sheen*, however, analyzed only a negligence claim. *Id.* at 924,

17

948.  Because Defendant has not fully analyzed the law, the Court cannot conclude Plaintiffs'

fraud claim must be dismissed based on the economic loss rule.

### F. Negligent Misrepresentation (Count V)

For this claim, Plaintiffs must plead

> (1) the speaker supplied information in the course of his business; (2) because of the speaker's failure to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of limited persons in a particular business transaction; (4) the hearer justifiably relied on the information; and (5) due to the hearer's reliance on the information, the hearer suffered a pecuniary loss.

*Rivera v. Bank of Am., N.A.*, 993 F.3d 1046, 1050 (8th Cir. 2021) (quoting *Renaissance Leasing,*

*LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 134 (Mo. 2010) (en banc).); *see also Hot Rods, LLC*

*v. Northrop Grumman Sys. Corp.*, 196 Cal. Rptr. 3d 53, 67 (Cal. Ct. App. 2015).  The heightened

pleading standard of Rule 9(b) also applies to this claim.  *Drew v. Lance Camper Mfg. Corp.*, 2021

WL 5441512, at *4 (W.D. Mo. Nov. 19, 2021).

Defendant largely reiterates its challenges to the fraud claim when asserting the negligent

misrepresentation claim must be dismissed.  For the reasons stated above, these arguments are

rejected.  One point, however, merits additional discussion.  Specifically, Defendant states

Plaintiffs failed to allege facts establishing Johnson did not exercise reasonable care when making

the above statements.  But the First Amended Complaint alleges Johnson, given Defendant's

internal doubts, "had no reasonable ground for believing that it would 'soon' be back on track."

(Doc. 33, ¶ 226.)  Elsewhere, Plaintiffs referenced concerns by employees and high-ranking

representatives.  (Doc. 33, ¶¶ 122, 127.)  In light of these assertions, the First Amended Complaint

adequately alleges Johnson provided assurances to Plaintiff without exercising reasonable care.

18

**G. Violation of the California Unfair Competition Law (Count VI)**

For this claim, "Plaintiffs must allege with specificity that [Defendant's] alleged misrepresentations: 1) were relied upon by the named plaintiffs; 2) were material; 3) influenced the named plaintiffs' decisions to purchase the [services]; and 4) were likely to deceive members of the public. *Tietsworth v. Sears, Roebuck & Co.*, 2009 WL 3320486, at *8 (N.D. Cal. Oct. 13, 2009) (citing a California Supreme Court decision). Again, Rule 9(b) applies to this claim. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). Defendant, relying on prior arguments, contends this claim does not meet the heightened pleading standard. The Court again finds this claim need not be dismissed.[8]

### III. CONCLUSION

For the foregoing reasons, the Motion to Dismiss, (Doc. 50), is **GRANTED IN PART AND DENIED IN PART**. More precisely, Count II is dismissed.[9] All other claims remain. **IT IS SO ORDERED.**

                                            /s/ Beth Phillips

                                            BETH PHILLIPS, CHIEF JUDGE

DATE: February 9, 2023                     UNITED STATES DISTRICT COURT

---

[8] Defendant also posits that, if Ghirardelli seeks to receive lost market share, such damages are not recoverable under the UCL. The First Amended Complaint, however, asks for restitution under the UCL, (Doc. 33, p. 54), and Ghirardelli does not appear to seek damages for lost market share or lost profits, (*see* Doc. 59, p. 42.)

[9] Plaintiffs ask the Court to grant leave to amend if their allegations are deemed insufficient. They, however, did not attach a proposed pleading as required by Local Rule 15.1(a)(1), nor do they explain how they will correct any potential issues. As a result, the Court declines to address the issue at this juncture.